## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

|  |  |
|---|---|
| W.W., | Case No. |
| *on behalf of herself and all others similarly situated*, | |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| Orlando Health, Inc., | |
| Defendant. | |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff W.W.,[1] at all times relevant herein, has been a patient of Orlando Health, Inc. hospitals and clinics ("Orlando Health" or "Defendant"), and brings this class action lawsuit against Defendant in her individual capacity and on behalf of all others similarly situated, and alleges, upon personal knowledge as to her own actions, her counsels' investigation, and upon information and belief as to all other matters, as follows:

1. Plaintiff brings this case to address Defendant's unlawful practice of disclosing Plaintiff's and Class Members' confidential personally identifiable information ("PII") and protected health information ("PHI") (collectively referred

---

[1] Plaintiff W.W. brings this action anonymously out of a desire to protect her personal health information under the Health Insurance Portability and Accountability Act of 1996 and Florida law.

1

to as "Private Information") to third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook"), Google, Inc. ("Google"), LinkedIn, Snapchat, Adobe, Pinterest, and TikTok (collectively, "Unauthorized Parties") without consent, through the use of tracking software that is embedded in Defendant's websites.

2.      Information about a person's physical and mental health is among the most confidential and sensitive information in our society, the mishandling of which can have serious consequences, including discrimination in the workplace or denial of insurance coverage.

3.      Defendant owns and controls www.orlandohealth.com ("Defendant's Website" or the "Website"), which it encourages patients to use for booking medical appointments, locating specific physicians and treatment facilities, communicating medical symptoms, conditions, and treatments via the search bar and related webpages, signing up for events and classes, and more.

4.      Included within Defendant's Website is the MyChart Patient Portal, which Defendant encourages patients to sign up for and use so that they can more conveniently book appointments and schedule visits, review their health records and test results, pay bills, communicate with service providers, request prescription refills, and complete medical forms.

5.      Unbeknownst to its patients, Defendant installed tracking technologies ("Tracking Tools") onto its Website, including the MyChart Sign In/Sign Up page on Defendant's Website that navigates to the login page for the MyChart Portal.

6.      Although Plaintiff is presently unaware of every type of pixel and tracking tool Defendant deployed on its Website and Patient Portal during the relevant time period, "Tracking Tools" refers to any technology that divulges confidential information to an unauthorized third-party that: (1) has not executed a HIPAA-compliant business associate agreement with Defendant; and (2) for which patients did not execute a HIPAA-compliant marketing authorization.

7.      As used herein, Tracking Tools includes: (1) Facebook or Meta's pixel, Conversions API tool, Custom Audiences, and other "Business Tools" it provides to marketers; (2) Google Analytics, the Google Tag Manager, and similar tools offered by Google in conjunction with its marketing products and other platforms (such as "DoubleClick" and "YouTube"); and (3) other trackers provided by real-identity platforms such as LinkedIn, TikTok, SnapChat, X, and Pinterest.

8.      These Tracking Tools intercept, record, and disseminate patients' communications with Defendant via its Website. Operating as designed, the Tracking Tools commandeer patients' web browsers and surreptitiously disclose their private communications to Facebook and Google as they use the Website.

9.      Plaintiff and Class Members used the Website to submit information related to their past, present, or future health conditions, including, for example, searches for their specific health conditions and medical treatments, and the booking of medical appointments with a specific physician. Such Private Information reveals to Unauthorized Parties (e.g., Facebook or Google) that a specific patient is seeking confidential medical care from Defendant, as well as the

type of medical care being sought, such as treatment for cancer, pregnancy, or addiction.

10.    The information collected and disclosed by Defendant's Tracking Tools is not anonymous. For example, Facebook connects patient data from Defendant's Website to the individual patient's Facebook ID (FID), which is linked to his/her Facebook profile and contains additional details about their identity.

11.    Similarly, Google "stores users' logged-in identifier on non-Google websites...in its logs ... Whenever a user logs-in on non-Google websites, whether in private browsing mode or non-private browsing mode, the same identifier is associated with the data Google collects from the user's browsing activities on that website. Google further logs all such data (private and non-private) within the same logs and uses these data for serving personalized ads."[2]

12.    Simply put, the health information disclosed via the Tracking Tools is personally identifiable.

13.    Defendant is a healthcare entity and thus its disclosure of health and medical communications is tightly regulated. The United States Department of Health and Human Services (HHS) has established "Standards for Privacy of

---

[2] *See Brown v. Google LLC*, Case No. 4:20-cv-3664-YGR, 2023 WL 5029899 (N.D. Cal. Aug. 7, 2023) (Order denying summary judgment and citing internal evidence from Google employees). Google also connects user data to IP addresses, IP addresses have been classified by the United States Department of Health and Human Services ("HHS") as personally identifying information. "Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates", HHS, available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Aug. 29, 2023) ("Such PHI may include, for example, an individual's IP address . . .").

Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) Privacy Rule, no health care provider can disclose a person's personally identifiable protected health information to a third party without express written authorization.

14.    In addition, as explained further below, HHS has specifically warned healthcare regulated entities that tracking technologies (like those used by Defendant) transmit personally identifying health information to third parties, both on the "public" portion of the website and within the password-protected patient portal, and that such information should not be transmitted without a HIPAA-compliant written authorization from patients.

15.    The Federal Trade Commission (FTC) has also warned hospitals and other entities that "even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule."

16.    In addition, Florida law prohibits the disclosure of patient medical records unless prior written authorization has been given by the patient or under specifically defined circumstances which do not apply here. Fla. Stat. Ann. § 456.057(7).

17.    Florida also requires that all "records owners shall develop and implement policies, standards, and procedures to protect the confidentiality and

5

security of the medical record. Employees of records owners shall be trained in these policies, standards, and procedures." Fla. Stat. Ann. § 456.057(10).

18.    Despite these clear laws and regulations, Defendant has essentially planted a bug on patients' web browsers, which forcibly and invisibly discloses their private and confidential communications with Defendant to Unauthorized Parties. This is the electronic equivalent of looking over the shoulder of each visitor for the entire duration of their Website interaction.

19.    Defendant did not disclose the presence of these Tracking Tools to its patients and Website users.

20.    Healthcare patients simply do not anticipate or expect that their trusted healthcare provider will send their private communications, PHI, or PII to Unauthorized Parties, let alone Facebook and Google, which both have a sordid history of privacy violations in pursuit of ever-increasing advertising revenue.

21.    Neither Plaintiff nor any other Class Member signed a written authorization permitting Defendant to send their Private Information to Facebook or Google.

22.    Defendant breached its statutory and common law obligations to Plaintiff and Class Members by, inter alia,: (i) aiding and/or procuring the interception of Plaintiff's and Class Members' communications; (ii) failing to remove or disengage technology that was known and designed to share patients' information; (iii) failing to obtain the written consent of Plaintiff and Class Members to disclose their Private Information to Facebook, Google, or others; (iv)

failing to take steps to block the transmission of Plaintiff's and Class Members' Private Information through Tracking Tools like the Facebook Pixel or Google Analytics; (v) failing to warn Plaintiff and Class Members; and (vi) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of patient Private Information.

23.    As a result of Defendant's conduct, Plaintiff and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) loss of benefit of the bargain, (iii) diminution of value of their Private Information, (iv) statutory damages, and (v) the continued and ongoing risk to their Private Information.

24.    Plaintiff seeks to remedy these harms and brings causes of action for (1) violation of the Florida Security of Communications Act, Florida Statutes § 934.01, et seq.; (2) violations of the Electronics Communication Privacy Act ("ECPA") 18 U.S.C. § 2511(1) - unauthorized interception, use, and disclosure; (3) breach of confidence; (4) invasion of privacy (intrusion upon seclusion); (5) unjust enrichment; and (6) breach of implied contract.

## PARTIES

25.    Plaintiff W.W. is a natural person and citizen of Florida where she intends to remain.

26.    Defendant Orlando Health, Inc. is a is a not-for-profit healthcare organization with $8.1 billion of assets under management that serves the

southeastern United States.[3] Its corporate headquarters are located 1414 Kuhl Ave., Orlando, Florida.

27.    Defendant operates more than 170 medical facilities in Florida, including 16 hospitals, 9 free-standing emergency rooms, 9 specialty institutes, 100 outpatient centers, 23 medical pavilions, and 17 urgent care centers.[4]

28.    Defendant is a covered entity under the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d and 45 C.F.R. Part 160-45 C.F.R. Part 162, and 45 C.F.R. Part 164 (HIPAA)).

## JURISDICTION & VENUE

29.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this case is brought as a class action where the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

30.    This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges question of federal laws under the ECPA (18 U.S.C. § 2511, *et seq*.).

31.    This Court has personal jurisdiction over Defendant because its principal place of business is in this District and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

---

[3] https://www.orlandohealth.com/about-us

[4] https://www.orlandohealth.com/about-us (last visited January 14, 2024).

32.    Venue is proper under 28 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District.

## COMMON FACTUAL ALLEGATIONS

### A. The U.S. Department of Health and Human Services and Federal Trade Commission Have Warned about Use of Tracking Tools by Healthcare Providers

33.    In January 2013, HHS issued a final rulemaking notice regarding modifications to the HIPAA privacy, security, enforcement, and breach notification rules under the Health Information Technology for Economic and Clinical Health Act (the "HITECH Act") to "strengthen the privacy and security protection for individuals' health information." 78 Fed. Reg. 5566 (January 25, 2013).

34.    As part of that final rulemaking, which became effective on March 26, 2013, HHS stated that, to be considered protected health information (PHI) under HIPAA, information did "not necessarily [need to] include diagnosis-specific information, such as information about the treatment of an individual." 78 Fed. Reg. at 5598. Instead, "[i]f the information is tied to a covered entity, then it is protected health information by definition since it is indicative that the individual received health care services or benefits from the covered entity, and therefore it must be protected … in accordance with the HIPAA rules." *Id.*

35.    In December 2022, HHS issued a bulletin (the "HHS Bulletin") warning regulated entities like Defendant about the risks presented by the use of Tracking Tools on their websites:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[5]

In other words, HHS has expressly stated that entities like Defendant that implement Facebook Pixel and Google Analytics and disclose patient information have violated HIPAA Rules unless those entities obtain a HIPAA-complaint authorization.

36.    The HHS Bulletin further warns that:

> While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.***[6]

37.    Additionally, HHS has warned healthcare providers that Protected Information is not limited exclusively to patient portals like MyChart, and thus Defendant still has an obligation to protect information on non-password protected (i.e., "unauthenticated") webpages. Citing to the 2013 Final Rulemaking,

---

[5] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited June 18, 2023) (emphasis added).

[6] *Id.*

HHS observed that "information that connects the individual to a regulated entity (i.e., that is indicative that the individual has received or will receive health care services or benefits from the covered entity)...relates to the individual's past, present, or future health or health care or payment for care."[7]

38.    The HHS Bulletin went on to state:

> Tracking technologies on a regulated entity's unauthenticated webpage that addresses specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials may have access to PHI in certain circumstances. ***For example, tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider. In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.***[8]

39.    In addition, HHS and the FTC have recently issued a letter, once again admonishing entities like Defendant to stop using Tracking Tools:

> If you are a covered entity or business associate ("regulated entities") under HIPAA, you must comply with the HIPAA Privacy, Security, and Breach Notification Rules (HIPAA Rules), with regard to protected health information (PHI) that is transmitted or maintained in electronic or any other form or medium. ***The HIPAA Rules apply when the information that a regulated entity collects through tracking technologies or discloses to third parties (e.g., tracking technology vendors) includes PHI. . .*** Even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC

---

[7] *Id.*

[8] *Id.* (emphasis added)

Act and the FTC Health Breach Notification Rule. . . As
recent FTC enforcement actions demonstrate, it is essential
to monitor data flows of health information to third parties
via technologies you have integrated into your website or
app. The disclosure of such information without a
consumer's authorization can, in some circumstances,
violate the FTC Act as well as constitute a breach of security
under the FTC's Health Breach Notification Rule.[9]

**B. Underlying Web Technology**

40.    To understand Defendant's unlawful data-sharing practices, it is

important first to understand basic web design and tracking tools.

41.    Devices (such as computer, tablet, or smart phone) access web content

through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser,

Apple's Safari browser, and Microsoft's Edge browser).

42.    Every website is hosted by a computer "server" that holds the

website's contents and through which the entity in charge of the website exchanges

communications with Internet users' client devices via their web browsers.

43.    Web communications consist of HTTP or HTTPS Requests and HTTP

or HTTPS Responses, and any given browsing session may consist of thousands of

individual HTTP Requests and HTTP Responses, along with corresponding

cookies:

- **Universal Resource Locator ("URL")**: a web address.

- **HTTP Request**: an electronic communication sent from the client

---

[9] *Re: Use of Online Tracking Technologies*, U.S. Dept. of Health & Hum. Servs. and Fed.
Trade. Comm'n (July 20, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-
OCR-Letter-Third-Party-Trackers-07-20-2023.pdf

device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL, GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- **Cookies**: a small text file that can be used to store information on the client device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.[10]

44.    Every website is comprised of Markup and "Source code." Source code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code. Source code is essentially the back of the website, and the user does not see what happens in the source code.

---

[10] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

45.    Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests that are invisibly executed in the background without notifying the person using the web browser. For example, the Tracking Tools in this case are snippets of code that Defendant embedded in its Source Code, thereby instructing the Website to send a second set of transmissions to Facebook and Google's own web servers.

46.    By contrast, the Markup is the façade of the website, and it is the only part that website visitors actually see when they access a website. As an example, a patient's HTTP Request seeks specific information from the Defendant's Website (e.g., "Find a Doctor" page), and the HTTP Response provides the requested information in the form of "Markup," forming the webpage's content and features.

47.    Similarly, when a patient visits www.orlandohealth.com and selects the "Find a Physician" button, their web browser automatically sends an HTTP Request to Defendant's web server. Defendant's web server automatically returns an HTTP Response, which loads the Markup for that particular webpage. As depicted below, patients only see the Markup, not Defendant's Source Code or underlying HTTP Requests and Responses.



*Figure 1. The image above is a screenshot taken from the user's web browser upon visiting https://orlandohealth.com/physician-finder.*

### C. Tracking Tools

48.    Tech companies like Facebook and Google offer Tracking Tools as software that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user communications and activity on those platforms.

49.    These Tracking Tools are offered to entities like Defendant for "free." In fact, however, they are bartered in exchange for Defendant's patients' data.

50.    The Tracking Tools are used to gather, identify, target, and market products and services to Defendant's patients. Advertisers, such as Defendant, can

track other user actions and communications and create their own tracking parameters when they implement the Tracking Tools into their websites.

51.    When a user accesses a webpage that is hosting Tracking Tools, their communications with the host webpage are instantaneously and surreptitiously duplicated and sent to the third party. For example, the Facebook Pixel on Defendant's Website causes the user's web browser to instantaneously duplicate the contents of the communication with the Website and send the duplicate from the user's browser directly to Facebook's server.

52.    Google Analytics is marginally different than the Facebook Pixel, but essentially accomplishes the same goal, tracking everything patients communicate via Defendant's Website.[11]

53.    Notably, transmissions only occur on webpages that contain Tracking Tools.[12] Thus, Plaintiff's and Class Member's Private Information would not have

---

[11]    *Comparing    Google    Analytics    vs    Facebook    Pixel*,    Boltic, https://www.boltic.io/blog/google-analytics-vsfacebookpixel#:~:text=Google%20Analytics%20is%20a%20comprehensive,time%20on%20site%2C%20and%20conversions.&text=On%20the%20other%20hand%2C%20Facebook,user%20actions%20on%20your%20website. (last visited July 31, 2023)

[12] Defendant's Pixel has its own unique identifier (represented as id=816179185220316) in the source code for orlandohealth.com, which can be used to identify which of Defendant's webpages contain the Pixel. Separately, "Google Analytics stores a client ID in a first-party cookie named _ga to distinguish unique users and their sessions on your website. Analytics doesn't store the client ID when analytics storage is disabled through Consent                                                    Mode." https://support.google.com/analytics/answer/11593727?hl=en#:~:text=Google%20Analytics%20stores%20a%20client,is%20disabled%20through%20Consent%20Mode. (last visited Oct. 4, 2023).

been disclosed to Facebook or Google via this technology but for Defendant's decisions to install the Tracking Tools on its Website.

54.    Even if a particularly tech-savvy user attempts to circumvent browser-based wiretap technology, their data is nonetheless transmitted directly to Facebook via Conversions Application Programming Interface ("CAPI"), which is a server-to-server transmission. Moreover, users typically cannot block first-party cookies within their web browser settings.

55.    Accordingly, CAPI functions as a redundant measure to circumvent any ad blockers or other denials of consent by the website user.[13, 14] Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[15]

56.    The Unauthorized Parties that receive patient communications via Tracking Tools do not provide any substantive website content relating to the user's communications. Instead, they harvest user data and communications for

---

[13] *What is the Facebook Conversions API and how to use it*, Realbot (last updated May 20, 2022), https://revealbot.com/blog/facebook-conversions-api/ (last visited Jan. 24, 2023).

[14] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel.... This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels.", https://developers.facebook.com/docs/marketing-api/conversions-api (last visited Jan. 27, 2023).

[15] *About Conversions API*, Meta Business Help Center, https://www.facebook.com/business/help/2041148702652965?id=818859032317965 (last visited Jan. 28, 2023).

the website owner's marketing purposes (*i.e.,* to bolster profits) and for their own benefit.

**D. Defendant Disclosed Plaintiff's and Class Members' Private Information to Facebook and Google via Tracking Tools on its Website.**

57.    In this case, Defendant employed Tracking Tools, including the Facebook Pixel and Conversions API, as well as the Google Analytics tool, to intercept, duplicate, and re-direct Plaintiff's and Class Members' Private Information to Facebook and Google.

58.    Defendant's Source Code manipulated its patient's browser by secretly instructing it to duplicate the patient's communications (HTTP Requests) with Defendant and to send those communications to Facebook and Google. These transmissions occur contemporaneously, invisibly, and without the patient's knowledge.

59.    Thus, without its patients' consent, Defendant has effectively used its source code to commandeer and "bug" or "tap" its patients' computing devices, allowing Facebook, Google, and other Unauthorized Parties to listen in on all of their communications with Defendant and thereby intercept those communications, including the Private Information contained therein.

60.    The Tracking Tools allow Defendant to optimize the delivery of ads, measure cross-device conversions, create custom audiences, and decrease advertising and marketing costs. However, Defendant's Website does not rely on the Tracking Tools in order to function.

61.    While seeking and using Defendant's services as a medical provider, Plaintiff and Class Members communicated their Private Information to Defendant via its Website.

62.    Plaintiff and Class Members were not aware that their Private Information would be shared with Unauthorized Parties as it was communicated to Defendant because, amongst other things, Defendant did not disclose this fact.

63.    Plaintiff and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information to Facebook or Google, nor did they intend for anyone other than Defendant to be a party to their communications (many of them highly sensitive and confidential) with Defendant.

64.    Defendant's Tracking Tools sent non-public Private Information to Facebook and Google, including but not limited to Plaintiff's and Class Members': (1) status as medical patients; (2) health conditions; (3) desired medical treatment or therapies; (4) desired locations or facilities where treatment was sought; (5) phrases and search queries (such as searches for symptoms, treatment options, or types of providers); and (6) searched and selected physicians and their specialties conducted via the general search bar.

65.    Importantly, the Private Information Defendant's Tracking Tools sent to Unauthorized Parties included PII that reveals the specific patient's real identity. Information sent to Facebook was sent alongside the Plaintiff's and Class Members' Facebook IDs (c_user cookie or "FID"), thereby allowing individual

patients' communications with Defendant, and the Private Information contained in those communications, to be linked to their unique Facebook accounts and therefore their real identity.[16]

66.    Information sent to Google was sent alongside the Plaintiff's and Class Members' unique identifier ("_ga" or "CID"), thereby allowing individual patients' communications with Defendant, and the Private Information contained in those communications, to be linked to their unique Google accounts and therefore their identity.[17]

67.    Similarly, Google users who are logged-in to their Google accounts also have an identifier that is stored in Google's logs. Google logs a user's browsing activities on non-Google websites and uses these data for serving personalized ads.[18]

68.    Defendant deprived Plaintiff and Class Members of their privacy rights when it: (1) implemented Tracking Tools that surreptitiously tracked, recorded, and disclosed Plaintiff's and other online patients' confidential communications and Private Information; (2) disclosed patients' protected

---

[16] Defendant's Website tracks and transmits data via first-party and third-party cookies. The c_user cookie or FID is a type of third-party cookie assigned to each person who has a Facebook account, and it is comprised by a unique and persistent set of numbers.

[17] Defendant's Google Analytics tool stores a client ID in a first-party cookie named _ga (also identified as a cid) to distinguish unique users and their sessions on your website. Analytics doesn't store the client ID when analytics storage is disabled through Consent Mode." https://support.google.com/analytics/answer/11593727?hl=en#:~:text=Google%20Analytics%20 20stores%20a%20client,is%20disabled%20through%20Consent%20Mode. (last visited Jan. 26, 2024).

[18] *Brown v. Google LLC*, Case No. 4:20-cv-3664-YGR, FN11 (quoting Google employee deposition testimony explaining how Google tracks user data).

information to Unauthorized Parties; and (3) undertook this pattern of conduct without notifying Plaintiff or Class Members and without obtaining their express written consent.

### E. Defendant's Tracking Tools Disseminate Patient Information Via Its Website

69.    When a patient uses www.orlandohealth.com to book an appointment with a cardiologist, the Website directs them to communicate Private Information.

70.    Unbeknownst to the patient, each and every communication and action on the Website is sent to Facebook and Google, including the specific text and medical conditions they type into the search bar and all of the other search parameters and filters they select.

71.    The image below shows what happened when a patient searched for a physician specialized in treating "cardiovascular disease" who identifies as "Male," speaks "Spanish," is based in "Orlando," and is currently offering "Online Scheduling."



*Figure 2. Screenshot of Defendant's find a physician page wherein the user has conducted a search based on the parameters outlined above.*

72.     Unbeknownst to ordinary patients, this particular webpage—which is undoubtedly used to communicate Private Information for the purpose of seeking medical treatment—contains Tracking Tools.

73.     The image below shows the "behind the scenes" portion of the Website that is invisible to patients, and each entry in the column on the right represents just one instance in which Defendant's Pixel sent the communications to Facebook via the Pixel and Google Tag Manager.



*Figure 3. Screenshot taken from Defendant's Website, which shows the mark-up (user-facing portion of the website) alongside the source code. Each entry in the column to the right represents one instance in which the user's information was transmitted to Facebook via Defendant's Pixel or the Google Tag Manager that implements the Pixel.*

74.    Thus, without alerting its patients, Defendant's Tracking Tools sent each and every communication to Unauthorized Parties, and the images below confirm that these communications include patients' Private Information.

75.    The image below shows what information Facebook received when the patient selected Dr. Jose A. LeFran's physician profile page and clicked the "Online Scheduling" button.



*Figure 4. Screenshot of background network information from Defendant's Website given the parameters outlined above*

76.    The first line of highlighted text, "tr/?id=816179185220316," refers to Defendant's Pixel ID for this particular webpage and confirms it installed the Pixel on its Website[19].

77.    The second line of text, "ev: SubscribedButtonClick," identifies and categorizes which actions a patient took on the Webpage ("ev:" is an abbreviation for event, and "SubscribedButtonClick" is the type of event). Thus, this identifies the user as having viewed the particular webpage after applying their search criteria, and it also identifies them as having clicked the "Online Scheduling" button.

78.    The next lines of highlighted text show Defendant has disclosed to Facebook that the user: (1) is a patient seeking medical care from Defendant via orlandohealth.com; (2) in conjunction with a specific medical condition (highlighted above as "Specialty Cardiovascular Disease"); and (3) is in the process of booking an appointment or searching for a particular physician ("physician-finder" that "Has Online Scheduling") who speaks Spanish ("Languages Spanish"), is based in Orlando ("City Orlando"), and is male ("Gender Male").

79.    The text also reveals the identity of a patient's specific physician (highlighted above as "jose-a-lefran-md"), their physician's particular field of

---

[19] Website owners and marketers commonly have multiple pixel IDs within the same website, and this all depends on the configuration of the particular website and the associated URLs. For example, some healthcare providers own multiple website domains even though those domains redirect the user to one particular webpage. At present, Plaintiff is unaware of each and every pixel ID associates with Defendant's Website. But in at least June 2022, February 2023, and September 2023, Defendant employed an additional Facebook ID on its Website identified as 431701023917763.

medicine or specialty ("Orlando Cardiologist" and "Cardiovascular Disease Doctor"), and the fact that the patient scheduled or attempted to schedule an appointment with Dr. Jose A. LeFran ("[buttonText]=Online Scheduling;" '[buttonFeatures]=schedule_button;" and "destination . . . physician-finder . . . jose-a-lefran-md . . . scheduling").

80. Finally, the highlighted text ("GET") combined with the user's Facebook ID (highlighted as the "c_user=") demonstrates that Defendant's Tracking Tools sent the user's communications, and the Private Information contained therein, alongside the user's Facebook ID (c_user ID), thereby linking a specific patients' communications to their Facebook profile.[20]

81. The Tracking Tools also disclose instances in which a patient has called or attempted to call their physician's phone number in conjunction with their scheduling request.

82. If a patient attempts to call Dr. Muhammad Ghanem's office by clicking the link on his physician profile page, that information is shared with Facebook and Google.

---

[20] The user's Facebook ID is represented as the c_user ID highlight in the image above, and Plaintiff has redacted the corresponding string of numbers to preserve the user's anonymity.



*Figure 5. Screenshot of Dr. Ghanem's webpage on Defendant's Website.*

83.   The Tracking Tools also disclose the patient's search parameters, and their phone call (or attempted phone call) is recorded as a "SubscribedButtonClick."

84.   When a patient searches for a "Male" physician, specialized in "Bariatric Surgery," who speaks "Arabic," all of that information is communicated without their knowledge or permission. The text not only reveals the fact that the patient called or attempted to call their physician's office, it also reveals the physician's identity ("physician finder" and "muhammad-ghanem-md#"), his specialty ("Specialty=Bariatric+ Surgery" and "Bariatric Surgeon Orlando FL – Weight Loss Specialist"); and the phone number ("phone-no", "destination": "callto:+13218438900").

85.    The images below illustrate the process discussed in the preceding two paragraphs:



*Figure 6. Screenshot of network traffic from Defendant's Website.*



*Figure 7. Screenshot of network traffic from Defendant's Website.*

86.    Defendant's Tracking Tools even divulged, word for word, the exact text and phrases patients typed into the general search bar located on Defendant's Website as illustrated by the image below:



*Figure 8. Screenshot of the persistent search bar header on Defendant's Website.*

87.    Upon typing "I have dementia" into the search bar, that exact phrase is sent to Facebook and Google, thereby allowing a patient's medical condition to be linked to their Facebook account for future retargeting and exploitation. This is simply unacceptable, and there is no legitimate reason for sending this information to Facebook or Google.



*Figure 9. Screenshot of network traffic taken from Defendant's Website.*



*Figure 10. Screenshot of network traffic from Defendant's Website.*

88.    The images below demonstrate that all of this information is also sent to Google via the Google Analytics tool and Google Tag Manager.

89.    Both images below contain the same search phrase and specific medical condition ("I have dementia").

*Figure 11. Screenshot of network traffic from Defendant's Website given the parameters outlined above, highlighting that the phrase "I have dementia" was transmitted to Google via the Google Analytics Tool (in addition to Google Tag Manager and other Tracking Tools).*



*Figure 12. Screenshot of network traffic taken from Defendant's Website, which demonstrates that the "cid," "tid," and "gid" and other persistent identifiers were transmitted to Google alongside the search phrase "I have dementia."*

90.     Accordingly, Google receives patients' communications alongside the patients' IP address, and the user's CID, which is also impermissible under HIPAA.

91.     Defendant's Website also includes a persistent menu bar on every webpage that contains the "MyChart" button.



*Figure 13. Screenshot of persistent menu bar from Defendant's Website*

92.    When a patient clicks the "MyChart" button, a new webpage populates wherein they can click "Sign In" or "Sign Up Now." This particular webpage contains Tracking Tools that, at a minimum, transmit the patient's communications to Google as seen in the image below:



*Figure 14. Screenshot of network traffic from the Website's Patient Portal webpage.*

93.    Defendant did not disclose that its Website tracks, records, and transmits patients' Private Information to Facebook and Google, and Plaintiff was not aware of this when she used the Website in conjunction with her ongoing medical care and treatment.

94.     Defendant never received consent or written authorization to disclose Plaintiff and Class Members' Private Information to Facebook and Google.

**F. Plaintiff W.W.'s Experience**

95.     Plaintiff W.W., as Defendant's patient, has received and paid for healthcare services from October 2018 to present at hospitals and clinics in Defendant's network.

96.     Since then, she has used Defendant's Website and MyChart Patient Portal to communicate Private Information to Defendant on numerous occasions to receive healthcare services from Defendant or Defendant's affiliates, at Defendant's direction, and with Defendant's encouragement.

97.     Plaintiff W.W. has been a Facebook user for at least the last 10 years.

98.     Plaintiff W.W. has had a Google account for several years.

99.     On numerous occasions, Plaintiff W.W. accessed Defendant's Website on her tablet, desktop computer, and mobile device for the purpose of finding and obtaining medical treatment for her specific medical conditions (listed in more detail below).

100.     Plaintiff W.W. used Defendant's Website and/or MyChart Patient Portal to conduct the following activities: fill out forms to request/book medical appointments, search for particular doctors, specialists, and their locations, complete forms to request medical records/invoices, complete treatment authorization forms, communicate with her medical providers, review healthcare

records, request medical bills/invoices, pay medical bills, and research sickness or disease, including symptoms and treatment.

101. Specifically, Plaintiff W.W. used the Website to find gastroenterologists and cardiologists, and she communicated her PHI related to ileostomy, heart pains, fatty liver disease, blacking out when standing up, and meningiomas to find doctors and information concerning these medical conditions and symptoms.

102. Because Defendant utilized the Tracking Tools, Unauthorized Parties, including Facebook and Google, received Plaintiff W.W.'s PHI and PII.

103. Plaintiff W.W.'s own off-site activity report from her personal Facebook account confirms that this occurred on February 24, 2023.



*Figure 15. Screenshot of Plaintiff's off-site activity report*

104.   Furthermore, as seen in the screenshot below, Plaintiff W.W.'s MyChart "Who's Accessed My Record?" information for Third-Party Apps confirms that on February 24, 2023, ThinkAndor accessed Demographics information from Plaintiff W.W.'s MyChart:



*Figure 16. Screenshot of "Who's Accessed My Record" within Plaintiff's MyChart*

105.   Upon information and belief, ThinkAndor is one of Orlando Health's technology services providers.

106.   As Defendant's patient, Plaintiff W.W. reasonably expected that her online communications with Defendant were solely between herself and Defendant and that such communications would not be transmitted to or disclosed to Unauthorized Parties. But for her status as Defendant's patient, Plaintiff W.W. would not have disclosed her Private Information to Defendant via its Website.

107.   During her time as a patient, Plaintiff W.W. never consented to the use of her Private Information by Unauthorized Parties or to Defendant enabling Unauthorized Parties to access or interpret such information.

108.   During the same transmissions, the Website routinely provided Unauthorized Parties with its patients' IP addresses, device IDs, and/or user accounts (and, in the case of Facebook, their FIDs) or other information they input into Defendant's Website, like their home address, zip code, or phone number. This is precisely the type of information that HIPAA requires healthcare providers

to anonymize to protect the privacy of patients. Plaintiff W.W.'s and Class Members identities could be easily determined based on the FID, IP address and/or reverse lookup from the collection of other identifying information that was improperly disclosed.

109.    After intercepting and collecting this information, Facebook and Google process it, analyze it, and assimilate it into datasets like Core Audiences and Custom Audiences. If the Website visitor is also a Facebook user, Facebook will associate the information that it collects from the visitor with a Facebook ID that identifies their name and Facebook profile, i.e., their real-world identity. If the patient is a Google user, Google similarly is able to identify the patient.

110.    Shortly after using the Website, Plaintiff W.W. observed advertisements on her Facebook account for ileostomy bags, products or services related to strokes, aortic stenosis, and heart failure, neuropathy doctors from Orlando Health, and spinal decompression.

111.    The presence of Facebook advertisements, in combination with the images above, confirms Defendant's unlawful transmission of Plaintiff's Private Information to Unauthorized Parties.

112.    In sum, Defendant's Tracking Tools transmitted Plaintiff's highly sensitive communications and Private Information to Facebook and Google, including communications that contained private and confidential information, without Plaintiff's knowledge, consent, or express written authorization.

113.    Plaintiff W.W. suffered injuries in the form of (i) invasion of privacy; (ii) diminution of value of the Private Information; (iii) statutory damages; (iv) the continued and ongoing risk to her Private Information; and (v) the continued and ongoing risk of harassment, spam, and targeted advertisements specific to Plaintiff's medical conditions and other confidential information she communicated to Defendant via the Website.

114.    Plaintiff W.W. has a continuing interest in ensuring that future communications with Defendant are protected and safeguarded from future unauthorized disclosure, and she also has an interesting in knowing which Unauthorized Parties—aside from Facebook and Google—have received her PII and PHI since she first started using the Website in 2018.

## H. Defendant's Conduct Is Unlawful and Violated Industry Norms

### i. Defendant Violated HIPAA Standards

115.    Under Federal Law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[21]

116.    The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined

---

[21] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[22]

117.    The Privacy Rule broadly defines "protected health information" ("PHI") as individually identifiable health information ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

118.    IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

119.    Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an

---

[22]HHS.gov,    HIPAA    For    Professionals    (last    visited    April    12,    2023), https://www.hhs.gov/hipaa/forprofessionals/privacy/index.html.

individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed;

> a.  Names;
>
> ***
>
> H. Medical record numbers;
>
> ***
>
> J.  Account numbers;
>
> ***
>
> M. Device identifiers and serial numbers;
>
> N. Web Universal Resource Locators (URLs);
>
> O.  Internet Protocol (IP) address numbers; ... and
>
> R. Any other unique identifying number, characteristic, or code...;and"
>
> The covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 160.514.

120.  The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

121.    An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person ... shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity ... and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

122.    The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant when it is knowingly disclosing individually identifiable health information relating to an individual, as those terms are defined under HIPAA.

123.    Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

124.    In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the HHS instructs:

Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data... If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[23]

125.   In its guidance for Marketing, the HHS further instructs:

The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. ... Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list.* (Emphasis added).[24]

126.   As alleged above, there is an HHS Bulletin that highlights the obligations of "regulated entities," which are HIPAA-covered entities and business associates, when using tracking technologies.[25]

127.   The Bulletin expressly provides that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules."

---

[23]https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/covereden tities/De-identification/hhs_deid_guidance.pdf (last visited Nov. 3, 2022).

[24]https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/covereden tities/marketing.pdf (last visited Nov. 3, 2022)

[25]   *See*   https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

128.   Defendant's actions violated HIPAA Rules per this Bulletin.

### ii. Defendant Violated Florida Law

129.   Florida law has established policies and procedures for the maintenance, preservation, and storage of patient medical records.

130.   Florida law provides in Fla. Stat. Ann. § 456.057 that health records may only be used or disclosed consistent with prior authorization or without such authorization in particular circumstances.

131.    Defendant's disclosure of PHI by use of Tracking Technologies does not fit within any prior authorization or circumstances provided in Fla. Stat. Ann. § 456.057.

132.   Defendant's actions described herein violated Florida law.

### iii. Defendant Violated Industry Standards

133.   A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

134.   The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

135.   AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care... Patient privacy encompasses a number of aspects, including, ... personal data (informational privacy)

136.   AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

137.    AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must…:(c ) release patient information only in keeping ethics guidelines for confidentiality.

### I.  Plaintiff's and Class Members' Expectation of Privacy

138.    Plaintiff and Class Members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

139.    Indeed, at all times when Plaintiff and Class Members provided their Private Information to Defendant, they each had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with Unauthorized Parties for a commercial purpose, unrelated to patient care.

140.    Plaintiff and Class Members would not have used Defendant's Website, would not have provided their Private Information to Defendant, and would not have paid for Defendant's healthcare services, or would have paid less

for them, had they known that Defendant would disclose their Private Information to Unauthorized Parties.

**J.  IP Addresses Are PII**

141.  On information and belief, through the use of the Tracking Tools, Defendant also disclosed and otherwise assisted Unauthorized Parties with intercepting Plaintiff's and Class Members' IP addresses and other persistent identifiers.

142.  An IP address is a number that identifies the address of a device connected to the Internet, and it is used to identify and route communications on the Internet.

143.  IP addresses of individual Internet users are used by Internet service providers, websites, and third-party tracking companies to facilitate and track Internet communications.

144.  Facebook tracks every IP address ever associated with a Facebook user for use in targeting individual homes and their occupants with advertising.

145.  As to Google, over 70% of online websites use Google's visitor-tracking products, Google Analytics and Google Ad Manager.

146.  Whenever a user visits a website that is running Google Analytics and Google Ad Manager, Google's software scripts on the website surreptitiously direct the user's browser to send a secret, separate message to Google's servers in California, which includes the user's IP address, the user's geolocation,

information contained in Google cookies, any user-ID issued by the website to the user, and information about the browser the user is using.

147. Under HIPAA, an IP address is considered PII:

- HIPAA defines PII to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. *See* 45 C.F.R. § 164.514 (2).

- HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See* also, 45 C.F.R. § 164.514(b)(2)(i)(O).

148. Consequently, by disclosing IP addresses, Defendant's business practices violated HIPAA and industry privacy standards.

## K. Defendant Was Enriched and Benefitted from the Use of The Tracking Tools and Unauthorized Disclosures

149. The primary motivation and a determining factor in Defendant's interception and disclosure of Plaintiff's and Class Members' Private Information was to commit criminal and tortious acts in violation of federal and state laws as alleged herein, namely, the use of patient data for advertising in the absence of express written consent. Defendant's further use of the Private Information after the initial interception and disclosure for marketing and revenue generation was in violation of HIPAA and an invasion of privacy. In exchange for disclosing the Private Information of its patients, Defendant is compensated by Facebook in the

form of enhanced advertising services and more cost-efficient marketing on its platform.

150.    Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions.

151.    Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients to get more patients to use its services. Defendant did so through use of the intercepted patient data it obtained, procured, and/or disclosed in the absence of express written consent.

152.    By utilizing the Tracking Tools, the cost of advertising and retargeting was reduced through further use of the unlawfully intercepted and disclosed Private Information, thereby benefitting Defendant while invading the privacy of Plaintiff and Class Members and violating their rights under federal and Florida law.

## L.  Plaintiff's and Class Members' Private Information Had Financial Value

153.    Plaintiff's data and Private Information has economic value. Facebook regularly uses data that it acquires to create Core and Custom Audiences, as well as Lookalike Audiences and then sells that information to advertising clients. Google has recognized the value of user data and has even instituted a pilot program in which it pays users $3 per week to track them online.

154.    Data harvesting is one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil."

Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

155.    The value of health data in particular is well-known and has been reported on extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[26]

156.    Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[27]

157.    Indeed, numerous marketing services and consultants offering advice to companies on how to build their email and mobile phone lists—including those seeking to take advantage of targeted marketing—direct putative advertisers to offer consumers something of value in exchange for their personal information.

---

[26] *See* https://time.com/4588104/medical-data-industry/ (last visited February 16, 2023).

[27] *See* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited March 1, 2023).

"No one is giving away their email address for free. Be prepared to offer a book, guide, webinar, course or something else valuable."[28]

158.   There is also a market for data in which consumers can participate. Personal information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig*., 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

159.   Several companies have products through which they pay consumers for a license to track their data. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing historical information.

160.   Facebook also has paid users for their digital information, including browsing history. Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

161.   Additionally, healthcare data is extremely valuable to bad actors. Health care records may be valued at up to $250 per record on the black market.[29]

---

[28]VERO, HOW TO COLLECT EMAILS ADDRESSES ON TWITTER https://www.getvero.com/resources/twitter-lead-generation-cards/. (last visited Sep. 1, 2023).
[29] Tori Taylor, *Hackers, Breaches, and the Value of Healthcare Data, SecureLink* (June

## TOLLING

162.   Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiff did not know (and had no way of knowing) that her Private Information was intercepted and unlawfully disclosed to Facebook and Google because Defendant kept this information secret and the Tracking Tools are invisible on the Website.

## CLASS ACTION ALLEGATIONS

163.   Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated ("the Class") pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

164.   The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> All individuals residing in the United States who are, or were, patients of Defendant or any of its affiliates, who used Defendant's Website in conjunction with their medical care.

In the alternative, Plaintiff seeks to represent an "Florida Class" defined as:

> All individuals residing in Florida who are, or were, patients of Defendant or any of its affiliates, who used Defendant's Website in conjunction with their medical care.

The Nationwide Class and Florida Class are collectively referred to as the "Class."

165.   Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any

---

30, 2021), https://www.securelink.com/blog/healthcare-data-new-prize-hackers.

Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

166.    Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

167.    <u>Numerosity</u>, Fed. R. Civ. P. 23(a)(1). The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds of thousands of individuals whose PII and PHI may have been improperly disclosed via Defendant's Tracking Tools, and the Class is identifiable within Defendant's records.

168.    <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3). Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

   a.    Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

   b.    Whether Defendant had a duty not to disclose its patients Private Information to Unauthorized Parties;

   c.    Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to Facebook and Google for marketing purposes;

d.  Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been divulged;

e.  Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient Private Information;

f.  Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members;

g.  Whether Defendant's conduct violated the Florida law regarding disclosure of patient records, Fla. Stat. Ann. § 456.057;

h.  Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct; and

i.  Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Defendant's disclosure of their Private Information.

169.  <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's use of Tracking Tools, due to Defendant's misfeasance.

170.  <u>Adequacy</u>, Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no

disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

171. <u>Superiority and Manageability</u>, Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate method for the fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

172. <u>Policies Generally Applicable to the Class</u>. Fed. R. Civ. P. 23(b)(2). This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct

54

toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

173.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

174.    The litigation of the claims is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

175.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

176.    Unless a class-wide injunction is issued, Defendant may continue disclosing the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint.

177.    Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

178.    <u>Issue Certification</u>, Fed. R. Civ. P. 23(c)(4). Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to, the following:

      a.   Whether Defendant has a legal duty to not disclose Plaintiff's and Class Members' Private Information to companies that have not executed a HIPAA-compliant business associate agreement;

      b.   Whether Defendant has a legal duty to not disclose Plaintiff's and Class Members' Private Information without first obtaining their express authorized consent;

c.    Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

d.    Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

e.    Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to Facebook and Google;

f.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information communicated via its Website;

g.    Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

## COUNT I
## VIOLATION OF THE FLORIDA SECURITY OF COMMUNICATIONS ACT
### (On Behalf of Plaintiff and the National Class)

179.    Plaintiff incorporates paragraphs 1-23, 28, and 33-178 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

180.   The Florida Secretary of Communications Act ("FSCA") is codified at Florida Statutes, § 934.01, *et seq*. The FSCA begins with legislative findings, including:

> On the basis of its own investigations and of published studies, the Legislature makes the following findings...(4) to safeguard the privacy of innocent persons, the interception of wire or oral communications when none of the parties to the communications has consented to the interceptions should be allowed only when authorized by a court of competent jurisdiction and should remain under the control and supervision of the authorizing court.

181.   Florida Statutes § 934.10 provides, in pertinent part, as follows:

> Any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of §§ 934.04-934.09 shall have a civil cause of action against any person or entity who intercepts, discloses, or uses, or procures any person or entity to intercept, disclose, or use, such communications and shall be entitled to recover from any such person or entity which engaged in that violation such relief as may be appropriate, including: (a) [p]reliminary or equitable declaratory relief as may be appropriate; (b) [a]ctual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of the violation or $1,0000, whichever is higher; (c) [p]unitive damages; and (d) [a] reasonable attorney's fee and other litigation costs reasonably incurred.

182.   The FSCA defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in party by a wire, radio, electromagnetic, photoelectronic, or photo-optical systems that affects intrastate, interstate, or foreign commerce." Fla. Stat. § 934.02(12). It further defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Fla. Stat. § 934.02(3).

183.   At all relevant times, Defendant aided, employed, agreed with, and conspired with Facebook to intercept Plaintiff's and Class Members' internet communications while accessing www.orlandohealth.com, including the contents thereof—*i.e.*, the URL visited, the medical conditions and types of doctors searched, whether and with whom the patient had a medical televisit, payment of medical bills, and the contents of any live chats. Such information not only constitutes protected health information, it also represents the substance, import, and meaning of the communications between Plaintiff and other Class Members had with Defendant's Website.

184.   Plaintiff and other Class Members had a reasonable expectation of privacy in the electronic communications they had with Defendant's Website.

185.   Nonetheless, these electronic communications were transmitted to and intercepted by Unauthorized Parties (*i.e.*, Facebook and Google) during the communication and without knowledge, authorization, or consent of Plaintiff and Class Members. This occurred because Defendant intentionally inserted an electronic device into its Website that, without the knowledge and consent of Plaintiff and Class Members, recorded and transmitted the substance of their confidential communications to Unauthorized Parties.

186.   Defendant willingly facilitated Unauthorized Parties' interception and collection of Plaintiff's and Class Members' Private Information by embedding Tracking Tools on its Website.

187.   Defendant used the following items as a device or apparatus to intercept wire, electronic, or oral communications made by Plaintiff and other Class Members:

a.  The computer codes and programs Facebook used to track Plaintiff's and Class Members' communications while they were navigating www.orlandohealth.com;

b.  Plaintiff's and Class Members' browsers;

c.  Plaintiff's and Class Members' computing and mobile devices;

d.  Facebook's web and ad servers;

e.  The web and ad-servers from which Facebook tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate www.orlandohealth.com;

f.  The computer codes and programs used by Facebook to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit Defendant's Website; and

g.  The plan Facebook carried out to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser or mobile application to visit Defendant's Website.

188.    Defendant failed to disclose, and continues to fail to disclose, that it used Tracking Tools specifically to divulge patients' communications and Website interactions to Unauthorized Parties, *i.e.*, Facebook and Google.

189.    To avoid liability under the FSCA, a defendant must show it had the consent of *all* parties to a communication.

190.    The private information that Defendant transmits constitutes PHI.

191.    As demonstrated hereinabove, Defendant violates the FSCA by aiding and permitting Unauthorized Parties to receive its patients' online communications in real time through its Website without their consent.

192.    By disclosing Plaintiff's and Class Members' Private Information, Defendant violated Plaintiff's and Class Members' statutorily protected privacy rights.

193.    As a result of the above violations and pursuant to Florida Statutes, § 934.10, Plaintiff and Class Members are entitled to actual damages or liquidated damages of $1,000 or $100 per day for each violation, whichever is higher.

194.    Under the statute, Defendant is also liable for reasonable attorneys' fees, reasonable litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

**COUNT II**
**VIOLATION OF ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**("ECPA")**
**18 U.S.C. § 2511(1) *et seq*.**
**UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE**

**(On Behalf of Plaintiff and the Class)**

195.    Plaintiff incorporates paragraphs 1-23, 28, and 33-178 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

196.    The ECPA protects both sending and receipt of communications.

197.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

198.    The transmissions of Plaintiff's Private Information to Defendant via Defendant's Website qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

199.    The transmissions of Plaintiff's Private Information to medical professionals qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(2).

200.    **Electronic Communications**. The transmission of Private Information between Plaintiff and Class Members and Defendant via its Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,...data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

201.    **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the

substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

202.    **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents ... include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

203.    **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device ... which can be used to intercept a[n] ... electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    a.  Plaintiff's and Class Members' browsers;

    b.  Plaintiff's and Class Members' computing devices;

    c.  Defendant's web-servers; and

    d.  The Tracking Tools deployed by Defendant to effectuate the sending and acquisition of patient communications.

204.    By utilizing and embedding Tracking Tools on its Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

205.    Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via Tracking Tools, which tracked, stored, and

unlawfully disclosed Plaintiff's and Class Members' Private Information to Unauthorized Parties including Facebook and Google.

206.  These intercepted communications include, but are not limited to, communications to/from Plaintiff's and Class Members' that contain PII and PHI.

207.  By intentionally disclosing or endeavoring to disclose the electronic communications of the Plaintiff and Class Members to Unauthorized Parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

208.  By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

209.  **Unauthorized Purpose**. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State – namely, violation of the FSCA, invasion of privacy, among others.

210.  Defendant intentionally used the wire or electronic communications to increase its profit margins. For example, this not only bolstered its marketing

efforts, it allowed Defendant to use a free and/or low-cost analytics tools in lieu of HIPAA-compliant business and marketing solutions.

211.    In doing so, Defendant specifically used the Tracking Tools to track and utilize Plaintiff's and Class Members' Private Information for financial gain.

212.    Defendant was not acting under color of law to intercept Plaintiff and the Class Member's wire or electronic communication.

213.    Plaintiff and Class Members did not authorize Defendant to acquire the contents of their communications for purposes of invading Plaintiff's privacy via the Tracking Tools.

214.    Any purported consent that Defendant received from Plaintiff and Class Members was not valid.

215.    In sending and in acquiring the content of Plaintiff's and Class Members' communications relating to the browsing of Defendant's Website, Defendant's purpose was tortious and designed to violate federal and state legal provisions, including as described above the following: (1) violating the FSCA; and (2) a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

### COUNT III
### BREACH OF CONFIDENCE
### (On behalf of Plaintiff and the National Class)

216.    Plaintiff incorporates paragraphs 1-23, 28, and 33-178 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

217.    Medical providers have a duty to their patients to keep non-public medical information completely confidential.

218.    Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

219.    Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed Tracking Tools to disclose and transmit Plaintiff's and Class Members' communications, including Private Information, to Unauthorized Parties.

220.    These disclosures were made without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged.

221.    The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

222.    As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and Class members were damaged by Defendant's breach in that:

    a. Sensitive and confidential information that Plaintiff and Class members intended to remain private is no longer private;

    b. Plaintiff and Class members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c.   Defendant eroded the essential confidential nature of the provider-patient relationship;

d.   General damages for invasion of their rights in an amount to be determined by a jury;

e.   Nominal damages for each independent violation;

f.   Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

g.   Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

h.   Defendant's actions diminished the value of Plaintiff's and Class Members' Private Information; and

i.   Defendant's actions violated the property rights Plaintiff and Class Members have in their Private Information.

**COUNT IV**
**INVASION OF PRIVACY**
**(Intrusion upon Seclusion)**
**(On Behalf of Plaintiff and the National Class)**

223.   Plaintiff incorporates paragraphs 1-23, 28, and 33-178 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

224.   The Private Information of Plaintiff and Class Members consists of private and confidential facts and information that were never intended to be shared beyond private communications.

225.   Plaintiff and Class Members had a legitimate expectation of privacy regarding their Private Information and were accordingly entitled to the protection of this information against disclosure to Unauthorized Parties.

226.   Defendant owed a duty to Plaintiff and Class Members to keep their Private Information confidential.

227.   Defendant's surreptitious recording and transmission of Plaintiff's and Class Members' Private Information to Unauthorized Parties, including two social media and marketing giants, is highly offensive to a reasonable person.

228.   Defendant's willful and intentional disclosure of Plaintiff's and Class Members' Private Information constitutes an intentional interference with Plaintiff's and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

229.   Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiff's and Class Members' privacy because Defendant facilitated Facebook's simultaneous eavesdropping and wiretapping of confidential communications.

230.   Defendant failed to protect Plaintiff's and Class Members' Private Information and acted knowingly when it installed the Tracking Tools onto its

Website because the purpose of the Tracking Tools is to disseminate patient's communications with the Website for marketing and advertising as opposed to legitimate medical purposes.

231.   Because Defendant intentionally and willfully incorporated the Tracking Tools and encouraged patients to use the Website for healthcare purposes, Defendant had notice and knew that its practices would cause injury to Plaintiff and Class Members.

232.   As a proximate result of Defendant's acts and omissions, the private and sensitive PII and PHI of Plaintiff and Class Members was disclosed to Unauthorized Parties, causing Plaintiff and the Class to suffer damages.

233.   Plaintiff, on behalf of herself and Class Members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, plus prejudgment interest, and costs.

234.   Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their Private Information is still maintained by Defendant and still in the possession of Facebook and the wrongful disclosure of the information cannot be undone.

235.   Plaintiff and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not undo Defendant's

disclosure of the information to Facebook who on information and belief continues to possess and utilize that information.

236.  Plaintiff, on behalf of herself and Class Members, further seeks injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiff's and Class Members' Private Information and to adhere to its common law, contractual, statutory, and regulatory duties.

## COUNT V
## UNJUST ENRICHMENT
## (On behalf of Plaintiff and the National Class)

237.  Plaintiff incorporates paragraphs 1-23, 28, and 33-178 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

238.  Defendant benefits from the use of Plaintiff's and Class Members' Private Information and unjustly retained those benefits at their expense.

239.  Plaintiff and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiff and Class Members, without authorization and proper compensation. Defendant consciously collected and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

240.  Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

241.    The benefits that Defendant derived from Plaintiff and Class Members was not offered by Plaintiff and Class Members gratuitously and rightly belongs to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles in Florida and every other state for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

242.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**COUNT VI**
**BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiff and the National Class)**

243.    Plaintiff incorporates paragraphs 1-23, 28, and 33-178 as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

244.    As a condition of utilizing Defendant's digital platforms and receiving services from Defendant, Plaintiff and the Class provided their Private Information and compensation for their medical care.

245.    When Plaintiff and Class Members provided their Private Information to Defendant, they entered into implied contracts pursuant to which Defendant agreed to safeguard and not disclose their Private Information without consent.

246.    Plaintiff and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and

Defendant obligating Defendant to not disclose Private Information without consent.

247.   Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Private Information to Unauthorized Parties. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of Private Information.

248.   Plaintiff and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendant and that the Court grant the following:

A.     For an Order certifying the Class and appointing Plaintiff and Counsel to represent such Class;

B.     For equitable relief enjoining Defendant from engaging in the wrongful conduct alleged in this Complaint pertaining to the misuse and/or disclosure of the Private Information of Plaintiff and Class Members;

C.     For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members:

D.    For an award of damages, including, but not limited to, actual, consequential, statutory, punitive, and nominal damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands that this matter be tried before a jury.

DATE: June 10, 2024                    Respectfully Submitted,

*/s/ Mariya Weekes*
Mariya Weekes (FL State Bar No. 56299)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
201 Sevilla Avenue, 2nd Floor
Coral Gables, FL  33134
Tel:  (786) 879-8200
Fax: (786) 879-7520
mweekes@milberg.com

*Counsel for Plaintiff and the Proposed Class*