**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

W.W.,

Plaintiff,

v. Case No. 6:24-CV-01068-JSS-RMN

ORLANDO HEALTH, INC.,

Defendant.

---

**DEFENDANT ORLANDO HEALTH, INC.'S**
**MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant, Orlando Health, Inc. ("Orlando Health") moves to dismiss Plaintiff's Complaint.

## INTRODUCTION

Relying largely on what a hypothetical person might do on a website, Plaintiff, W.W. ("W.W.") claims that Orlando Health violated her privacy rights under various statutes and common law theories by using common third-party website analytics tools in the operation of its own website, www.orlandohealth.com (the "Website") (Doc. 1 ¶¶ 5-8, 9-12). Specifically, she claims that Orlando Health's alleged use of the Meta Pixel ("Pixel"), Meta's Conversions' API ("CAPI"), Google Analytics, and other undefined "tracking tools" caused information about her activities on Orlando Health's Website to be sent to third parties such as Meta and Google. (*Id.* at ¶¶ 6-8 ). But, when stripped of allegations of hypothetical scenarios (see Doc. 1 at ¶¶ 47, 69-92), the only allegations as to W.W.'s website activity on

www.orlandohealth.com are the high-level and broad summations set forth in paragraphs 99-101 of the Complaint. W.W. falls short of actually *alleging* what information of her was transmitted to unauthorized third parties through *her use of a public Website* (as she does not specifically allege there are "tracking tools" in the patient portal).

As a matter of law, W.W.'s allegations are insufficient to support each of the claims alleged in the Complaint: (1) violation of the Florida Security of Communications Act, Fla. Stat. § 934.01 et seq. ("FSCA") (Count I); (2) violation of the Federal Electronic Communications Privacy Act, 18 U.S.C. § 2511(1) et seq. ("Federal Wiretap Act") (Count II); (3) Breach of Confidence (Count III); (4) Invasion of Privacy (Count IV); (5) Unjust Enrichment (Count V); and (6) Breach of Implied Contract (Count VI).

## BACKGROUND AND COMPLAINT ALLEGATIONS

### I. W.W.'s Third Attempt to Bring Claims against Orlando Health.

This is W.W.'s third attempt to bring claims against Orlando Health for the matters alleged in the Complaint. On March 16, 2023, W.W. filed a substantially identical complaint against Orlando Health. *W.W. v. Orlando Health Medical Group, Inc.*, Case No. 23-cv-00483 (M.D. Fla.) (Doc. 1 at ¶ 4) ("First W.W. Action"). W.W. proceeded with service of process and her attorneys filed motions to appear pro hac vice. (*Id.* at Docs. 11-13, 15-16). Nonetheless, when the First W.W. Action was *sua sponte* dismissed without prejudice on April 12, 2023, due to the failure to file a Notice of Pendency of Other Actions and Disclosure Statement, W.W. did nothing

to correct this procedural deficiency. (*Id.* at Doc. 17). Presumably, this was because her counsel was electing to proceed with a similar action filed one day prior to the First W.W. Action in the Middle District of Florida, Tampa Division, *Cyr v. Orlando Health, Inc.*, No. 23-cv-00588 (M.D. Fla.) ("*Cyr* Action"), on behalf of a different plaintiff.[1] It was not until January 31, 2024, almost a year after filing the First W.W. Action, that W.W. again tried to assert claims against Orlando Health by seeking to join the *Cyr* Action as a named plaintiff. *Cyr v. Orlando Health, Inc.*, No. 23-cv-00588, Doc. 50 (M.D. Fla.). When the Court denied leave to amend to add W.W. as a plaintiff in the *Cyr* Action, the *Cyr* Action was voluntarily dismissed. *Id.* at Docs. 53 & 54. Four months after the voluntary dismissal of the *Cyr* Action, W.W. filed this Action. (*See id.* at Doc. 54.).

## II. Complaint Allegations.

### A. The relevant Parties and website at issue.

Orlando Health is a nonprofit hospital network in Central Florida. (Doc. 1 at ¶ 26). Orlando Health operates the publicly accessible Website, www.orlandohealth.com. (*Id.* at ¶ 3). W.W. alleges she received healthcare services from Orlando Health's facilities since 2018 and "used [Orlando Health's] Website and MyChart Patient Portal to communicate Private Information to [Orlando Health] on numerous occasions." (*Id.* at ¶¶ 95-96). W.W. claims that Orlando Health installed "tracking tools" such as the Pixel, CAPI, and Google Analytics on its

[1] While Orlando Health's motion to dismiss in the *Cyr* action was denied by the court in a paperless order that did not address the merit, since that order district courts across the country have dismissed similar claims.

Website and caused information about her activities on the Website to be sent to Meta and Google. (*Id.* at ¶ 5, 57).

B. Plaintiff does not actually allege Orlando Health installed "tracking tools" within the MyChart Patient Portal.

W.W alleges she communicated PII and PHI to Orlando Health that was intercepted and transmitted to Meta and Google. (Doc. 1 at ¶ 1). In an apparent effort to survive dismissal by giving the impression she did more on the public Website than mere browsing activities and searches that could have been done on WebMD, W.W. intentionally asserts vague allegations concerning Orlando Health's MyChart Patient Portal. Notably, however, she does not actually allege that Orlando Health installed "tracking tools" *within the authenticated*[2] *portion of the MyChart Patient Portal*. For example, W.W. only expressly alleges that "tracking tools" were deployed on www.orlandohealth.com (the publicly accessible website). (Doc. 1 at ¶ 5). By contrast, as it pertains to the MyChart Patient Portal, Plaintiff only alleges that "tracking tools" were deployed in "the MyChart Sign In/Sign Up page that *navigates to* the login page for the MyChart Portal," which still resides on www.orlandohealth.com and not within an authenticated patient portal. (*Id.* at ¶ 5 (emphasis added)); *see also* https://www.orlandohealth.com/mychart. W.W. does

[2] Authenticated portion of the patient portal refers to the webpages available to a person after logging in to their unique account, as opposed to the publicly available portions of the Website or the sign in or sign up page for the portal that navigates to a subdomain containing the MyChart login page *Cf.* https://www.orlandohealth.com/mychart, *with* https://mychart.orlandohealth.com/MyChart/Authentication/Login?; *see also Okash v. Essentia Health*, No. 23-482, 2024 WL 1285779, at *2 n.1 (D. Minn. Mar. 26, 2024) (taking judicial notice of the contents of the public website).

not allege that "tracking tools" were actually used within MyChart. Instead, she makes an amorphous statement that she is "presently unaware" of every type of "tracking tool" deployed on MyChart. (Doc. 1 at ¶ 6). Indeed, while W.W. goes to great lengths to provide many *hypothetical* examples of alleged "tracking tools" at work on the Website, her only specific reference to MyChart is to the sign in or sign up page on the Website, which navigates to a separate subdomain that contains the login page for MyChart. (*Id.* at ¶ 92). And, all that a website visitor may do on that sign in/sign up page on the Website is "click" on the sign in or sign up button—not actually login or enter any information. *See supra* note 2.

W.W. also alleges that a "technology services provider" accessed her "Demographics" in the MyChart portal. (*Id.* at ¶¶ 104-105). But these allegations are a red herring because she does not allege that "ThinkAndor" is a "tracking tool"[3] or that it was not she who used the ThinkAndor platform for a "virtual visit." (*See id.*).

C. <u>Plaintiff's allegations of browsing and searching for information on the Website and about a hypothetical person in hypothetical scenarios are insufficient.</u>

As set forth above, a parsing of the actual allegations in the Complaint make clear it is only the Website (and not the MyChart portal) that is at issue in this litigation which renders many of W.W.'s allegations implausible, irrelevant, and insufficient to state a claim. W.W. conclusively asserts that her protected health information ("PHI") and personally identifiable information ("PII"), collectively

[3] It is not a tracking tool. Instead, it is a virtual visit platform. *See* https://andorhealth.com/thinkAndor.html.

defined in the Complaint as "Private Information," were transmitted to unauthorized third parties. (*Id.* at ¶ 1). But W.W. falls short of identifying specific "Private Information" that was "intercepted" through the use of alleged "tracking tools" on the Website, choosing instead to base her Complaint largely around hypothetical scenarios of what hypothetical persons may do on the Website. (*Id.* at ¶¶ 69-92).

In the 248-paragraph Complaint, W.W. devotes less than 20 paragraphs to her specific experience. (Doc. 1 at ¶¶ 95-114). Out of those, less than 5 of the paragraphs specifically address W.W.'s use of the Website and what she did on the Website. (*Id.* at ¶¶ 96, 99, 100-101). While W.W. alleges performing several actions pertaining to receiving healthcare services, she lumps them all together under the allegation of what she did on the "Website and/or MyChart Patient Portal." (*Id.* at ¶ 100). Plaintiff alleges she used the "Website and/or MyChart Patient Portal" to "complete forms to request medical records/invoices, complete treatment authorization forms, communicate with her medical providers, review healthcare records, request medical bills/invoices, [and] pay medical bills…," but those allegations can only plausibly relate to MyChart as none of those functions are available on the public Website. *See generally* www.orlandohealth.com; *see also Okash*, 2024 WL 1285779 at *2 n.1 (rejecting allegations of actions that could only be taken on MyChart).

As explained above, a detailed review of the allegations shows that W.W. does not actually allege the use of Meta Pixel, Google Analytics, or other tools *within* MyChart. Thus, any "PII" or "PHI" that she may have provided when performing those actions within the MyChart portal cannot support her claims premised on what

she did on the public Website.

Indeed, when limited to just the Website or sign in/sign up page on the Website (as opposed to the actual MyChart patient portal), W.W. only alleges using the Website to find doctors without specifically identifying what "PHI" she communicated to Orlando Health which was disclosed to unauthorized third parties. (Doc. 1 at ¶ 101). The remainder of the allegations in the Complaint are W.W.'s characterizations of how the Pixel, CAPI, and Google Analytics code works (*id.* at ¶¶ 40-56), hypothetical scenarios of a hypothetical visitor to the website (*id.* at ¶¶ 47, 74-92), and "HIPAA standards" which have no bearing on the validity of the claims alleged (*id.* at ¶¶ 115-128). While W.W. has carefully crafted her Complaint to *suggest* that her medical information may have been transmitted to Meta and Google, she has failed to identify any specific PHI or PII about *her* that was actually intercepted and transmitted to Meta or Google.

## STANDARD OF REVIEW

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). A court considering a motion to dismiss must "take the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

### I. W.W. has Failed to Allege a Claim under the FSCA.

To allege a claim under the FSCA, a plaintiff must allege facts showing that there was an (1) interception (2) of the contents of a wire, oral or electronic communication (3) through the use of an electronic, mechanical, or other device. §§ 934.02(3), Fla. Stat. Thus, W.W.'s FSCA claim turns on whether her interactions with Orlando Health's website constitute "electronic communications" whose "contents" were unlawfully "intercepted" by a "device" within the meaning and scope of the FSCA.[4] As a matter of law, W.W.'s activities on the Website are insufficient to state a claim under the FSCA.

The FSCA defines the "contents" of a communication to mean "any information concerning the *substance, purport or meaning of the communication*." § 934.02(7), Fla. Stat. (emphasis added). Because the FSCA is modeled after its federal counterpart, the Federal Wiretap Act, Florida courts follow federal courts as to the meaning of analogous provisions, including what constitutes "contents" of a communication. *See, e.g.*, *Minotty v. Baudo*, 42 So.3d 824, 831 (Fla. 4th DCA 2010). In this regard, the Ninth Circuit's decision in *In re Zynga Privacy Litigation*, 750 F.3d 1098, 1107 (9th Cir. 2014) is instructive as to the intended purpose and meaning of the term "contents" in the context of the Federal Wiretap Act, as "contents" is

---

[4] Orlando Health does not concede any of the other elements of W.W.'s FSCA claim by not addressing them herein and expressly reserves all arguments regarding the same.

similarly defined in the FSCA. Compare § 934.02(7), Fla. Stat., *with* 18 U.S.C. § 2510(8). In *In re Zynga*, the Ninth Circuit held that the plaintiff's Meta ID, which "functions as a 'name' or 'subscriber number or identity,'" and "location of a webpage a user is viewing [that] functions like an 'address'" were not protected "contents" sufficient to survive a motion to dismiss. *Id.* That is because the definition of "contents" is intended to mean "a person's intended message to another (i.e., the 'essential part' of the communication, the 'meaning conveyed,' and the 'thing one intends to convey')." *Id.* at 1106.

Following this analogous federal law, a seminal Florida court decision held that allegations the defendant intercepted plaintiff's so-called electronic communications including "search terms," "information inputted by Plaintiff, and pages and content viewed by Plaintiff," were insufficient to state a claim for a violation of FSCA. *Jacome v. Spirit Airlines, Inc.*, No. 2021-000947-CA-01, 2021 WL 3087860, at *3-4 (Fla. Cir. Ct. June 17, 2021) ("The Court further finds that Congress did not intend for the Federal Wiretap Act to extend to the use of commonplace analytics software to improve a website browsers' experience and the FSCA, being modeled after the Federal Wiretap Act, likewise does not extend to the use of commonplace analytics software to improve a website browsers' experience."). The *Jacome* court found that this information was "precisely the type of non-record information that courts consistently find do not constitute 'contents' under the Federal Wiretap Act or any of its state analogs because it does not convey the substance or meaning of any message." *Id.* Indeed, there is no actual intended

message to another when browsing or searching for information on a public website. Here, W.W. alleges that information inputted on the Website was "intercepted" but she, like the plaintiff in the *Jacome* case, fails to identify the specific information.

The holding in *Jacome* has been adopted by multiple U.S. District Courts in Florida, with the federal courts dismissing claims that the alleged interception of website browsing activity violates the FSCA. *See e.g.*, *Cardoso v. Whirlpool Corp*, Case No. 21-CV-60784-WPD, 2021 WL 2820822, at *1 (S.D. Fla. Jul. 6, 2021); *Goldstein v. Luxottica of Am., Inc.*, Case No. 21-80546-CIV, 2021 WL 4093295 at *2–3 (S.D. Fla. Aug. 23, 2021), *report and recommendation adopted*, 2021 WL 4125357 (S.D. Fla. Sept. 9, 2021); *Goldstein v. Costco Wholesale Corp.*, 559 F. Supp. 3d 1318, 1322 (S.D. Fla. 2021); *Swiggum v. EAN Servs.*, LLC, Case No. 8:21-CV-493-TPB-CPT, 2021 WL 3022735, at *2 (M.D. Fla. July 16, 2021).[5] And, in *Cardoso v. Whirlpool Corp.*, the plaintiff alleged that the defendant intercepted the plaintiff's "personal interests, browsing history, queries, and habits as he interacted with and browsed [d]efendant's website" and the ***contents of live chat feature***. 2021 WL 2820822 at *1; *see also Cardoso v. Whirlpool Corp.*, Case No. 21-CV-60784-WPD, Doc. 33 (Second Amended Class Action Complaint) at ¶¶ 41-44 (S.D. Fla.). In *Cardoso,* the plaintiff further alleged that the conduct could cause "sensitive information and other personal information to

[5] The fact that the decision in *Jacome* and subsequent district court decisions involved a different website technology, session replay, is of no consequence. Plaintiff's allegations center on the alleged tracking of a person's use of a website just like the allegations of the plaintiffs in *Jacome* and other cases. *See, e.g.*, *Cardoso* 2021 WL 2820822, at *1 (complaint alleged session replay captured "search terms, information inputted into the website, and pages and content viewed while visiting the website…").

leak to third parties." *Cardoso*, 2021 WL 2820822 at *1. The court, however, held that plaintiff's allegations were insufficient to state a claim under the FSCA, adopted the reasoning in *Jacome*, and dismissed the action. *Id.* at *2.

Here, W.W. fails to allege *facts* showing that the *substantive contents* of any of *her* communications on the Website (see *supra* at pp. 4-7) were unlawfully intercepted by Orlando Health. W.W.'s parroting of the legal conclusion that "Private Information" is intercepted, without any facts as to *what* "Private information" was intercepted is insufficient as a matter of law. *See Goldstein*, 559 F. Supp. 3d at 1322 ("The Court must know *what* information was allegedly intercepted to determine *whether* it qualifies as content." (emphasis in original)). Indeed, W.W. crafts her allegations in a way to *suggest* that her information inputted on the Website *may* have been intercepted, but falls short of alleging whether there was an interception and, more importantly, what precisely was plausibly "intercepted." (*See supra* at pp. 4-7). And while W.W. alleges that her own Facebook account shows that "PHI and PII" was transmitted to Facebook, the screenshot merely reflects that "1 interaction" was "shared with" Facebook. (Doc. 1 at ¶ 103). W.W. does not allege what that "interaction" was (i.e., was it just opening the Website and doing nothing else or was it an actual communication?). That singular vague "interaction" stands in stark contrast to W.W.'s insinuation that, since she used the Website since 2008, substantive communications must have been intercepted. W.W.'s mere suggestions and vague conclusory assertions regarding her own website activity, and reliance on

the website activity of hypothetical plaintiffs, are not enough. *See generally Nienaber v. Overlake Hospital Med. Ctr.*, No. 23-cv-01159, 2024 WL 2133709, at *6 (W.D. Wash. May 13, 2024) ("Plaintiff's two sentences of specific allegations coupled with the hypotheticals offered is simply not enough.").

## II. W.W. Failed to State a Claim under the Federal Wiretap Act.

W.W.'s claim under the Federal Wiretap Act for unauthorized interception (Count II) fails for several reasons. First, for all the reasons stated *supra* in Part I, W.W. has failed to allege the interception of an electronic communication. Second, even if W.W. has alleged the interception of an electronic communication (she has not), the Federal Wiretap Act's one-party consent rule bars her claim regardless of whether the alleged interception concerned her PII, PHI, or something else. Third, W.W. has failed to allege facts sufficient to establish the crime-tort exception to the one-party consent rule under the Federal Wiretap Act.

### A. Orlando Health was a Party to the Allegedly Intercepted Communications.

Under the Federal Wiretap Act's one-party consent rule, a direct party to a communication cannot unlawfully intercept the communications. 18 U.S.C. § 2511(2)(d) (no liability where "one of the parties to the communication has given prior consent" to the interception); *Ramos v. Delphi Behavioral Health Grp., LLC*, No. 21-11218, 2022 WL 1415856, at *1 (11th Cir. May 4, 2022) ("[I]t is lawful for an individual to intercept a communication if he is a party to it." (citing 18 U.S.C. § 2511(2)(d)). As the party that allegedly installed the technologies at issue on its own

Website, Orlando Health "necessarily consent[ed] to the use of those [technologies]" and their collection of the alleged communications between W.W. and Orlando Health. *R.S. v. Prime Healthcare Servs., Inc.*, No. 5:24-CV-00330-ODW (SPX), 2024 WL 3730609, at *2 (C.D. Cal. Aug. 7, 2024). Thus, there can be no actionable claim under the Federal Wiretap Act.

It is well-settled that where a plaintiff claims that a hospital's use of Pixel or other analytics tools on its website resulted in the alleged interception of the plaintiff's communications with the hospital, the "hospital is a party to the communication." *See, e.g.*, *id.* at *2 ("Courts across the country, including others in this District, agree that a hospital is a party to the communication where it uses a pixel to track activity on its website.") (collecting cases); *B.K. v. Eisenhower Med. Ctr.,* No. 5:23-cv-2092-JGB, 2024 WL 878100, at *5 (C.D. Cal. Feb. 29, 2024); *Williams v. Dukehealth*, No. 1:22-cv-727, 2024 WL 898051, at *8 (M.D.N.C. Mar. 1, 2024), *report and recommendation adopted sub nom. Naugle v. Duke Univ. Health Sys., Inc.*, No. 1:22-cv-727, 2024 WL 1307216 (M.D.N.C. Mar. 27, 2024); *Okash*, 2024 WL 1285779 at *4 (D. Minn. Mar. 26, 2024).

Here, W.W. acknowledges and admits that Orlando Health is a party to the "communications" at issue. (*See, e.g.*, Doc. 1 at ¶¶ 106, 198 (alleging Orlando Health was intended recipient of alleged "communication")). Accordingly, under the one-party consent rule, W.W.'s Federal Wiretap Act cannot survive unless she alleges an exception to the rule. As set forth below, she has attempted to do so, but has fallen far short.

B. The Federal Wiretap Act's "Crime-Tort" Exception Does Not Apply.

W.W. attempts to sidestep the fatal flaw in her Federal Wiretap Act claim that Orlando Health was a party to the communications by relying on the crime-tort exception to the one-party consent rule. (Doc. 1 at ¶ 209). The crime-tort exception to the one-party consent rule is applicable where a "communication is intercepted for the **purpose** of committing any criminal or tortious act." 18 U.S.C. § 2511(2)(d) (emphasis added). W.W. contends that the exception to the one-party rule applies because the alleged interception resulted in a violation of the FSCA and invasion of privacy. (Doc. 1 at ¶ 209). But the purpose-based exception to the one-party consent rule does not apply simply because an alleged interception *itself* is tortious or unlawful. Such an interpretation would make the exception swallow the rule.

It is well settled that the criminal or tortious purpose "must be separate and independent from the act of recording." *Planned Parenthood Fed'n of Am., Inc. v. Newman*, 51 F.4th 1125, 1136 (9th Cir. 2022). "Congress chose the word 'purpose' for a reason. Therefore, the offender must have as her objective a tortious or criminal result." *Caro v. Weintraub*, 618 F.3d 94, 100 (2d Cir. 2010). As such, "the focus is *not* upon whether the interception itself violated [the] law; it is upon whether the *purpose* for the interception—its intended use—was criminal or tortious." *Newman*, 51 F.4th at 1136 (emphasis in the original); *Lucas v. Fox News Network, LLC*, 248 F.3d 1180, 1180 n.2 (11th Cir. 2001) ("[T]he district court correctly noted that plaintiffs' allegation that defendants' purpose in videotaping the session was to cause Lucas

insult and injury was insufficient to state a claim under the Federal Wiretap Act.").

In short, for the crime-tort exception to apply here, W.W. must allege that, at the time her communications with Orlando Health were allegedly intercepted, Orlando Health's *intended purpose* was to commit *a separate and independent* criminal or tortious act – beyond any liability for the act of intercepting. W.W. has failed to do so. To the contrary, W.W. alleges only that Orlando Health's purpose was to violate the FSCA and invade website visitors' privacy. (*See* Doc. 1 at ¶ 209). In other words, W.W. alleges that the exception applies merely because the interception occurred. This is not enough.

W.W. also claims the crime-tort exception applies because Orlando Health allegedly had a financial motive in using the alleged website analytics tools. (Doc. 1 at ¶ 210). But acting for a commercial gain such as profit, without more, is insufficient to trigger application of the crime-tort exception. *See, e.g., Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 945 (N.D. Cal. 2023) (dismissing Federal Wiretap Act claim because the defendant's alleged profit motive is insufficient to trigger the crime-tort exception); *Roe v. Amgen Inc.,* No. 2:23-CV-07448-MCS-SSC, 2024 WL 2873482, at *6 (C.D. Cal. June 5, 2024) (same); *Okash*, 2024 WL 1285779, at *4 (same); *In re DoubleClick, Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 518 (S.D.N.Y. 2001) ("DoubleClick's purpose has plainly not been to perpetuate torts on millions of Internet users, but to make money by providing a valuable service to commercial Web sites").

W.W. cannot rely on alleged HIPAA violations, premised on a guidance from

the US Department of Health and Human Services ("HHS"), to support her Federal Wiretap Act claim. (Doc. 1 at ¶¶ 33-39). W.W. cannot restate alleged violations of HIPAA as violations of the Federal Wiretap Act to manufacture a private right of action that does not exist. *See Brush v. Miami Beach Healthcare Group Ltd.*, 238 F. Supp. 3d 1359, 1367 (S.D. Fla. 2017) ("Plaintiff cannot manipulate the common law to state a private, statutory cause of action where none exists."). *See also Okash*, 2024 WL 1285779, at *4 (holding that "because neither the alleged HIPAA nor privacy violations were independent of the interception, the crime-tort exception does not apply"). And, notably, the HHS guidance upon which W.W. so heavily relies upon in her Complaint has been vacated in relevant respects by the Northern District of Texas. *AHA v. Becerra*, No. 23-cv-01110, 2024 WL 3075865, at *14 (N.D. Tex. June 20, 2024) ("[T]he closest the Proscribed Combination gets to IIHI is a speculative inference extrapolated from (but unsubstantiated by) collected metadata….[T]he Proscribed Combination facially exceeds HIPAA's unambiguous text….").

W.W. has failed to allege sufficient facts to plausibly claim that Orlando Health has violated the Federal Wiretap Act. Her claim should be dismissed.

## III. W.W.'s Breach of Confidence Claim Fails.

W.W. has failed to allege the elements necessary to state a breach of confidence claim. "A common law breach of confidence lies where a person offers private information to a third party in confidence and the third party reveals that information." *Stephens v. Availity, L.L.C.*, Case No. 19-cv-236, 2019 WL 13041330, at *7 (M.D. Fla. Oct. 1, 2019); *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 932

(11th Cir. 2020) ("A breach of confidence 'is rooted in the concept that the law should recognize some relationships as confidential *to encourage uninhibited discussions between the parties involved*." (emphasis added)).

While W.W.'s Complaint is big on rhetoric, it falls far short of actual facts supporting what alleged "Private Information" about W.W. was disclosed through W.W.'s actions on the Website, that Orlando Health was to keep in confidence, and which was later revealed to a third party. The Complaint conclusively refers to W.W.'s "Private Information," including "personally identifiable information ("PII")" and "protected health information ("PHI")." (Doc. 1 at ¶ 1). However, the Complaint fails to specify (1) the PII and PHI of W.W. entrusted to Orlando Health when browsing or searching for information on the Website, (2) which was to be kept in confidence, and (3) that this confidential information was revealed.

W.W. has failed to plead facts sufficient to show that any of her alleged medical information provided in the course of a doctor-patient relationship was actually transmitted to Facebook, Google, or any other third party. Indeed, all W.W. alleges about herself is that she has been an Orlando Health patient and has used the "Website and/or MyChart Patient Portal." But, as to just the Website specifically, W.W. only alleges she used it to search for doctors and vaguely claims she "communicated her PHI" in the course of doing so. (*Id.* at ¶ 101). The remainder of her allegations on paragraph 100 of the Complaint, which vaguely refers to "Website and/or MyChart Patient Portal," are replete with alleged actions she could not have plausibly taken on the public Website. *See supra* at pp. 4-7; *Okash*, 2024 WL 1285779

at *2 (taking judicial notice of the website and finding many of plaintiff's allegations pertained to matters that could only be performed within the MyChart patient portal which was not at issue).

Nowhere does W.W. allege what medical information of hers was actually disclosed to a third party. Instead, W.W. describes scenarios of hypothetical "patients" using Orlando Health's Website and searching for a doctor, providing examples of information that hypothetically ***could*** be disclosed to Facebook or Google in the fabricated scenarios. None of these allegations concern W.W. And a hypothetical plaintiff's allegations cannot sustain this action.

The recent decision in *B.K. v. Eisenhower Med. Ctr.*, dismissing a breach of confidence claim where the Complaint alleged similar hypothetical scenarios, is instructive:

> Plaintiffs fail to allege what, if any, medical information or medical records were transmitted or disclosed. Notably, Plaintiffs' Complaint is 90 pages long but includes less than four pages of vague allegations about Plaintiffs and their experiences with Defendant. The Complaint is replete with conjectures and hypothetical scenarios and patients. Plaintiffs fail to allege any specificity as to what medical information was allegedly disclosed or when it was disclosed. B.K. states she started using the Website over three years ago and started receiving unsolicited ads "shortly after" but provides no more information about the alleged disclosures.

2024 WL 878100 at *4. Given these fatal flaws, the court found that the plaintiff's breach of confidence claim could not survive dismissal. *Id.* at *8; *see also Doe v. Davita Inc.*, No. 23-cv-01424, 2024 WL 1772854, at *2 (S.D. Cal. Apr. 24, 2024) (dismissing claims against healthcare provider arising from use of Pixel because "[plaintiffs]

fail[ed] to state what information they each provided to Defendant, via their browsing activity, that was subsequently disclosed to Meta”).

Plaintiff’s own allegations as to how the alleged Pixel, CAPI, and Google Analytics software work reveal that what is allegedly being sent to Facebook and Google is merely internet metadata automatically generated as a function of a person’s browsing activities or the searching of information and not any actual doctor-patient communications.[6] (*See, e.g.*, Doc. 1 at ¶¶ 73, 75-77, 85, 87). The fact W.W. alleges she was supposedly looking for doctors on the Website, *id.* at ¶ 101, and not other public sources like Goole search or WebMD, does not now make the searches confidential private information exchanged with Orlando Health to be kept in confidence. *See Smith v. Facebook*, 262 F.Supp.3d 943, 954-55 (N.D. Cal. 2017) (holding that disclosure to Facebook of browsing history on healthcare providers’ public websites, as alleged here, did not disclose protected health information because “[t]hese pages contain general health information that is accessible to the public at large.”).

Because W.W. does not allege *facts* showing an unauthorized disclosure of her actual medical information or medical records, the Court should dismiss Count III.

**IV. W.W.’s Invasion of Privacy Claims Fail.**

A public website is not W.W.’s private quarters and she does not allege an intrusion into her home or another private place. Accordingly, her claim for invasion of privacy is due to be dismissed because such a claim “requires intrusions into a

[6] *See supra* at pp. 4-7.

place in which there is a reasonable expectation of privacy." *Spilfogel v. Fox Broadcasting Co.*, 433 F. App'x 724, 726 (11th Cir. 2011) (internal quotation marks omitted). Specifically, "[f]or liability to attach, the offender must be guilty of 'physically or electronically intruding into one's *private quarters*." *Id.* (emphasis added); *see also Bradley v. City of St. Cloud*, Case No. 12-cv-1348, 2013 WL 3270403, at *5 (M.D. Fla. June 26, 2013). 2013 WL 3270403 at *5; *see also Watts v. City of Hollywood, Fla.*, 146 F. Supp. 3d 1254, 1267 (S.D. Fla. 2015) (database where plaintiff's driver's license information was kept was not a "place" for purposes of a claim for invasion of privacy).

"Courts generally agree that when a plaintiff voluntarily browses a healthcare website, there is no intrusion when the Pixel transmits the information to Meta." *Okash*, 2024 WL 1285779 at *7 (collecting cases); *Allen v. Novant Health, Inc.*, No. 22-697, 2023 WL 5486240, at *2 (M.D.N.C. Aug. 24, 2023); *Hartley v. Univ. of Chi. Med. Ctr.*, No. 22-5891, 2023 WL 7386060, at *3 (N.D. Ill. Nov. 8, 2023). This is because "[i]ntrusion requires an affirmative act by the defendant in obtaining the information which cannot exist when the information is provided by the plaintiff, even if a defendant later shares the information." *Okash*, 2024 WL 1285779 at *7; *accord Nienaber v. Overlake Hosp. Med. Ctr.*, No. 2:23-CV-01159-TL, 2024 WL 2133709, at *9 (W.D. Wash. May 13, 2024).

Here, W.W.'s claim for invasion of privacy is rooted in her allegations that she willfully shared private information with Orlando Health (*See* Doc. 1 at ¶ 61), which

Orlando Health then allegedly shared with third parties, Facebook and Google. (*See* Doc. 1 at ¶¶ 62, 82). Because W.W. alleges that she voluntarily provided her information to Orlando Health through her use of Orlando Health's website, there was never an intrusion upon her seclusion and her invasion of privacy claim fails.

**V. Plaintiff's Unjust Enrichment Claim Also Fails.**

"Under Florida law, a claim for unjust enrichment requires that: '(1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted or retained the benefit conferred; and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it.'" *Desue v. 20/20 Eye Care Network, Inc.*, Case No. 21-CIV-61275, 2020 WL 796367, at *8 (S.D. Fla. Mar. 15, 2022). W.W.'s unjust enrichment claim fails for several reasons.

First, W.W. has failed to plead any facts to support her conclusory allegations of a purported "benefit . . . in the form of Private Information" that conferred "economic, intangible, and other benefits, including substantial monetary compensation" on Orlando Health. (*See* Doc. 1 at ¶ 239). In the case of *B.K. v. Eisenhower Med. Ctr.,* the court dismissed a virtually identical unjust enrichment claim, explaining:

> Plaintiffs do not allege any facts that would lead the Court to find that Defendant was unjustly enriched. Above, the Court finds that Plaintiffs fail to plead facts showing that Defendant disclosed Plaintiffs' information—Plaintiffs fail to persuade the Court that it should come to a different conclusion as to [the unjust enrichment claim]. Without specific allegations about the underlying information that was allegedly disclosed, it is unclear to the Court how, if at all, Defendant was

> unjustly enriched. . . . the Complaint does not include facts specific to unjust enrichment of Defendant resulting from Plaintiffs' information.

2024 WL 878100 at *9.

Here, like in *B.K.*, where W.W. has not made specific factual allegations as to what information she provided to Orlando Health that was subsequently disclosed, she has failed to establish a benefit was conferred on Orlando Health. *See also Overlake Hosp. Med. Ctr.*, 2024 WL 2133709 at *14 (In a case involving the use of the Meta Pixel, finding that the plaintiff made no "contentions regarding the specific private information she contends that she shared with Defendant and that Defendant, in turn, shared to third parties" and "[w]ithout this factual support…Plaintiff has not plead a concrete detriment for purposes of an unjust enrichment claim.").

Second, W.W.'s unjust enrichment claim fails because courts routinely recognize that allegations of collection and dissemination of website usage information are insufficient to establish an uncompensated benefit as needed to support a claim for unjust enrichment. *See Heeger v. Facebook, Inc.*, 509 F. Supp. 3d 1182, 1191 (N.D. Cal. 2020) (dismissing unjust enrichment claim where plaintiffs were unable to make any allegation that "they retain a stake in the profits garnered from" the collection of their IP addresses); *see also In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 834-35 (N.D. Cal. 2020) (rejecting unjust enrichment claim based on profits allegedly garnered from plaintiffs' "'personal information' that Defendants[] allegedly used"). Here, W.W. has failed to allege the requisite

uncompensated benefit to Orlando Health for which "the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it." *See Mount v. PulsePoint, Inc.*, Case No. 13-civ-6592, 2016 WL 5080131, at *6 (S.D.N.Y. Aug. 17, 2016) (dismissing unjust enrichment claim finding "[w]hile we recognize that browsing information may possess value in the abstract, absent allegations suggesting that plaintiffs' ability to monetize their browsing information was diminished, this alleged harm remains too conjectural."), *aff'd*, 684 F. App'x 32, 36 (2d Cir. 2017). For these reasons, Count V should be dismissed.

**VI. W.W.'s Claim for Breach of Implied Contract Fails.**

W.W. attempts to bring a claim for breach of implied contract on the theory that "[w]hen Plaintiff and the Class Members provided their Private Information to Defendant, they entered into an implied contract pursuant to which [Orlando Health] agreed to safeguard and not disclose their Private Information without consent." (Doc. 1 at ¶ 245). As a matter of law, these allegations are insufficient to allege the existence of an implied contract. *See Overlake Hosp. Med. Ctr.*, 2024 WL 2133709 at *11 (holding that similar allegations were "insufficient to allege the existence of an implied contract."). W.W. has failed to allege any actual facts indicating a meeting of the minds on any terms underlying such "implied contract," defining the "contract," or alleging damages flowing from a purported breach.

"A contract implied in fact…is based on a tacit promise, one that is inferred in whole or in part from the parties' conduct, not solely from their words." *Brush*, 238 F. Supp. 3d at 1368-69. "Common examples of contracts implied in fact are where a

person performs services at another's request, or where services are rendered by one person for another without his expressed request, but with his knowledge, and under circumstances fairly raising the presumption that the parties understood and intended that compensation was to be paid." *Id.* Here, there are no allegations that plausibly show that Orlando Health agreed not to use website analytics tools on its publicly accessible website. There are no *factual* allegations whatsoever concerning any conduct by Orlando Health that would support such a theory. W.W.'s formulaic recitation of the elements of the claim is insufficient. *Id.* (dismissing claim for breach of implied contract because "[n]othing in the Plaintiff's Complaint gives rise to a factual inference that the Defendants tacitly agreed to secure her personal data in exchange for remuneration").

Lastly, an implied contract claim without damages is not actionable. *See Vanguard Plastic Surgery, PLLC v. Aetna Life Ins. Co.*, Case No. 22-cv-61853, 2023 WL 3171963, at *6 (S.D. Fla. Mar. 27, 2023) (damages is an element of claim for breach of implied contract). W.W.'s conclusory allegations of "loss of the benefit of [her] bargain and diminution in value of Private Information" are conclusory assertions lacking any factual support. (*See* Doc. 1 at ¶ 247). "[D]amages based on the collection and dissemination of personal information are insufficient to state a claim for breach of contract." *Yunker v. Pandora Media, Inc.*, 2013 WL 1282980, at *13 (N.D. Cal. Mar. 26, 2013); *Overlake Hosp. Med. Ctr.*, 2024 WL 2133709 at *13 ("[C]ourts in this circuit have dismissed cases where, like here, plaintiff's injury is based on 'the loss of the inherent value of their personal data,' as well as where it was

undisputed that plaintiffs paid no money to the defendant" for the safeguarding of that data.); *Doe I v. Google LLC*, No. 23-CV-02431-VC, 2024 WL 3490744, at *7 (N.D. Cal. July 22, 2024) ("The loss of personal data is also not sufficient to demonstrate an economic injury.").

In *B.K.,* the court dismissed a similar implied contract claim on the grounds that the plaintiff failed to establish damages, explaining:

> A basic principle of contract law is that the "purpose of contract damages is to put a plaintiff in the same economic position he or she would have occupied had the contract been fully performed." Low v. LinkedIn Corp., 900 F. Supp. 2d 1010, 1029 (N.D. Cal. 2012). ***Plaintiffs have not persuasively alleged that they "reasonably expect[ed] that they would be compensated for the 'value' of their personal information."*** Id. (citing In re Jetblue Airways Corp. Privacy Litigation, 379 F. Supp. 2d 299, 327 (E.D. N.Y. 2005)). ***Plaintiffs have not alleged that they, or any other Users, have been foreclosed from opportunities to capitalize on the value of their personal information.***

2024 WL 878100 at *7 (C.D. Cal. Feb. 29, 2024) (emphasis added).

This Court should likewise dismiss W.W.'s breach of implied contract claim as it fails as a matter of law.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Defendant Orlando Health, Inc. respectfully requests that the Court dismiss the Complaint against it pursuant to Rule 12(b)(6) because Plaintiff fails to state any viable claim and award any such other and further relied as the Court may deem just and appropriate.

## RULE 3.01 CERTIFICATION

On August 23, 2024, the undersigned had a substantive conversation via Microsoft Teams with Plaintiff's counsel, Clint Watson, regarding this Motion to Dismiss. The Parties were unable to reach an agreement as to any of the arguments raised in this Motion to Dismiss.

Respectfully submitted this 26th day of August, 2024.

**BAKER & HOSTETLER LLP**

*/s/ Yameel L. Mercado Robles*
Julie Singer Brady
Florida Bar No. 389315
Email: jsingerbrady@bakerlaw.com
Yameel L. Mercado Robles
Florida Bar No. 1003897
Email: ymercadorobles@bakerlaw.com
200 South Orange Avenue, Suite 2300
Orlando, FL 32801-3432
(407) 649-4000

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

*/s/ Yameel L. Mercado Robles*
Yameel L. Mercado Robles