**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| W.W.,<br><br>*on behalf of herself and all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>Orlando Health, Inc.,<br><br>Defendant. | Case No. 6:24-CV-01068-JSS-RMN<br><br>Judge Julie S. Sneed<br><br>Magistrate Judge Robert M. Norway<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |

## I. INTRODUCTION

Defendant mischaracterizes Plaintiff's complaint as "allegations of hypothetical scenarios" and wrongly characterizes the redirecting of its patients' communications to unauthorized third parties as normal public website activities. *See* Doc. 17 ("MTD") at 1. Instead, Plaintiff plainly alleges that Defendant, Plaintiff's medical provider, violated Plaintiff's confidentiality and used her communications for unlawful marketing purposes by sharing them with unauthorized third parties such as Facebook and Google. Defendant did this through the use of hidden tracking technologies on its website that intercepted and disclosed Plaintiff's PHI to third parties like Facebook and Google for unlawful commercial purposes without authorization or consent. Federal courts in Florida have repeatedly found under analogous circumstances—including a previous case against Defendant for use of the same technologies—that a dismissal at the pleading stage is improper. *See D.S. v. Tallahassee Mem'l Healthcare*, No. 4:23cv540-MW/MAF, 2024 WL 2318621, at *1 (N.D. Fla. May 22, 2024) (*"TMH"*), citing *Cyr. v. Orlando Health, Inc.*, No. 8:23cv588WJF-CPT (M.D. Fla. July 5, 2023) ("*Orlando Health I*"), ECF No. 37. The Court should reach the same conclusion here.

## II. FACTUAL BACKGROUND

Defendant owns and controls www.orlandohealth.com and encourages its patients to use the site for booking medical appointments, locating specific physicians and treatment facilities, communicating medical symptoms, conditions, and treatments via the search bar and related webpages, signing up for events and classes,

and more. Compl., Doc. 1, ¶ 3. Defendant installed tracking technologies ("Tracking Tools") onto its Website, including the MyChart Sign In/Sign Up page on Defendant's Website that navigates to the login page for the MyChart Portal. *Id.* ¶¶ 5, 9, 48-55, 57-59, 69-94 149-52. Plaintiff and Class Members used the Website to submit information related to their past, present, or future health conditions, including, for example, searches for their specific health conditions and medical treatments, and the booking of medical appointments with a specific physician. *Id.* The Tracking Tools allowed third parties to intercept Plaintiff's and Class Members' communications without their consent. *Id.* ¶¶ 63, 94, 107, 112. The third parties then used this information to target Defendant's patients for marketing of Defendant's, and others, goods and services. *Id.*

Plaintiff details her specific activities during the relevant timeframe, the results she observed, and establishes a plausible causal connection between her communications with Defendant's website and marketing targeted at her. *See id.* ¶¶ 95-114. "On numerous occasions, Plaintiff W.W. accessed Defendant's Website on her tablet, desktop computer, and mobile device for the purpose of finding and obtaining medical treatment for her specific medical conditions (listed in more detail below)." *Id.* ¶ 99. Plaintiff "used the Website to find gastroenterologists and cardiologists, and she communicated her PHI related to ileostomy, heart pains, fatty liver disease, blacking out when standing up, and meningiomas to find doctors and information concerning these medical conditions and symptoms." *Id.* ¶ 101. "Shortly after using the Website, Plaintiff observed advertisements on her Facebook account for ileostomy

bags, products or services related to strokes, aortic stenosis, and heart failure, neuropathy doctors from Orlando Health, and spinal decompression." *Id.* ¶ 110. Plaintiff never consented to the disclosure of her PHI to third parties. *Id.* ¶ 107.

## III. LEGAL STANDARD

For purposes of a motion to dismiss under Rule 12(b)(6), "the Court must view the allegations of the complaint in the light most favorable to plaintiff, consider the allegations of the complaint as true, and accept all reasonable inferences drawn from the Complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-58 (2007). "'[D]etailed factual allegations' are not required, but the Rule does call for sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *Twombly* at 555). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plaintiff alleges facts, not mere legal conclusions, and as such these facts must be accepted as true. Plaintiff is not required to plead evidence or "detailed factual allegations." *Id.*

## IV. LAW & ARGUMENT

### A. Plaintiff Has Adequately Alleged an FSCA Claim

Defendant first wrongly argues that Plaintiff does not plausibly allege the "contents" of any communications were intercepted. Florida law defines "contents" as "any information concerning the substance, purport, or meaning of that communication." Fla. Stat. § 934.02(7). As Defendant points out, "[b]ecause the

FSCA is modeled after its federal counterpart, the Federal Wiretap Act, Florida follows federal courts as to the meaning of analogous provisions, including what constitutes 'contents' of a communication." MTD at 8.

To that end, Defendant cites *In re Zynga Priv. Litig.*, 750 F.3d 1098 (9th Cir. 2014) for the proposition that a Facebook ID and the referrer header that a user visits are not "contents" for purposes of the Wiretap Act. Defendant relies upon a series of cases in Florida that have followed *In re Zynga* in examining a completely different technology, "session replay," and have concluded that none of the information transmitted constituted "contents" for purposes of the FSCA. *See* MTD at 9-10. But the court in *In re Zynga* recognized that certain types of intercepted information constitute "contents," observing: "Under some circumstances, a user's request to a search engine for specific information could constitute a communication such that divulging a URL containing that search term to a third party could amount to disclosure of the contents of a communication." *In re Zynga*, 750 F.3d at 1108–09. The facts of *Zynga* simply did not involve such descriptive URLs.

Defendant's argument here is identical to the arguments made in *Orlando Health I* and *TMH*, where both courts denied nearly identical motions to dismiss. *See TMH*, 2024 WL 2318621, at *1, citing *Orlando Health I*. Session replay software is distinguishable from the Tracking Tools used here. Accordingly, federal courts have concluded that "contents" are disclosed with pixel tracking software and have distinguished *In re Zynga*. *See, e.g., In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d

589, 605 (9th Cir. 2020) ("Unlike the URLs in *Zynga*, which revealed only that a Facebook user had clicked on a link to a gaming website, Plaintiffs allege that the URLs in the instant case could emanate from search terms inputted into a third-party search engine. These terms and the resulting URLs could divulge a user's personal interests, queries, and habits on third-party websites operating outside of Facebook's platform."); *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1076–77 (N.D. Cal. 2023) ("In my view, the log-in buttons and the kinds of descriptive URLs identified … are 'contents' within the meaning of the statute. Unlike in *Zynga*, the URLs at issue here would not merely reveal the name of a Facebook user or group—as Smith explained, the transmitted URLs include both the 'path' and the 'query string.' [citing to exhibit] (showinghardfordhospital.org/services/digestive-health/conditions-we-treat/colorectal-small-bowel-disorders/ulcerative-colitis URL)").

Since the briefing and order in *Orlando Health I*, several other courts have similarly distinguished between tracking pixels in healthcare and session replay in normal commercial settings. *See, e.g., R.C. v. Walgreen Co.*, No. EDCV 23-1933 JGB (SPX), 2024 WL 2263395, at *16 (C.D. Cal. May 9, 2024); *In re Grp. Health Plan Litig.*, 709 F. Supp. 3d 707, 717-20 (D. Minn. 2023); *Doe v. Microsoft Corp.*, No. C23-0718-JCC, 2023 WL 8780879, at *9 (W.D. Wash. Dec. 19, 2023); *Cousin v. Sharp Healthcare*, 702 F. Supp. 3d 967, 976 (S.D. Cal. 2023). Several other courts have determined that plaintiffs have properly asserted that their "contents" have been transmitted by similar Tracking Tools for purposes of a federal Wiretap Act claim. *Hartley v. Univ. of Chicago Med. Ctr.*, No. 22 C 5891, 2024 WL 1886909, at *2 (N.D. Ill. Apr. 30, 2024); *McCulley,*

*et. al. v. Banner Health*, No. CV- 23-00985-PHX-SPL (D. Ariz. May 5, 2024) ("*Banner Health*") (attached hereto as Ex. A); *In re BetterHelp, Inc. Data Disclosure Cases*, No. 23-CV-01033-RS, 2024 WL 3416511 (N.D. Cal. July 15, 2024).

Defendant's reliance on *Jacome* and its lineage, which are based upon *In re Zynga*, is therefore misplaced. Numerous courts have held that allegations of pixel tracking technology on healthcare websites results in "contents" being transmitted for purposes of a federal Wiretap claim or a claim under the FSCA.

### B. <u>Plaintiff Has Properly Pleaded a Federal Wiretap Claim</u>

Plaintiff alleges Defendant violated the ECPA, which proscribes the interception and disclosure of her electronic communications and the use of those communications' contents. *See* Compl. ¶¶ 195-215 (citing 18 U.S.C. § 2510). For the reasons stated above, Plaintiff has alleged the interception of an electronic communication. Thus, Defendant's *sole defense* is that its conduct falls within the ECPA's party-exception provision. However, this exception does not apply when the "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d).

As alleged throughout the Complaint, Orlando Health's conduct falls within the crime-tort exception. Defendant is a HIPAA-covered entity that knowingly and purposely installed surreptitious Tracking Tools on its Website for the purpose of intercepting its patients' private communications without their knowledge or consent in violation of federal, state, and common laws. Compl. ¶¶ 22-24, 59, 6-80, 94, 102-

03, 107-13. When it installed the Tracking Tools and allowed Plaintiff's communications containing Private Information to be intercepted, it intended to use those communications to avoid HIPAA's and Florida's confidentiality and consent requirements so Defendant could receive "free" advertising services. Thus, Defendant's purpose was to commit a criminal or tortious act to which Plaintiffs did not consent. *Id.*

A long line of recent cases recognized that a plaintiff properly invokes the crime-tort exception under the ECPA by alleging a medical provider knowingly transmitted PHI to third parties like Facebook and Google for financial gain. *See, e.g.*, *M.R. v. Salem Health Hosps. & Clinics*, No. 6:23-CV-01691-AA, 2024 WL 3970796, at *5 (D. Or. Aug. 28, 2024); *Cooper v. Mount Sinai Health Sys., Inc.*, No. 23 Civ. 9485 (PAE), --- F. Supp. ---, 2024 WL 3586357, at *9-11 (S.D.N.Y. July 30, 2024); *Smith v. Loyola Univ. Med. Ctr*, 2024 WL 3338941, at *7 (N.D. Ill., July 9, 2024); *Banner Health*, No. 23-CV-00985-PHX-SPL; *Sweat v. Houston Methodist Hosp.*, 2024 WL 3070184, at *3-4 (S.D. Tex. June 20, 2024); *Walgreen Co.*, 2024 WL 2263395, at 15; *Kane v. Univ. of Rochester*, 2024 WL 1178340, at 7 (W.D.N.Y. March 19, 2024); *Mekhail v. N. Mem'l Health Care*, ---F. Supp. 3d ---, 2024 WL 1332260, at *5 (D. Minn. Mar. 28, 2024); *B.K. v. Desert Care Network*, 2024 WL 1343305, at *6 (C.D. Cal. Feb. 1, 2024); *In re Grp. Health Plan Litig.*, 709 F. Supp. 3d at 718-20. The same circumstances exist here.

***1. The fact that Orlando Health was a party to the communications does not shield it from liability because the crime-tort exception applies.***

The crime-tort exception focuses on whether "the *purpose* for the interception—its intended use—was criminal or tortious," and "[t]he existence of a lawful purpose does not sanitize an interception that was also made for an illegitimate purpose." *In Re Meta Pixel Healthcare Litig.*, 647 F.Supp.3d 778, 799 (N.D. Cal. 2022) (emphasis in original & citation omitted) ("*Meta Pixel I*"). Plaintiff need only allege that either the "primary motivation or a determining factor in [defendant's] actions has been to injure [P]laintiffs tortiously." *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021) (quotations & citation omitted).

Orlando Health wrongly argues that the crime-tort exception does not apply here, but Plaintiff has met her burden by alleging Orlando Health knowingly installed software that surreptitiously intercepted her electronic communications for the purpose of violating both state and federal laws. Compl. ¶¶ 16-17, 129-132 (explaining the disclosures violates Fla. Stat. Ann § 456.057), 209-215 (explaining Defendant's unlawful purpose). More specifically, Orlando Health sought to collect and disclose patients' PHI and/or individually identifiable health information without first obtaining their consent, thereby tortiously and criminally invading Plaintiff's and Class Members' privacy. *Id.* ¶¶ 117-18, 121-123. It is a federal crime to "knowingly" disclose IIHI to third parties, and there are increased penalties when the crime is "committed with the intent to . . . use" the information "for commercial advantage [or] personal gain." *Id.* (citing 42 U.S.C. § 1320d-6). Plaintiff further alleges Orlando Health knowingly disclosed her and other patients' Private Information to third parties in breach of its fiduciary duty of confidentiality. *Id.* ¶¶ 133-140, 219-221. Its acquisition

of Plaintiff's and Class Members' Private Information to disclose it to third parties without authorization gives rise to liability under HIPAA, the FSCA, and other statutes independent of the act of recording Plaintiff's internet activity. *Id.*

Notably, many of the cases that Orlando Health relies on do *not* implicate the disclosure of patient health information and HIPAA. Rather than admit this distinction, Defendant relies on factually inapposite cases to argue that acting for its own commercial gain insulates it from liability. *See* MTD at 14-15. But courts have found profit motive invokes the crime-tort exception. *See, e.g., In re Grp. Health*, 709 F.Supp.3d at 720 (the crime-tort exception may be applicable "where the defendant's primary motivation was to make money"); *Cooper*, 2024 WL 3586357, at *9; *Brown*, 2023 WL 5029899, at *15.

***2. Plaintiff pleads an independent crime or tort.***

Plaintiff alleges Defendant's use of Tracking Technologies is not merely to engage in marketing, but also to avoid obtaining proper consent to disclose confidential medical information, as is required by law. *Meta Pixel I*, 647 F. Supp. 3d at 797 (finding allegations of "the use of patient data for advertising" sufficient at the pleading stage to evince that "plaintiffs may be able to show that the crime-tort exception applies"). Courts interpret the crime-tort exception as requiring only "sufficient facts to support an inference that the offender intercepted the communication for the purpose of a tortious or criminal act that is independent of the intentional act of recording." *Caro v. Weintraub*, 618 F.3d 94, 100 (2d. Cir, 2010). *Caro* explained that "if, at the time of the recording, the offender ***plans*** to use the recording

to harm the other party to the conversation, a civil cause of action exists under the Wiretap Act." *Id.* (emphasis added). The Complaint easily satisfies and exceeds this standard. *See* Compl. ¶¶ 22-24, 58-60, 94, 102-03, 107-113, 149, 152 (explaining that—when it intercepted Plaintiff's Private Information—Orlando Health planned to use it to harm Plaintiff through its unauthorized disclosure to third parties, non-consensual targeted advertising, invasion of privacy, and violation of numerous laws).

Plaintiff does not seek a "private right of action" under HIPAA as Orlando Health suggests. MTD at 16. Rather, she has alleged that Orlando Health's conduct violates numerous laws, and this would still be true even if HIPAA did not exist. Thus, Defendant's reliance on *AHA v. Becerra*, No. 23-cv-01110, 2024 WL 3075865, at *14 (N.D. Tex. June 20, 2024) is misplaced. MTD at 16. Additionally, that case is inapplicable because Plaintiff's allegations are not solely based on the dissemination of IP address or "metadata."[1]

Finally, whether Orlando Health had criminal or tortious intent is a factual question to be decided on the basis of a full evidentiary record. *See, e.g.*, *Cooper*, 2024 WL 3586357, at *8 (explaining that defendant's purpose can be established in discovery); *In re Grp. Health*, 709 F. Supp. 3d at 720 ("[D]etermination of [defendant]'s actual purpose for … using the Pixel Code requires a factual undertaking."). Precisely because Plaintiffs "may be able to show" that the crime-tort exception applies at a

[1] *AHA* is expressly limited to a "Proscribed Communication," a defined term meaning (1) an IP address; and (2) a visit to an unauthenticated public webpage. 2024 WL 3075865, at *2. Plaintiff's allegations here go far beyond that limited term.

later, fact-intensive stage, courts have held that it is inappropriate to dismiss a suit at the pleading stage based on the single-party consent defense. *See, e.g.*, *Doe v. Smith*, 429 F.3d 706, 709 (7th Cir. 2005) (even where defendant "obviously consented to the recording, [] that does not justify dismissing the suit. Complaints need not anticipate or attempt to defuse potential defenses").

### C. Plaintiff Has Properly Pleaded a Breach of Confidence Claim

"A breach of confidence involves the unconsented, unprivileged disclosure to a third party of nonpublic information that the defendant has learned within a confidential relationship." *Desue v. 20/20 Eye Care Network, Inc.*, No. 21-CIV-61275-RAR, 2022 WL 796367, at *9 (S.D. Fla. Mar. 15, 2022) (quoting *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 932 (11th Cir. 2020)). A successful breach of confidence claim will consist of two elements: "(i) disclosure to a third party and (ii) the existence of a confidential relationship between the parties." *Id.* "A confidential relationship is found 'where confidence is reposed by one party and a trust accepted by the other.'" *Id.* (quoting *Traub v. Traub*, 102 So. 2d 157, 159 (Fla. 2d DCA 1958)). These confidential relationships "most often arise in close professional relationships—'those involving physicians, therapists, financial institutions, and the like.'" *Id.* (quoting *Muransky*, 979 F.3d at 932).

Defendant does not contest that it has a confidential relationship with Plaintiff as her medical provider, but instead argues "the Complaint fails to specify (1) the PII and PHI of W.W. entrusted to Orlando Health when browsing or searching for information on the Website, (2) which was to be kept in confidence, and (3) that this

confidential information was revealed." MTD at 17. Defendant further argues Plaintiff has not adequately alleged that any PHI was "actually transmitted to Facebook, Google, or any other third party." *Id.* These arguments ignore the allegations in the Complaint and attempt to impose a pleading standard that requires specificity in conflict with Rule 8. *See TMH*, 2024 WL 2318621, at *1 ("the Rule 8 bar is low").

Plaintiff alleges that Defendant disclosed confidential communications (such as the text typed into the search bar on its Website) and other sensitive data from Plaintiff's interactions with its Website (like scheduling appointments with providers or logging into the patient portal) to third party companies like Facebook and Google without authorization. *See* Compl. ¶¶ 69-92, 99-114.[2] From these disclosures, third parties were able to learn Plaintiff's patient status. *Compare TMH*, 2024 WL 2318621, at *1 with *Doe v. Bon Secours Mercy Health*, No. A2002633, 2021 WL 9939010, at *2 (Ohio Com.Pl. Nov. 22, 2021) ("While a non-patient may visit defendant's website to view some of the information thereon, in the absence of a physician-patient relationship with defendant, plaintiff and others would be unlikely to visit defendant's website to … schedule appointments, [an action that is] allegedly disclosed to third parties.").[3]

---

[2] A detailed description of how the tracking technologies functioned on Defendant's Website is included in the Complaint. *See* Compl. ¶¶ 40-94.

[3] Patient status itself is a form of confidential PHI. *See Meta Pixel I.*, 647 F.Supp.3d at 799 ("the Pixel captures information that connects a particular user to a particular healthcare provider—i.e., patient status—which falls within the ambit of information protected under HIPAA."); *Arvidson v. Buchar*, No. ST-16-cv-410, 2018 WL 10613032, at *10 (V.I. Super. Ct. June 6, 2018) (ruling that patient names and a patient list were PHI which were therefore subject to special disclosure requirements under

In addition to patient status, Defendant disclosed information from which third parties could (and did) learn Plaintiff's specific medical conditions and other PHI, as well as PII such as Plaintiff's name, IP address, zip code, Facebook ID, and device identifiers. *See* Compl. ¶¶ 99-112, 141-48.[4] These third parties then used the PHI and PII that Defendant unlawfully provided them with to target Plaintiff with advertisements related to her specific medical conditions. *Id.* ¶¶ 101, 110-11. The Complaint even includes images of records showing transmissions from Defendant's Website to third parties. *See id.* ¶¶ 103-04.

The fact that Defendant obtained Plaintiff's data and communications from interactions with its public facing website does not make it any less confidential. *See Bon Secours Mercy Health*, 2021 WL 9939010, at *2 ("Defendant first notes that its website is available to anyone, not just its patients. No doubt this is true, but plaintiff is a patient."). Even if the Website was public, the information that Defendant disclosed was not. *See id.* at *3 ("[S]earches for plaintiff's conditions and/or visits to pages containing information about such conditions have been disclosed to third parties and associated with identifying information about plaintiff…. None of this information would be publicly available if not for defendant's disclosure thereof").

Defendant's status as a healthcare provider and Plaintiff's status as Defendant's patient differentiates Plaintiff's use of Defendant's website from a mundane, run-of-

HIPAA).

[4] Third parties like Facebook connect PHI with Plaintiff's name and other information that it already has, like image, gender, age, and work or educational history. *See* Compl. ¶¶ 65-67, 108-109.

the mill Google query. As one court recently explained, PHI is distinct and more protected than data obtained in traditional commercial settings. *See Meta Pixel I*, 647 F.Supp.3d at 799 ("Communications made in the context of a patient–medical provider relationship are readily distinguishable …. First, patient-status and medical-related communications between patients and their medical providers are protected by federal law. Second, unlike communications made while inquiring about items of clothing on a retail website, health-related communications with a medical provider are almost uniquely personal."); s*ee also* Compl. ¶¶ 115-48.

Because Plaintiff is Defendant's patient, Defendant should have treated the information it received from Plaintiff as confidential. Therefore, the disclosure of this PHI to unauthorized third parties like Facebook and Google is sufficient to form a cause of action of breach of confidence under Florida law.

**D. Plaintiff Has Properly Pleaded an Invasion of Privacy Claim**

"Intrusion upon seclusion is defined as where a person 'intentionally intrudes, physically or otherwise, upon the solitude of another or his private affairs or concerns…if the intrusion would be highly offensive to a reasonable person." *Jackman v. Cebrink-Swartz*, 334 So. 3d 653, 656 (Fla. Dist. Ct. App. 2021).

Defendant intentionally and secretly intrudes into its patients' private quarters—not only their browsers via installation of the Pixel, but also their conversations with their healthcare providers, and discloses their personal medical information to Facebook or Google. *See* Compl. ¶¶ 115-117, 133-40, 228-29. Defendant neither sought nor obtained Plaintiff's or Class Members' consent. It is

well-accepted that patients have a reasonable expectation of privacy when communicating with their healthcare provider and that surreptitious intrusion into the realm of patient-healthcare confidentiality for disclosure to third parties is "highly offensive." *See, e.g.*, *Doe v. Regents of U. of California*, No. 23-CV-00598-WHO, 2023 WL 3316766, at *6 (N.D. Cal. May 8, 2023) (declining to dismiss invasion of privacy claim in a pixel case because "[p]ersonal medical information is understood to be among the most sensitive information that could be collected about a person ….."); *Salem Health*, 2024 WL 3970796, at *6 (similar); *In re Grp. Health Plan Litig.*, 709 F. Supp. 3d at 714 (similar); *see also In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 151 (3d Cir. 2015) (finding conduct "highly offensive" because it was surreptitious).

Defendant's reliance on *Bradley v. City of St. Cloud*, No. 12-cv-1348, 2013 WL 3270403, at *5 (M.D. Fla. June 16, 2013) and *Watts v. City of Hollywood, Fla.*, 146 F. Supp. 3d 1254, 1267 (S.D. Fla. 2015) is misplaced. *Bradley* dismissed the complaint *without prejudice* because "[p]laintiff did not allege that [d]efendants intruded into her home or another private place." *Bradley*, 2013 WL 3270403 at *5. *Watts* addressed driver license records—not private, sensitive, and confidential medical information. *Watts*, 146 F.Supp.3d at 1267-68 (finding intrusion into driver license records is not "highly offensive."). By contrast, here the Complaint alleges Defendant unlawfully intruded into and commandeered Plaintiff's web browser as it relates to patient-physician confidentiality. This is a modern equivalent of window-peeping into a traditional private place for purposes of an invasion of privacy claim. *See In re*

*Community Health Data Incident Litig.*, No. 49D01-2211-PL-041242, 6-8 (Ind. Comm. Ct., Marion Cnty. Oct. 25, 2023) (attached as Ex. B). As such, Plaintiff's allegations satisfy the necessary elements.

**E. Unjust Enrichment Is Properly Pleaded**

A claim for unjust enrichment requires (1) that the "plaintiff conferred a benefit on the defendant, who has knowledge thereof"; (2) that the defendant "voluntarily accept[ed] and retain[ed] the benefit conferred"; and (3) that "the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff." *Edmondson v. Caliente Resorts, LLC*, No. 8:15-CV-2672-T-23TBM, 2018 WL 1565453, at *3 (M.D. Fla. Mar. 30, 2018).

Defendant contends that W.W. has not plausibly pleaded that Defendant received any benefit from the use of W.W.'s Private Information. But Plaintiff clearly alleges that Defendant utilized and configured Tracking Tools to harvest information for impermissible purposes, such as bolstering its marketing capabilities and enhancing its bottom line, by using protected data to build targeted advertisements in collaboration with unauthorized third parties. Compl., ¶¶ 149-152. Importantly, the information at issue here is not mere browsing information, but identifying information and PHI, which has actual economic value. *Id.*, ¶¶ 115-128, 141-148. In exchange for disclosing the Private Information of its patients, Defendant is compensated by these third parties, such as Facebook, in the form of "free" enhanced advertising services and more cost-efficient marketing on its platform. *Id.*, ¶¶ 149-161.

Plaintiff receives no compensation in this equation, even though she is furnishing the data that Defendant uses to barter for the enhanced advertising and marketing services.

Defendant relies on *B.K. v. Eisenhower Med. Ctr.*, No. EDCV232092JGBKKX, 2024 WL 878100, *9 (C.D. Cal. Feb. 29, 2024), *on reconsideration in part*, 2024 WL 2037404 (C.D. Cal. Apr. 11, 2024), which held that plaintiff had not made "specific allegations about the underlying information that was allegedly disclosed" to show that Defendant had been unjustly enriched. By contrast, here Plaintiff alleges the details of her counsel's investigation confirming Defendant's Website used Tracking Tools. *See* Compl. ¶¶ 40-94. Plaintiff further alleges specific actions that she took on Defendant's Website, including the exact categories of specialists and particular symptoms she researched; that Defendant's Website shared activity with Facebook on at least February 24, 2023; and that the same day, Plaintiff's MyChart was accessed by a third party who, upon information and belief, is one of Defendant's technology service providers. *Id.* ¶¶ 101, 103-104. This level of specificity exceeds any pleading requirements. *See Ramirez v. Paradies Shops, LLC*, 69 F.4th 1213, 1220 (11th Cir. 2023) ("We cannot expect a plaintiff in Ramirez's position to plead with exacting detail every aspect of Paradies's [data] security history and procedures. . . .").

Finally, Defendant contends that transmission of general browsing information cannot be the basis for an unjust enrichment claim. *Mount v. PulsePoint, Inc.*, 13 Civ. 6592(NRB), 2016 WL 5080131, at *6 (S.D.N.Y 2016) is distinguishable in that it involved general browsing data, not PHI. Defendant's reliance on *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797 (N.D. Cal. 2020) is similarly misplaced because it did

not involve an unjust enrichment claim, *see,* 457 F. Supp. 3d at 810, and because the court found plaintiffs had not alleged that their private information had "financial value, 457 F. Supp. 3d at 834, which Plaintiff here has affirmatively alleged. Compl. ¶¶ 153-61.[5]

Courts have declined to dismiss unjust enrichment claims under similar circumstances. *See, e.g., Walgreen*, 2024 WL 2263395, at *14 (declining to dismiss unjust enrichment claim because "Plaintiffs allege that their data has financial value and Defendant received a financial benefit from disclosing their data without Plaintiffs' consent" and that "Defendant used the Meta Pixel tool to enhance advertising services and utilize cost-effective marketing to increase Defendant's own profits"); *Boone Health*, 2023 WL 4996117, at *7 (similar); *In re Grp. Health Plan Litig.*, 709 F. Supp. 3d at 715 (similar); *Salem Health*, 2024 WL 3970796, at *7 (similar); *Mekhail*, 2024 WL 1332260, at *12-14 (similar). Defendant has not demonstrated the application of Florida law warrants a different outcome here.

### F. <u>Breach of Implied Contract Is Properly Pleaded</u>

An implied contract is "based on an implicit promise, one that is inferred in whole, or in part, from the parties' conduct." *Fertilizantes Tocantins S.A. v. TGO Agric. (USA), Inc.*, 599 F. Supp. 3d 1193, 1206 (M.D. Fla. 2022). Under Florida law, "where a patient hands over personal information to a health services provider, courts have found that course of conduct sufficient to imply a contract even where a written one

---

[5] *Heeger v. Facebook, Inc.*, 509 F. Supp. 3d 1182, 1191 (N.D. Cal. 2020) is similarly inapposite.

does not exist." *Gilbert v. BioPlus Specialty Pharm. Servs., LLC*, No. 6:21-CV-2158-RBD-DCI, 2023 WL 3555006, at *3 (M.D. Fla. Mar. 3, 2023).

Defendant argues Plaintiff "has failed to allege any actual facts indicating a meeting of the minds on any terms underlying such 'implied contract,' defining the 'contract,' or alleging damages flowing from a purported breach." MTD at 23. However, Plaintiff was Defendant's patient. Unlike a member of the general public, the course of conduct inherent in the relationship between a medical provider and patient implies a contract to keep PHI confidential. *See* Compl. ¶¶ 99-114, 244-48; *Gilbert*, 2023 WL 3555006, at *3 (receipt of PHI by pharmaceutical company implied a contract to keep that data confidential).

The mutual understanding between Defendant and its patients like Plaintiff was illustrated in *Orlando Health I* at oral argument in which the Court asked:

> [I]t's more than just me looking for, you know, … what's the best all-season car tire, isn't it? Isn't it, you know, stuff that a reasonable plaintiff would assume is not going to be provided to Facebook?
>
> …
>
> You do agree with me, don't you, … that [if] there's … a little cricket on your website that said, by the way, if you click on your website, we will share this with Facebook and maybe Google in a manner by which you can be identified, no one would click on that website. You agree with that, no one is going to click, you know, when do I get my breast augmentations removed, when is it time? Isn't it just assumed this is between me or the clicker and your client? Isn't that a fair assumption?

*Orlando Health I,* ECF No. 42 (attached as Ex. C at 6, 17-20). Indeed, the mutual understanding of the parties can be inferred from the relevant course of conduct as a matter of common sense.

Plaintiff has also alleged cognizable injuries from the diminished (or misappropriated) value of her PHI and the lost benefit of her implied bargain for confidentiality. *See* Compl. ¶¶ 95, 99-114, 149-61. Such injuries are sufficient to state a claim for breach of contract in this context. *See, e.g., In re Grp. Health Plan*, 709 F. Supp. 3d at 714-15; *In re Facebook Priv. Litig.*, 572 F. App'x 494 (9th Cir. 2014); *see also Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1085 (11th Cir. 2019) (recognizing that the "benefit-of-the-bargain theory of contract damages" is "well-established" under Florida law).[6]

Regardless, any dispute about the alleged meeting of the minds or adequacy of damages are issues of fact better reserved for a later stage. *See Group Health*, 2023 WL 8850243, at *3-4 ("Arguments about whether Plaintiffs and HealthPartners had a meeting of the minds or debates over the value of Plaintiffs' loss are fact disputes better left for summary judgment or trial."); *see Orlando Health I* , ECF 37; *accord TMH*, 2024 WL 2318621, at *1-2 (following *Orlando Health I*). The Court should reach the same conclusion here.

## V. CONCLUSION

For all the foregoing reasons, Plaintiff submits that Defendant's Motion to Dismiss should be denied.

---

[6] At the very least, Plaintiff can recover nominal damages. *See Farmer v. Humana, Inc.*, 582 F. Supp. 3d 1176, 1187-88 (M.D. Fla. 2022) ("[E]ven if Farmer had not alleged 'quantifiable damages,' he could still recover nominal damages for the alleged breach of implied contract.").

DATE: September 16, 2024

Respectfully Submitted,

*/s/ Mariya Weekes*
Mariya Weekes
**Milberg Coleman Bryson**
**Phillips Grossman PLLC**
201 Sevilla Avenue, 2nd Floor
Coral Gables, FL 33134
954-647-1866
Email: mweekes@milberg.com

Clint Watson
**The Lyon Firm**
2754 Erie Ave.
Cincinnati, Ohio 45208
Phone: (513) 381-2333
Fax: (513) 766-9011
Email: cwatson@thelyonfirm.com

***Counsel for Plaintiff and the Putative Class***

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was filed through the Court's CM/ECF filing system and that all counsel of record receive a copy of the document through that service.

/s/ Mariya Weekes
Mariya Weekes