**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

W.W., *et al., individually and on behalf of all others similarly situated*,

Plaintiff,

v.

Orlando Health, Inc.,

Defendant.

_______________________________________/

Case No. 6:24-CV-01068

Judge Julie S. Sneed

Magistrate Judge Robert M. Norway

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVE, APPOINTMENT OF CLASS COUNSEL, AND SUPPORTING MEMORANDUM OF LAW**

Plaintiff W.W. ("Plaintiff"),[1] through her undersigned counsel and pursuant to Federal Rules of Civil Procedure 23(a), (b)(3), and (g), moves to certify this case as a class action, appoint Plaintiff as class representative, and appoint Joseph Lyon and Clint Watson of the Lyon Firm, W.B. Markovits and Dylan Gould of Markovits, Stock & DeMarco, and Mariya Weeks of Milberg Coleman Bryson Phillips Grossman as class counsel. In support of this motion, Plaintiff attaches the Declaration of Joseph Lyon ("Lyon Decl.") as **Exhibit 1** and the Declaration of Plaintiff W.W. ("W.W. Decl.") as **Exhibit 2**.

[1] Plaintiff W.W. brought this action anonymously out of a desire to protect her health information, including the health information in the Complaint and her declaration supporting this motion, as well as her status as Defendant's patient. *See In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 792-93 (N.D. Cal. 2022) (explaining that the status of an individual as a patient of a specific provider is protected health information).

The proposed classes that Plaintiff seeks to certify are:

> **Nationwide class**. All natural persons residing in the United States who used Defendant's Website to complete an Appointment Request Form from April 26, 2018 to March 7, 2023.
>
> **Florida class**. All natural persons residing in the State of Florida who used Defendant's Website to complete an Appointment Request Form from April 26, 2018 to March 7, 2023.[2]

Plaintiffs propose that the following be excluded from the classes: Defendant's officers and directors (including the officers and directors of its parents, subsidiaries, successors, or assigns); and any Judge who adjudicates this case, including their staff and immediate family.[3]

## MEMORANDUM IN SUPPORT

## I. INTRODUCTION

This case presents fundamental questions about patient privacy in the digital age: whether a major healthcare provider can secretly install tracking technologies on its website to intercept sensitive communications from individuals seeking medical treatment and transmit those communications to social media and advertising companies for its own pecuniary gain and without consent. Defendant Orlando Health, Inc. ("Orlando Health" or "Defendant") operates over 170 medical facilities

---

[2] The reference to "Appointment Request Forms" in the proposed definitions includes all forms submitted through one of the URLs categorized as "Appointment Request" in the "Purpose" column of document attached to the Lyon Declaration as **Exhibit A** (OH-WW_0000001), which is a document that Defendant produced in discovery.

[3] Hereafter, Plaintiff will refer to the proposed classes as the "Classes," and the individuals meeting the class definitions as "Class Members."

with $8.1 billion in assets, serving hundreds of thousands of patients across Florida and beyond—each of whom trusted that their private medical communications would remain confidential when they used OrlandoHealth.com (the "Website") to request appointments.

The answer to whether Orlando Health violated privacy laws will be identical for every one of the thousands of Class Members because Orlando Health used tracking technologies on its Appointment Request Forms throughout the entire class period. These technologies operated invisibly to capture patient interactions while requesting appointments. Expert analysis confirms Orlando Health embedded tracking code that mechanized the capture and disclosure of protected health information for all such users within the proposed class throughout the class period.

Class certification is appropriate because the central liability questions can be answered with common proof. Orlando Health either violated privacy laws by installing and configuring the Meta Pixel, Google Analytics, and related marketing technologies (collectively "Tracking Tools") or it did not. The Tracking Tools either intercepted protected health information ("PHI") without authorization or they did not. These binary questions—resolved through Orlando Health's own admissions and the technical analysis by Plaintiff's expert—demonstrate why this case is ideally suited for class treatment. For these reasons, explained more fully below, Plaintiff requests certification of the proposed classes, appointment of herself as class representative, and appointment of her attorneys as class counsel.

## II. STATEMENT OF FACTS

### A. Orlando Health

Orlando Health is one of Florida's largest healthcare organizations, operating as a HIPAA-covered entity with legal obligations to protect the health information of individuals seeking medical care. *See* Answer, Doc. 39 at PageID 374, 376-77, ¶¶ 13, 26, 28. Orlando Health's Assistant Vice President of Marketing Technology, Daniel Ruyter, testified as one of Orlando Health's corporate representatives and confirmed that Orlando Health's Website serves as a comprehensive platform where patients, among other things, book appointments and complete Appointment Request Forms. *See* Deposition of Daniel Ruyter ("Ruyter Dep.") at 181:11-182:11, 197:3-198:6.[4]

### B. The Systematic Implementation of Tracking Technologies

Despite patients' reasonable expectations of privacy, Orlando Health secretly installed comprehensive and invisible Tracking Tools throughout its Website, including on its Appointment Request Forms. *See id.* Ruyter confirmed that both the Meta Pixel and Google Analytics were installed on the Website's Appointment Request Forms. *See* Ruyter Dep. at 28:2-3, 110:19-22, 150:1-151:7, 181:11-182:11, 206:9-25, 235:15-236:5. The Expert Report of Dr. Zubair Shafiq ("Shafiq Rep.") confirms that the Meta Pixel and Google Analytics were installed on the Appointment

[4] The relevant excerpts of the Ruyter Deposition cited in this memorandum are attached to the Lyon Declaration as **Exhibit L**.

Request Forms during the entire class period as well. Shafiq Rep. ¶¶ 53-56.[5] Dr. Shafiq's investigation revealed that the Meta Pixel was installed from at least April 26, 2018 through the end of the class period, and that Google Analytics was installed from at least July 13, 2016 through the end of the class period. Shafiq Rep. ¶ 52.

### C. The Scope and Nature of Information Disclosed

Orlando Health confirmed that it "recognize[s] patient status as PHI." *See* Ruyter Dep. at 64:16-18, 65:1-10. Dr. Shafiq's forensic analysis revealed that Orlando Health shared "the following baseline set of content information about patient activity": (1) "[c]ookies containing account or device identifiers"; (2) "IP address, user agent, and device properties containing identifying information" (Shafiq Rep. ¶ 58); (3) "Page URL," (4) "Page title," and (5) "Button clicks." Shafiq Rep. ¶ 59. Dr. Shafiq documented specific examples showing Orlando Health transmitted full-string URLs containing sensitive medical information related to appointment requests, including:

- https://www.orlandohealth.com/campaigns/vascular-surgery/appointment-request;
- https://www.orlandohealth.com/campaigns/urology/request-an-appointment;
- https://www.orlandohealth.com/services-and-specialties/lung-cancer-screening/request-an-appointment;

[5] The Shafiq Report is attached to the Lyon Declaration as **Exhibit I**. Appendix B to the Shafiq Report has been omitted due to file size considerations but was previously served on counsel for Defendant.

- https://www.orlandohealth.com/virtual-visit/see-my-doctor/request-an-appointment/thank-you.

Shafiq Rep. ¶ 53(c).[6] As evidenced by the language in these URL strings, third parties who receive this data can plainly infer that the individual submitting the form was seeking medical treatment from Orlando Health. Orlando Health's other corporate representative, Ryan Walker, further testified that its Tracking Tools were installed on every webpage, and their respective configurations operated in a uniform manner across every webpage and Appointment Request Form. *See* Deposition of Ryan Walker ("Walker Dep.") at 18:17-21:5, 31:18-33:14.[7]

Ruyter admitted Orlando Health was "providing [Google and Meta] with the URL to an appointment request form submission" to build custom audiences for targeted advertising. *See* Ruyter Dep. at 193:24-194:1. These campaigns included, for example, "lung cancer leads" using thank-you confirmation pages. *See* Ruyter Dep. at 192:12-193:17. Ruyter admitted that Orlando Health can identify individuals who completed Appointment Request Forms. *See* Ruyter Dep. at 183:1-8. Dr. Shafiq's analysis confirmed the transmitted data enabled individual identification. *See* Shafiq Rep. ¶¶ 30, 62.

---

[6] The full list of Appointment Request Forms that formed the basis for this portion of Dr. Shafiq's expert report are identified in the document attached to the Lyon Declaration as **Exhibit A** (OH-WW_0000001), which is a document Defendant produced in discovery. *See* Lyon Decl. ¶ 13; Shafiq Report ¶ 53(c) n.134.

[7] The relevant excerpts of the Walker Deposition and the exhibits referenced in those deposition excerpts are attached to the Lyon Declaration as **Exhibit M**.

### D. Defendant's Lack of Authorization to Disclose PHI

Orlando Health is legally required to safeguard the protected health information ("PHI") of individuals seeking medical treatment under both state and federal laws, and this duty extends to Plaintiff's and the Class Members' completion of Appointment Request Forms. *See* Compl., ECF 1 ¶¶ 13-18, 28, 33-39, 115-31 (citing relevant statutes, regulations, and official guidance). Orlando Health is simply not permitted to disclose a person's PHI for marketing purposes without first obtaining that person's express written authorization. *See* 45 CFR 164.501, 164.508(a)(3). Taken as a whole, Plaintiff and Class Members uniformly had a reasonable expectation that Orlando Health would not disclose their PHI to Meta or Google.

Additionally, Orlando Health explicitly promised it would not disclose the information of individuals using its Website to seek medical treatment without authorization (as required by law). Its Privacy Policy stated: "We will not disclose your personally identifiable information to any unaffiliated third party unless we have your permission or when we need to treat the information collected through this website as an asset in the event of the merger or sale of Orlando Health, or a portion of our business." Lyon Decl. ¶ 15, **Ex. C** (OH-WW_0002034). Ruyter confirmed Orlando Health's understanding that it "would need to get written permission from its patient before using P[H]I for marketing purposes," and admitted he was "not aware of any process to get written authorization from [Orlando Health's] patients to disclose

their data to Meta or Google." *See* Ruyter Dep. at 78:2-20. Orlando Health's privacy notices did not disclose that PHI would be shared with Meta or Google for marketing purposes either. *See* Ruyter Dep. at 77:3-23; 78:13-20, Ex. 7 (OH-WW_0002027-28). Yet, as explained above, Orlando Health systematically transmitted data to Meta and Google when patients completed Appointment Request Forms.

Defendant's Chief Privacy Officer became aware of these privacy concerns in June 2022 after viewing an article about hospital websites sharing protected health information with Facebook. *See* Lyon Decl. ¶¶ 17-18, **Exs. E-F** (OH-WW_0001196, OH-WW_0003956). In response to an email about that, Defendant's Senior Director of Digital Strategy and Strategic Communications confirmed that Orlando Health had the "Meta (Facebook) pixel installed on [its] website" for "quite some time" to "track and target [its] customers," apparently without ever running that decision by the Chief Privacy Officer. *See* Lyon Decl. ¶ 17, **Ex. E** (OH-WW_0001196). As detailed in the Shafiq Report, interception and disclosure of PHI then continued long after this June 2022 conversation. *See* Shafiq Rep. ¶¶ 52-62.

### E. The Economic Value of Intercepted Data

Plaintiff's economics expert has determined that the PHI Orlando Health systematically captured and transmitted has substantial economic value that can be calculated on a class-wide basis. *See* Expert Report of Eric Krause ("Krause Rep."), *passim*; Supplement to Expert Report of Eric Krause ("Supp. Krause Rep."), *passim*.[8]

[8] The Krause Report is attached to the Lyon Declaration as **Exhibit J**, and the Supplemental Krause Report is attached to the Lyon Declaration as **Exhibit K**.

Through comprehensive analysis of academic studies and market data, Krause calculated that "a reasonable preliminary valuation of the type of personal information and patient status that Plaintiff alleges was improperly transferred for the putative class in this matter is approximately $200 per putative class member." Krause Rep. ¶ 70; *see also* Supp. Krause Rep. ¶¶ 9-10. This valuation reflects the fair market value of the baseline data uniformly transmitted without consent across all class members. *See* Krause Rep. ¶¶ 67-70.

The tracking technologies provided substantial economic benefits to Orlando Health. Krause's analysis demonstrates that Orlando Health saved approximately $18.3 million in advertising costs between 2018-2023 through the deployment of these Tracking Tools. *See* Krause Rep. ¶ 75; Supp. Krause Rep. ¶ 16.

**F. Plaintiff's Representative Experience**

Plaintiff has been an Orlando Health patient since September 2018, establishing care after relocating to Florida as her permanent residence. W.W. Decl. ¶ 3. She suffers from multiple serious medical conditions requiring ongoing specialist care, including complications from a prior ileostomy procedure, chronic heart pains, and fatty liver disease. *Id.* ¶ 7. Plaintiff specifically used Defendant's Website to complete an Appointment Request Form on or about March 31, 2022 in order to request a

neurology appointment, which was confirmed by Defendant's own records. *See id.* ¶ 6; Lyon Decl. ¶ 14, **Ex. B**.[9]

Throughout the proposed class period, Plaintiff regularly accessed OrlandoHealth.com to manage her healthcare needs, including by completing Appointment Request Forms, booking appointments through the online scheduling system, and accessing the MyChart patient portal to view test results and communicate with providers. *See* W.W. Decl. ¶ 5. Following these interactions, W.W. began receiving targeted advertisements on Facebook for medical devices related to ileostomy care, liver health supplements, and cardiac monitoring devices. *Id.* ¶ 7.

Defendant did not disclose to Plaintiff that her PHI would be tracked and disclosed to third parties. *Id.* ¶ 8. At no time did W.W. consent to Orlando Health sharing her private medical information or patient status with Meta, Google, or any other third party. *Id.* ¶ 9.

## III. PROCEDURAL HISTORY

Plaintiff filed her Complaint on June 10, 2024. ECF 1. The Complaint brought claims on behalf of Plaintiff and the Class Members for violations of the Florida Security of Communications Act, Florida Statutes, § 934.01, et seq.; violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), et seq.; breach of confidence;  invasion of privacy; unjust enrichment; and breach of implied

[9] Defendant's corporate representative explained that when Plaintiff and other Class Members submitted an Appointment Request Form, a record is created and stored in its CRM system. *See* Ruyter Dep. at 182:12-183:15.

contract. ECF 1 ¶¶ 179-248. Thereafter, Defendant moved to dismiss Plaintiff's claims in their entirety, and on March 6, 2025, the Court issued an opinion and order that denied Defendant's motion with respect to all claims except invasion of privacy. ECF 38. Thereafter, the parties engaged in discovery necessary to decide the issue of class certification, culminating in the filing of this motion.

## IV. LEGAL STANDARDS

"To obtain class certification under Rule 23, the Plaintiffs must meet each of the requirements specified in Rule 23(a), as well as at least one of the three subsections of Rule 23(b)." *Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1189-90 (11th Cir. 2009). To meet Rule 23(a)'s prerequisites, a plaintiff must demonstrate that:

1. the class is so numerous that joinder is impracticable;
2. there are questions of law or fact common to the class;
3. the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
4. the representative parties will adequately protect the interest of the class.

Fed. R. Civ. P. 23(a)(1)-(4). Here Plaintiff seeks certification under Rule 23(b)(3), which further requires that "questions of law or fact common to class members predominate" and that a "class action is superior." Fed. R. Civ. P. 23(b)(3). The proposed classes must also be "adequately defined and clearly ascertainable," which is an implicit prerequisite that must be satisfied. *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1302 (11th Cir. 2021).

After applying the relevant factors, the Court "has broad discretion in determining whether to certify a class." *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1569 (11th Cir. 1992).

## V. THE PROPOSED CLASSES SATISFY THE REQUIREMENTS FOR CLASS CERTIFICATION UNDER RULE 23(a)

### A. The Proposed Classes Are Ascertainable

"[A] proposed class is ascertainable if it is adequately defined such that its membership is capable of determination." *Cherry*, 986 F.3d at 1304. On the flip side, a class is not ascertainable if it "is defined in terms so vague as to be indeterminate." *Id.* at 1303. In this case, the two proposed classes are ascertainable because they are comprised of individuals residing in the United States or Florida "who used Defendant's Website to complete an Appointment Request Form from April 26, 2018 to March 7, 2023."[10] These are objective, determinable criteria – there is nothing vague or subjective about them. Therefore, the requirement of ascertainability is met.

Although other Circuits may require a showing of administrative feasibility as part of the ascertainability requirement, this is not the case within the Eleventh Circuit, which has emphasized that a class "can be capable of determination without being capable of *convenient* determination." *Cherry*, 986 F.3d at 1303 (emphasis in original); *see also Rensel v. Centra Tech, Inc.*, 2 F.4th 1359, 1361 (11th Cir. 2021) ("[T]he party

---

[10] These definitions are narrower than what was originally proposed in the Complaint. *See* ECF 1. The proposed modifications are intended to provide the Court with the most straightforward class for certification purposes based on discovery and expert analysis, which established both the time period and the mechanism by which identifiable Class Members' PHI was uniformly transmitted to third parties without consent.

seeking certification need not establish its ability to identify class members in a convenient or administratively feasible manner."). To the extent it has any role, "[the district court] may consider administrative feasibility as part of the manageability criterion of Rule 23(b)(3)(D)." *Cherry*, 986 F.3d at 1304. But manageability issues, "rarely, if ever" are sufficient to prevent certification. *Id*. And regardless, as discussed in the statement of facts above, discovery and expert review establish that the proposed classes are not only ascertainable but readily identifiable.

### B. The Proposed Classes Are Sufficiently Numerous

Numerosity is satisfied because "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "While 'mere allegations of numerosity are insufficient,' Rule 23(a)(1) imposes a 'generally low hurdle,' and 'a plaintiff need not show the precise number of members in the class.'" *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674, 684 (S.D. Fla. 2013) (quoting *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1267 (11th Cir. 2009)). The general rule of thumb in the Eleventh Circuit is that "more than forty [is] adequate." *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986).

Orlando Health's discovery responses demonstrate that the number of Class Members exceeds several thousand. *See* Lyon Decl. ¶ 20, **Ex. H** (Supplement Answers to Plaintiff's First Set of Interrogatories), Response No. 5(D) (identifying annual appointment requests by unique individuals). Ruyter confirmed tracking technologies were deployed on the appointment scheduling page, capturing every visitor during the

class period who scheduled an appointment on the Website. *See* Ruyter Dep. at 28:2-3, 110:19-22, 150:1-151:7, 181:11-182:11, 206:9-25, 235:15-236:5. Dr. Shafiq's analysis confirmed this as well. Shafiq Rep. ¶¶ 49, 52. With the number of patients affected, joinder is clearly impracticable.

### C. There are Common Questions of Law and Fact

There are numerous common issues in this case suitable for resolution on a class-wide basis. The test for commonality is whether the class claims present "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This test presents a "low hurdle." *Williams v. Mohawk Indus.*, 568 F.3d 1350, 1356 (11th Cir. 2009). Plaintiff need only show that her claims present "at least one issue whose resolution will affect all of a significant number of the putative class members," or that her claims are "susceptible to class-wide proof." *Id.* at 1355.

There are numerous common material questions of law and fact, including: whether and to what extent Defendant had a duty to protect the PHI of Plaintiff and Class Members; whether Defendant had a duty not to disclose Plaintiff and Class Members PHI to Meta and Google; whether Defendant's disclosure of PHI to Meta and Google violated state and/or federal law; whether Defendant's disclosure of PHI to Meta and Google was intentional; whether Defendant failed to obtain affirmative express consent in writing from Plaintiff and Class Members prior to disclosing their PHI to Meta and Google for marketing purposes; whether Defendant failed to execute a HIPAA-compliant Business Associate agreements with Meta and Google prior to transmitting patients' PHI to those entities; and whether PHI of Class Members was

transmitted to Meta and Google when patients completed Appointment Request Forms during the proposed class period. *Cf. In re Novant Health, Inc.*, No. 1:22-CV-697, 2024 WL 3028443, at *3 (M.D.N.C. June 17, 2024) (finding commonality satisfied under analogous circumstances). These are not only common questions, but of more importance are questions that will generate common answers central to the claims of all Class Members. *See Sihler v. Glob. E-Trading, LLC*, No. 8:23-CV-1450-VMC-JSS, 2024 WL 3771717, at *4 (M.D. Fla. Aug. 13, 2024). Accordingly, the commonality prong is satisfied.

### D. Plaintiff's Claims are Typical

Plaintiff's claims are typical of the Classes. The test for typicality is whether the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 232(a). The test is not a demanding one and may be satisfied "despite substantial factual differences . . . when there is a strong similarity of legal theories." *Mohawk Indus.*, 568 F.3d at 1356-57. Typicality exists where the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory. *Id*. at 1357.

In this case Plaintiff's claims are squarely aligned with Class Members' claims. Plaintiff, like all Class Members, had her PHI transmitted to Meta and Google when she used Defendant's Website to complete Appointment Request Forms within the proposed Class Period. *See* W.W. Decl. ¶ 6; Lyon Decl. ¶ 14, **Ex. B**. Plaintiff, like all class members, was not notified that this invasion of her privacy would occur nor did

she consent to it. *See* W.W. Decl. ¶¶ 8-9. Her claims arise from the same course of conduct by Defendant that was directed at all Class Members. *Cf. In re Novant*, 2024 WL 3028443, at *4 ("The claims of the named plaintiffs are typical of the claims of the class members because the claims asserted arise from Novant's alleged monitoring of all class members."). The legal theories are the same. Therefore, typicality is met.

### E. Plaintiff and Her Counsel are Adequate

The adequacy requirement asks if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This in turn has been interpreted to consist of a two-pronged analysis: "(1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1275 (11th Cir. 2021) (quotation marks and citation omitted).

Plaintiff has no conflict of interest with Class Members, substantial or otherwise. She resides in Florida, has been a patient of Orlando Health for several years, and, as discussed above, was subject to the same course of conduct based on the same set of facts resulting in the same set of claims as all Class Members. Plaintiff has also demonstrated that she will adequately prosecute the action. She has retained appropriate and competent counsel, been involved in the litigation through that counsel (including providing documents and information in response to discovery requests), and is committed to pursuing the litigation on behalf of the class. *See* Lyon Decl. ¶¶ 28-30. Furthermore, as discussed at length with respect to Plaintiff's request

under Rule 23(g) below, proposed Class Counsel consists of qualified attorneys with prior experience in similar data privacy cases. Therefore, Plaintiff and proposed Class Counsel are adequate representatives.

## VI. THE PROPOSED CLASSES SATISFY RULE 23(b)(3) REQUIREMENTS

### A. Predominance

Rule 23(b)(3) requires in part that "questions of law or fact common to class members predominate over any questions affecting only individual members . . . ." The rule does not require that all issues presented in the case be common among the class, only that common issues predominate over individual issues. *Klay v. Humana*, 382 F.3d 1241, 1254 (11th Cir. 2004). Common questions predominate "when the substance and quantity of evidence necessary to prove the class claims won't vary significantly from one plaintiff to another." *Tershakovec v. Ford Motor Co*., 79 F.4th 1299, 1306 (11th Cir. 2023).

In this case, the common issues previously described (*supra*, Section V(C)) are central to determination of all Class Members' claims. The necessary elements of Plaintiff's and Class Members' claims do not present individualized issues that would predominate at trial. Instead, Plaintiff will prove her claims and at the same time the claims of every Class Member with common evidence demonstrating that Defendant knowingly disclosed the protected health information of persons seeking medical treatment to third parties like Meta and Google without authorization. Courts have previously found the predominance element satisfied in healthcare tracking cases under similar circumstances. *See, e.g., Frasco v. Flo Health, Inc.*, 349 F.R.D. 557, 574-87

(N.D. Cal. 2025); *Doe v. Mosaic Health Sys.*, No. 22BU-CC01774-01, 2025 WL 2531618, at *3-5 (Buchanan Cnty., Mo. Cir. Ct. Aug. 29, 2025); *In re Novant*, 2024 WL 3028443, at *5; *Doe v. Virginia Mason Med. Ctr.*, No. 19-2-26674-1 SEA, 2021 WL 12295937, at *3 (King Cnty., Wash. Super. Ct. Sept. 21, 2021). Like those cases, because Plaintiff and Class Members are all Defendant's patients or prospective patients, were subject to the same course of unlawful conduct, and had the same information disclosed, individual issues will not predominate.

Although the issue of standing is often raised at class certification, in this case the inquiry is straight forward because Plaintiff and all individuals who completed Appointment Request Forms on the Website had their PHI disclosed without consent, and therefore suffered injury. Regarding Plaintiff's statutory claims, Plaintiff and all Class Members have suffered injury because the violations of Florida and federal wiretapping statutes are analogous to the common law injury associated with invasion of privacy. *See Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1117-18 (9th Cir. 2020) (finding standing to bring ECPA claims like the one alleged here because it implicates injuries analogous to those caused by common law privacy torts); *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1340-41 (11th Cir. 2017) (applying similar analysis and finding standing to bring claims under the Video Privacy Protection Act).

There are injuries to support Plaintiff's common law claims as well, including the loss of privacy and confidence, the lost benefit of Class Members' implied bargain that Defendant would not unlawfully disclose their PHI, and the value of the PHI that Defendant was enriched by. *Compare* ECF 38 at PageID 368 ("The court agrees that

private information, at least in the context of sensitive medical information, has value.") *with Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019) (economic harm is a concrete injury); *see also Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1084 (11th Cir. 2019) (lost benefit of bargain is an economic injury that confers standing); ECF 38 at PageID 363 ("One can think of few subject areas more personal and more likely to implicate privacy interests than that of one's health ….") (quoting *Norman-Bloodsaw v. Lawrence Berkeley Lab'y*, 135 F.3d 1260, 1269 (9th Cir. 1998)).

The traceability of these injuries will not be difficult to prove on a class-wide basis because, as discussed above, Defendant has records of the individuals who used its Website to complete Appointment Request Forms during the relevant time period, and Plaintiff will present common evidence that all such individuals had their PHI unlawfully disclosed to third parties. *See* Shafiq Rep. ¶¶ 52-66. Redressability is straight forward as well because Plaintiff seeks damages on behalf of herself and the proposed classes. *See Uzuegbunam v. Preczewski*, 592 U.S. 279, 293 (2021) ("[N]ominal damages can redress Uzuegbunam's injury even if he cannot or chooses not to quantify that harm in economic terms."). Therefore, issues related to standing will not predominate.

The necessary damage calculations will not present individualized issues either. *See Allapatah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003) ("the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate"). In this case actual damages are readily calculable on a class-wide basis. Krause Rep. ¶¶ 77-79. Furthermore, Plaintiff will seek statutory

damages for her statutory claims, and nominal damages (in the alternative to actual damages) for her common law claims. Both statutory and nominal damages would make an award of class-wide damages simple and straight forward. *See Attias v. CareFirst, Inc.*, 346 F.R.D. 1, 12 (D.D.C. 2024) ("If anything, the fact that the entire class will likely be limited to nominal damages will streamline proceedings by dispensing with the need for individualized damage calculations."); *Doe v. MG Freesites, LTD*, 707 F. Supp. 3d 1157, 1182 (N.D. Ala. 2023) ("As an initial matter, the availability of statutory liquidated damages … means that damages are a common, rather than an individualized, issue.").

Without any individualized issues, let alone those that would predominate, the requirement of predominance is satisfied.

**B. Superiority**

Rule 23(b)(3) also requires for class certification that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Four non-exhaustive factors guide the court's inquiry:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

*Id*. "In many respects, the predominance analysis . . . has a tremendous impact on the superiority analysis . . . for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims." *Klay*, 382 F.3d at 1269.

Proceeding as a class action here is infinitely superior to thousands of individual cases or joinder. There is no indication, nor obvious rationale, why a Class Member might have an interest in individually bringing a separate action, particularly given the relatively low actual or statutory damages to which they would be individually entitled. *See Attias*, 346 F.R.D. at 12 ("Aggregating smaller claims that are not worthwhile to pursue individually is class action's raison d'être.").

There is no other current litigation, to the best of counsel's knowledge, by or against Class Members involving the set of facts at issue here. Lyon Decl. ¶ 31. Concentrating the litigation in this forum – the district where Defendant is located – is both logical and desirable. Finally, there are no meaningful difficulties in managing this case as a class action. Identifying Class Members is relatively simple in this case from Defendant's records. *Supra*, Section II(C). For these reasons, superiority is well established.

## VII. PROPOSED CLASS COUNSEL MEET THE REQUIREMENTS OF RULE 23(g)

A "court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g)(1). The court must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class

actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).

Proposed Class Counsel have invested substantial time and resources investigating and developing this litigation. Counsel have: (1) conducted extensive pre-suit investigation into Orlando Health's tracking practices, including technical analysis of the Website's source code; (2) retained and worked closely with technical and economic experts to analyze the scope and impact of the privacy violations; (3) engaged in discovery, including deposing Orlando Health's corporate representative and reviewing thousands of pages of documents; (4) researched and analyzed the complex intersection of HIPAA, state privacy laws, and electronic surveillance statutes as applied to healthcare website tracking; and (5) prepared detailed pleadings that, with the exception of one of six claims, survived a motion to dismiss. *See* Lyon Decl. ¶ 26.

Proposed Class Counsel possess extensive experience prosecuting complex class actions. *See* Lyon Decl. ¶¶ 5-11; *see also, e.g., Shy v. Navistar Internat'l Corp.*, No. 3:92-CV-00333, 2022 WL 2125574, at *4 (S.D. Ohio June 13, 2022) ("Class Counsel, the law firm Markovits, Stock & DeMarco, LLC, are qualified and are known within this District for handling complex cases including class action cases such as this one."). Proposed class counsel have also been at the forefront of emerging healthcare privacy and pixel tracking litigation. *See In re Novant Health, Inc.*, 2024 WL 3028443, at *4 (noting that many of the same firms here "have taken a leading role in data security

class actions and data tracking pixel litigation."). They have served as lead or co-lead counsel in numerous data privacy actions. Lyon Decl. ¶¶ 6, 8-11. Their expertise is also evidenced by the comprehensive briefing submitted in this case and counsel's successful handling of similar healthcare tracking cases.

Proposed Class Counsel have the financial resources, support staff, and technological infrastructure necessary to prosecute this litigation against a well-funded defendant. The firms have: dedicated teams of attorneys and paralegals assigned to this matter; relationships with leading experts in digital forensics, healthcare privacy, and economics; financial resources to advance all costs through trial if necessary; secure technology systems capable of handling large-scale electronic discovery and Class Member data; and no conflicts of interest with Plaintiff or the proposed class. *See* Lyon Decl. ¶ 27. Accordingly, proposed Class Counsel should be appointed to represent the proposed Class in this case.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court certify the proposed Classes, appoint Plaintiff as class representative, and appoint Joseph Lyon and Clint Watson of the Lyon Firm, W.B. Markovits and Dylan Gould of Markovits, Stock & DeMarco, and Mariya Weeks of Milberg Coleman Bryson Phillips Grossman as class counsel.

Respectfully Submitted,

*<u>/s/ Mariya Weekes</u>*
Mariya Weekes (FL State Bar No. 56299)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
333 SE 2nd Avenue, Suite 2000
Miami, FL, 33131
Tel: (866) 252-0878
mweekes@milberg.com

Joseph M. Lyon*
Clint Watson*
**THE LYON FIRM**
2754 Erie Ave.
Cincinnati, Ohio 45208
Phone: (513) 381-2333
Fax: (513) 766-9011
*jlyon@thelyonfirm.com*
*cwatson@thelyonfirm.com*

W.B. Markovits*
Dylan J. Gould*
**MARKOVITS, STOCK & DEMARCO, LLC**
119 E. Court St., Ste. 530
Cincinnati, Ohio 4502
Phone: (513) 651-3700
Fax: (513) 665-0219
*bmarkovits@msdlegal.com*
*dgould@msdlegal.com*

***Counsel for Plaintiff and the Putative Class***

* *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed on October 1, 2025 through the Court's CM/ECF filing system and that all counsel of record received a copy of the document through that service.

*/s/ Mariya Weekes*
Mariya Weekes