**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

W.W.,

Plaintiff,

v.

Orlando Health, Inc.,

Defendant.

Case No. 6:24-cv-01068

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVE, APPOINTMENT OF CLASS COUNSEL**

# TABLE OF CONTENTS


**Page**

**INTRODUCTION**......1

**BACKGROUND**......2

**I. THE CLAIMS, CLASSES, AND DATA AT ISSUE.**......2

**II. THE WEBSITE ANALYTICS TOOLS.**......4

A. The Relevant Aspects of Internet Transmissions......4

B. Orlando Health's Use of The Pixel and GA.......5

C. Variables Affecting Whether and What Device Information is Transmitted.......6

D. Orlando Health Disclosed the Use of Website Analytics Tools.......7

**III. THE NAMED PLAINTIFF.**......8

A. Plaintiff's Experience......8

B. Relevant Procedural Background.......10

**ARGUMENT**......11

**I. PLAINTIFF MUST SHOW, BY A PREPONDERANCE OF THE EVIDENCE, THAT CLASS CERTIFICATION IS APPROPRIATE.**......11

**II. PLAINTIFF DOES NOT HAVE STANDING.**......12

A. The Mere Alleged Violation of a Statute is Not Enough......12

B. Plaintiff Failed to Show Standing as to her Common Law Claims.......14

**III. INDIVIDUALIZED ISSUES PREDOMINATE OVER ANY COMMON QUESTION, PRECLUDING CERTIFICATION OF ANY PUTATIVE CLASS.**......16

A. Individualized Issues Regarding Injury-in-Fact under Article III Predominate.......18

*1. No Class-Wide Proof Exists to Show Injury-in-Fact for the Statutory Claims.*......18

*2. Individualized Inquiries Regarding Standing as to the Common Law Claims Predominate.*......21

B. Individualized Issues Regarding the Merits of Plaintiff's Claims Will Also Predominate.......23

1. *Individualized Inquiries as to Consent Predominate.* ....23

2. *The ECPA and FSCA Claims Raise Individualized Questions that Will Predominate and Defeat Class Certification.* ....24

3. *The Breach of Implied Contract Claim Raises Individualized Inquiries that Predominate.* ....25

4. *Plaintiff Fails to Show Predominance on the Unjust Enrichment Claim.* ....26

5. *The Breach of Confidence Claim Requires Individualized Inquiries.* ....27

6. *Plaintiff's Lack of a Plausible Actual Damages Methodology Defeats Predominance.* ....28

C. Individualized Issues Pertaining to Arbitrability of All Claims Predominate. ....33

**IV. PLAINTIFF CANNOT SHOW TYPICALITY.** ....**34**

**V. PLAINTIFF FAILS TO SHOW SUPERIORITY OR MANAGEABILITY.** ....**35**

**VI. PLAINTIFF'S NATIONWIDE CLASS CANNOT BE CERTIFIED AS TO THE FSCA CLAIM AND THE COMMON LAW CLAIMS.** ....**36**

**VII. PLAINTIFF IS NOT ADEQUATE TO SERVE AS CLASS REPRESENTATIVE.** ....**38**

**VIII. THE PROPOSED CLASS DEFINITIONS ARE OVERBROAD.** ....**39**

**CONCLUSION** ....**40**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Lashify, Inc.*,
689 F. Supp. 3d 1146 (M.D. Fla. 2023) ....................24, 34

*Birmingham v. RoFx.net*,
2023 WL 3378177 (S.D. Fla. May 11, 2023) ....................37

*In re BPS Direct, LLC*,
705 F. Supp. 3d 333 (E.D. Pa. 2023) ....................20

*Brown v. Electrolux Home Prods., Inc.*,
817 F.3d 1225 (11th Cir. 2016) ....................11, 12, 17, 23, 28

*Cicale v. Prof'l Parking Mgmt. Corp.*,
2025 WL 3541417 (S.D. Fla. Sept. 11, 2025) ....................14

*Cohen Bros., LLC v. ME Corp., S.A.*,
872 So. 2d 321 (Fla. 3d DCA 2004) ....................37, 38

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ....................28

*Doe v. Adventist Health Care Network, Inc.*,
2025 WL 1797226 (Los Angeles Sup. Ct., Cal. Feb. 14, 2025) ....................18

*Doe v. Medstar Health, Inc.*,
2023 WL 4931348 (Cir. Ct. Baltimore City, Md. Mar. 10, 2023) ....................18

*Doe v. Mosaic Health Sys.*,
2025 WL 2531618 (Buchanan Cty., Mo. Cir. Ct. Aug. 29, 2025) ....................17

*Doe v. Virginia Mason Med. Ctr.*,
2021 WL 12295937 (King Cty., Wash. Super. Ct. Sept. 21, 2021) ....................17

*In re: Facebook Privacy Litig.*,
2016 WL 4585817 (N.D. Cal. Sept. 2, 2016) ....................15, 19

*Fisher v. Ciba Specialty Chems. Corp.*,
238 F.R.D. 273 (S.D. Ala. 2006) ....................40

*Frasco v. Flo Health*,
349 F.R.D. 557 (N.D. Cal. 2025) ....................18

*Gelfound v. Metlife Ins. Co. of Connecticut*,
313 F.R.D. 674 (S.D. Fla. 2016) ... 36

*In re Google RTB Consumer Priv. Litig.*,
2024 WL 2242690 (N.D. Cal. Apr. 4, 2024) ... 24

*Green-Cooper v. Brinker Int'l, Inc.*,
73 F.4th 883 (11th Cir. 2023) ... 16, 17

*Griffin v. Dugger*,
823 F.2d 1476 (11th Cir. 1987) ... 12

*Griffith v. TikTok, Inc.*,
2024 WL 4308813 (C.D. Cal. Sept. 9, 2024) ... 35

*Griggs-Ryan v. Smith*,
904 F.2d 112 (1st Cir. 1990) ... 24

*Hively v. Northlake Foods, Inc.*,
191 F.R.D. 661 (M.D. Fla. 2000) ... 34

*In re Hulu Privacy Litig.*,
2014 WL 2758598 (N.D. Cal. June 17, 2014) ... 36

*Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*,
48 F.4th 1236 (11th Cir. 2022) ... 12, 13, 14

*Leach v. Dist. Bd. Of Trs. Of Palm Beach*,
244 F. Supp. 3d 1334 (S.D. Fla. 2017) ... 13

*Lingard v. Holiday Inn Club Vacations, Inc.*,
2025 WL 495019 (M.D. Fla. Feb. 14, 2025) ... 28, 33

*London v. Wal-Mart Stores, Inc.*,
340 F.3d 1246 (11th Cir. 2003) ... 38

*Luczak v. Nat'l Beverage Corp.*,
548 F. Supp. 3d 1256 (S.D. Fla. 2021) ... 35

*Lyttle v. Trulieve, Inc.*,
2021 WL 3602996 (M.D. Fla. Aug. 13, 2021) ... 40

*Martinez v. D2C, LLC*,
2024 WL 4367406 (S.D. Fla. Oct. 1, 2024) ... 40

*In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*,
603 F. Supp. 3d 1183 (S.D. Fla. 2022) ... 25

*Muransky v. Godiva Chocolatier, Inc.*,
979 F.3d 917 (11th Cir. 2020) ....................23, 27

*New Concept Dental v. Dental Res. Sys., Inc.*,
2020 WL 3303064 (S.D. Fla. Mar. 3, 2020)....................24

*In re Novant*,
2024 WL 3028443 (M.D.N.C. June 17, 2024) ....................17

*In re Panacryl Sutures Prods. Liab. Cases*,
263 F.R.D. 312 (E.D.N.C. 2009) ....................37

*In re Photochromic Lens Antitrust Litig.*,
2011 WL 13141933 (M.D. Fla. Oct. 26, 2011) ....................37

*Prado-Steiman ex rel. Prado v. Bush*,
221 F.3d 1266 (11th Cir. 2000) ....................1, 2, 12

*Rothenberg v. Knight Swift Transp.*,
2023 WL 3511271 (M.D. Fla. Feb. 7, 2023) ....................13

*Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*,
601 F.3d 1159 (11th Cir. 2010) ....................36

*Sliwa v. Bright House Networks, LLC*,
333 F.R.D. 255 (M.D. Fla. 2019)....................34

*Tershakovec v. Ford Motor Co., Inc.*,
79 F.4th 1299 (11th Cir. 2023) ....................35

*Theus v. Brinker Int'l, Inc.*,
2025 WL 1786346 (M.D. Fla. June 27, 2025)....................17

*Trumpet Vine Invs., N.V. v. Union Capital Partners I, Inc.*,
92 F.3d 1110 (11th Cir. 1996) ....................37

*Vega v. T-Mobile USA, Inc.*,
564 F.3d 1256 (11th Cir. 2009) .................... *passim*

*Vision Constr. Ent. Inc. v. Argos Ready Mix LLC*,
2019 WL 11075886 (N.D. Fla. Nov. 7, 2019)....................12

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)....................11

**Statutes**

18 U.S.C. § 2511 .................... 2, 23-24

18 U.S.C. § 2520 .......... 39, 40

Fla. Stat. § 95.11 .......... 39

Fla. Stat. §§ 934.02 .......... 24

Fla. Stat. § 934.03 .......... 2, 23

Fla. Stat. § 934.10 .......... 39, 40

**Other Authorities**

Fed. R. Civ. P. 23 .......... 1, 2, 11, 12, 16, 17, 35, 36, 38, 40

**INTRODUCTION**

Plaintiff seeks certification of a class so that she can pursue hundreds of millions of dollars in statutory damages against Orlando Health based on its use of common website analytics tools. Plaintiff can point to no harm resulting from the use of these tools, other than the fact that information relating to her browsing the Orlando Health public website was sent to computer servers at Google or Meta.

In her Motion for Class Certification and Memorandum of Law in Support (ECF No. 52) (the "**Motion**"), Plaintiff treats class certification as if it is a formality or foregone conclusion. Plaintiff has a burden of *proof*—not *pleading*—that each of the requirements of Rule 23 is met. Her motion falls far short. The Motion is built on a chain of assumptions where the ability to certify a class quickly unravels when one assumption is shown to be inaccurate. To mask the failure to meet Rule 23's requirements, Plaintiff resorts to hyperbole claiming this case "presents fundamental questions about patient privacy in the digital age," characterizing Orlando Health as "secretly" installing "tracking technologies on its website to intercept sensitive communications" for "its own pecuniary gain." Mot. at 2. In reality, this case is a novel attempt to apply pre-internet surveillance statutes to modern internet technologies in order to obtain catastrophic statutory penalties, without having to prove that the Plaintiff, or anyone else, suffered any concrete injury.

Plaintiff's motion glosses over a critical step in the analysis. To represent a class, Plaintiff must offer proof to support an injury in fact sufficient to confer Article III standing. *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279-80 (11th Cir. 2000).

If Plaintiff lacks Article III standing, no class can be certified. *Id.* The fact that Plaintiff seeks statutory damages does not alter this requirement. She must establish that she suffered a concrete injury of a type recognized under common law. Plaintiff cannot satisfy this requirement for herself, let alone the class members she seeks to represent.

Plaintiff also fails to establish all elements of Rule 23 required to certify a class. Plaintiff merely pays lip service to the predominance element of Rule 23. After a rigorous analysis of predominance is conducted, it is clear individualized inquiries overwhelm any common issues. What class-wide proof will establish that each class member suffered an injury-in-fact sufficient to confer Article III standing? There is none. Whether on Article III standing or the claims, predominance cannot be established due to a lack of class-wide proof that the same data for each putative class member was intercepted and transmitted to Meta or Google.

Plaintiff has also failed to submit proof of various other required elements of Rule 23. For all these reasons, a class should not be certified.

## BACKGROUND

### I. The Claims, Classes, and Data at Issue.

Plaintiff filed this putative class action on June 10, 2024, alleging claims arising out of Orlando Health's use of website analytics tools on its website www.orlandohealth.com ("**Website**"). Focusing on Meta Pixel ("**Pixel**") and Google Analytics ("**GA**"), the Complaint asserts six causes of action: (1) violation of Florida's Security of Communications Act, § 934.03 *et seq.*, Fla. Stat. ("**FSCA**"); (2) violations of the federal Electronic Communications Privacy Act, 18 U.S.C. § 2511(2)(d)

("**ECPA**"); (3) breach of confidence; (4) invasion of privacy (dismissed, see ECF No. 38); (5) unjust enrichment; and (6) breach of implied contract. ECF No. 1.

Plaintiff has modified her class definitions since the inception of this case and now seeks certification of a nationwide or, alternatively, a Florida class, of individuals (rather than patients) who completed "Appointment Request Forms" on the Website. The proposed class period starts six (6) years before the filing of this action, despite the longest applicable statute of limitation period on any claim being four (4) years:

> **Nationwide class**. All natural persons residing in the United States who used Defendant's Website to complete an Appointment Request Form from April 26, 2018 to March 7, 2023.
>
> **Florida class**. All natural persons residing in the State of Florida who used Defendant's Website to complete an Appointment Request Form from April 26, 2018 to March 7, 2023.

Appointment Request Forms[1] are submitted through the public portions of the Website. Plaintiff is not pursuing allegations that Pixel and GA were within Orlando Health's patient portal, MyChart. Plaintiff's current theory is that submission of every Appointment Request Form submitted resulted in the transmission of (1) device information, which she equates to personally identifying information and (2) a URL which reflected "patient status" to Meta's and/or Google's computer servers. Mot. at 5-7.

---

[1] Appointments are not actually scheduled when completing these forms. (Mot., Ex. 1 at Ex. G, p. 25 ("[C]ompletion of this form only shows interest in making an appointment and not an actual appointment being made.")). There are numerous types of Appointment Request Forms all with different URLs. *See* Mot., Ex. 1 at Ex. A. Generally, the various Appointment Request Forms can be grouped into: (1) doctor specific forms (*e.g.*, "OH – Physician Finder – AR" form (Mot., Ex. 1 at Ex. A, p. 2)); (2) department or specialty specific forms; (3) location specific forms; (4) generic forms; and (5) campaign specific forms. *Id.*

## II. The Website Analytics Tools.[2]

### A. The Relevant Aspects of Internet Transmissions.

The data Plaintiff and her experts put at issue are: (1) "cookies containing account or device identifiers"; (2) "IP address, user agent, and device properties containing identifying information," (3) "Page URL," (4) "Page Title," and (5) "Button clicks." Mot. at 5. As Orlando Health's expert, Jim Vint ("**Vint**") explains, other than cookies (addressed *infra* Background Pt. II.C.), this is technical common data that needs to be exchanged to make the internet work.[3] Expert Report of Jim Vint dated January 15, 2026 ("**Vint R.**"), at ¶¶19-22 attached as **Exhibit 1** to Declaration of Julie S. Brady dated January 16, 2026 ("**Brady Decl.**"), attached as **Exhibit A**. To access a website, a browser and website server must exchange: (1) an IP address which is essentially the digital address of a device connected to the internet (e.g., mobile phone, wi-fi router, etc.) and varies by location (home, workplace, Starbucks, etc.); (2) a Uniform Resource Location ("**URL**") which is the address for a webpage; and (3) "header information" which includes a "user-agent" that identifies the operating system and web browser. Vint R., Ex. A at Ex. 1 ¶¶19-31.

None of the foregoing identifies an individual, they merely relate to a *device*. *Id.* at ¶192. It is this technical device information and "cookies," ("**Device Information**") that Plaintiff contends is personally identifying information. Mot. at 5-7.

---

[2] The Motion references "Tracking Tools," defined as Pixel, GA, and "related marketing technologies," (Mot. at 3.), but only Pixel and GA are specifically addressed by Plaintiff or her experts.
[3] Orlando Health retained Vint, a managing director at Secretariat International and expert in data-driven forensic and data privacy investigations with an emphasis on internet data, to analyze Orlando Health's use of Pixel and GA on the Website.

When accessing a website that uses Pixel or GA, a user's browser loads Pixel or GA when loading the website. Vint R., Ex. A at Ex. 1 ¶¶46-47. Pixel and GA are found on many, if not most, websites—including government websites, some of which are required to use analytics tools. *Id.* at ¶¶47, 48-50. For instance, these technologies are so common and generally accepted that the Medicare website, www.medicare.gov, also a HIPAA covered entity, uses the Pixel. *Id.* at ¶48. This Court's website, www.flmd.uscourts.gov, uses GA. *Id.* at ¶50. Plaintiff contends that Orlando Health's "secret" installation of Pixel and GA on the *public portions* of its own website constitutes "wiretapping," under state and federal statutes that pre-date the advent of the internet as we know it today by decades, warranting imposition of hundreds of millions of dollars in statutory damages for the proposed class.

**B. Orlando Health's Use of The Pixel and GA.**

Orlando Health installed the Pixel on the Website in April 2018 (and removed it on March 8, 2023). Mot., Ex. 1 at Ex. G, pp. 11-12. GA was installed on the Website before 2018. *Id.* at p. 12. The Pixel and GA were only installed on the public portions of the Website and never within the patient portal. Mot., Ex. 1 at Ex. G, p. 14.

Orlando Health used the Pixel to assist with optimizing clicks on advertisements on Meta's platforms and providing health information when and where needed. Excerpts of Deposition Transcript of Daniel Ruyter as Corporate Representative of Orlando Health dated August 27, 2025 ("**Ruyter Tr.**"), at 28:4-10, attached as **Exhibit 2** to Brady Decl.; Declaration of Daniel Ruyter dated January 16, 2026 ("**Ruyter Decl.**"), at ¶10, attached as **Exhibit B**. GA was used "to provide website owners more

information on their visitors in aggregate," "help better understand [Orlando Health's]…website visitor behavior, and to attempt to provide better content and experiences to them on the website," and "optimize navigation by understanding how users move through the site in practice versus intended paths, allowing Orlando Health to simplify menus and page hierarchies." *Id.* at 22:16-21 & 25:8-15; Ruyter Decl., ¶9.

### C. Variables Affecting Whether and What Device Information is Transmitted.

Plaintiff's expert, Dr. Zubair Shafiq ("**Shafiq**"), rendered an opinion as to what Device Information was transmitted by the Pixel and GA on the Website. Mot., Ex 1 at Ex. I. Shafiq, however, opines on the ***maximum*** amount of data that could have been transmitted. Excerpts of Deposition Transcript of Zubair Shafiq dated December 18, 2025 ("**Shafiq Tr.**"), at 81:10-83:11, attached as **Exhibit 3** to Brady Decl. There are numerous variables based on device and browser settings or privacy tools that could have an impact on the type of data transmitted or whether any data is transmitted at all. Vint R., Ex. A at Ex. 1 ¶13. This is critical because class certification depends on the same type of data being transmitted for all class members. Plaintiff's "damages" expert, Eric Krause ("**Krause**"), *assumes* that the class is comprised only of persons who had *all* Device Information transmitted and concedes that his damages methodology is dependent on all the same Device Information and patient status being transmitted for *all* class members. Excerpts of Deposition Transcript of Eric Krause dated January 6, 2026 ("**Krause Tr.**"), at 51:20-56:10, attached as **Exhibit 4** to Brady Decl.

Orlando Health's expert, Vint, considered the variables that may impact whether and what data was transmitted by Pixel or GA. Vint R., Ex. A at Ex. 1 ¶13(c). Vint concludes that "the potential information transmitted to any third party when a visitor interacted with the Website is dependent upon numerous variables, which can only be known after an individualized inquiry into each visitor's devices, browsers, and settings." *Id.* Vint addresses these variables which include number and type of devices and browsers used and their configuration. *Id.* at ¶¶52-55, 59-68, 74-79, 116-17.

As to "cookies," Mot. at 5, Vint explains how they have nothing to do with "patient" activity. Vint R., Ex. A at Ex. 1 ¶¶60-68, 74-77. They are values that vary and are used to distinguish visits to a website. *Id.* These cookies are not always transmitted. *Id.* at ¶60-68, 74-79. If these cookies are not transmitted to Facebook or Google, then there is no uniformity in the Device Information transmitted and Plaintiff's damages methodology fails. Lastly, there are common tools (like adblockers) that block transmissions from Pixel and GA or impact the Device Information transmitted. *Id.* at ¶¶78-79, 148, 168.

### D. Orlando Health Disclosed the Use of Website Analytics Tools.

On November 17, 2021, Orlando Health published its Privacy Policy and Terms and Conditions of Use (the "**Privacy Policy and Terms of Use**") on the Website in a persistent footer link. Ruyter Decl. at ¶6. The Privacy Policy and Terms of Use discloses the use of "third-party cookies from service providers such as Google Analytics" for tracking activity on the Website and include an arbitration provision applicable to "all disputes." A true and correct copy of the Privacy Policy and Terms

of Use is attached as **Exhibit C**. Ruyter Tr., Ex. A at Ex. 2 pg. 67:10-68:11.

## III. The Named Plaintiff.

### A. Plaintiff's Experience.

Plaintiff has been an Orlando Health patient since approximately 2018. Excerpts of Deposition Transcript of Plaintiff dated December 15, 2025 ("**WW Tr.**"), at 32:22-33:3, attached as **Exhibit 5** to Brady Decl. On March 31, 2022, Plaintiff completed an Appointment Request Form on the Website. Mot., Ex. 2 at ¶ 6. Orlando Health's records indicate the form was to request an appointment with Dr. Dhingra. Mot., Ex. 1 at Ex. B. Plaintiff does not remember visiting the webpage for Dr. Dhingra, does not remember submitting an Appointment Request Form for Dr. Dhingra, and never saw Dr. Dhingra. WW Tr., Ex. A at Ex. 5 pg. 193:14-194:9 (Plaintiff did not recognize Dr. Dhingra). This is the only Appointment Request Form submitted by Plaintiff through the Website during the relevant period. *See* Mot., Ex. 1 at Ex. B; Mot., Ex. 2 at ¶6.

Plaintiff asserts that the URL transmitted upon submission of an Appointment Request Form disclosed "patient status." Mot. at 10. Plaintiff has not offered any evidence that "patient status" was communicated in the URL associated with her submission of an Appointment Request Form. It was not. The URL associated with Plaintiff's submission of an Appointment Request Form did not contain any language referencing an appointment or even a request for an appointment. *See* Mot., Ex. 1 at Ex. B, p. 2; Declaration of Ryan Walker dated January 14, 2026 ("**Walker Decl.**"), at ¶11, attached as **Exhibit D**. Instead, if any URL was transmitted at all related to

Plaintiff's submission, it would have been a generic "thank you" page with the generic URL www.orlandohealth.com/thankyou. Walker Decl., ¶11.

It is unknown which device Plaintiff used to complete her Appointment Request Form. She has used multiple electronic devices over the years (mobile phones, laptop, and iPad), and would use whichever device was most convenient. WW Tr., Ex. A at Ex. 5 pg. 61:11-65:20. Plaintiff testified being aware of privacy-focused browsers (*id.* at 87:9-88:14), virtual private networks (VPNs) (i*d.* at 101:24-103:21), adblockers (*id.* at 115:5-117:12) and targeted advertisements dating back to 2020 (*Id.* at 103:15-104:18). Plaintiff never took any action to prevent tracking of her internet activity and attributed her inaction to "laziness." *Id.* at 103:5-111:12. Even after learning that Pixel and GA were used on the Website, she continued using the Website. *Id.* at 167:18-20; 204:22-205:8.

Plaintiff testified she has conducted Google searches relating to her medical conditions.[4] *Id.* at 82:12-83:15. Before doing so, Plaintiff did not take any steps to determine the privacy of the searches and whether Google would receive the searches. *Id.* at 163:10-165:22. Plaintiff also frequently posts about her medical information on Facebook. *Id.* at 122:9-123:8 (checking in at an Orlando Health facility), 123:9-125:3 (posting about her experience while in the hospital), 125:4-126:11 (publishing video while in the hospital and the whiteboard "when you go in there and it tell you [*sic*] your nurse and your doctor and stuff. I posted that."), 126:7-130:17 (asking questions

[4] For example, Plaintiff searched for "milo ostomy bag," "what is the difference between a colostomy and ileostomy," and "orlando health pulmonary." Ex. A at Ex. 7.

about her medical conditions on a public Facebook page).[5]

Plaintiff asserts that she received advertisements on Facebook for medical devices related to her medical conditions after "some of [her] interactions" on Orlando Health's Website. Mot., Ex. 2 at ¶ 7. Receipt of Facebook ads is the only consequence she identifies from her use of the Website and she offers no link between her submission of an Appointment Request Form and the advertisements. The advertisements are likely related to her own voluntary disclosures to Facebook of her medical information. *See* Terms of Service, Facebook.com, available at https://www.facebook.com/terms/, last accessed January 14, 2026 ("We use your personal data, such as information about your activity and interests, to show you personalized ads and sponsored content….").

**B. Relevant Procedural Background.**

On October 1, 2025, Plaintiff filed the Motion asserting that she is an adequate class representative. ECF No. 52. On October 8, 2025, after repeated requests for deposition dates for Plaintiff, Plaintiff's counsel advised the undersigned that Plaintiff had informed them she was ill, did not want to proceed with this action, would not sit for a deposition, and did not want counsel to contact her again. Brady Decl. at ¶7. Plaintiff confirmed during her deposition that she instructed her counsel to "never contact" her again. WW Tr., Ex. A at Ex. 5 pg. 261:5-262:13. After Plaintiff's

[5] Plaintiff testified as to her Facebook activity but has refused to produce any of her Facebook posts, even after Orlando Health agreed to limit its request to posts regarding Orlando Health or her medical conditions. The Court has set Orlando Health's motion to compel (ECF No. 62) for hearing on January 22, 2026.

counsel's attempts to find additional or substitute plaintiffs seemingly failed—at least for now—and after substantial delay to the briefing on the Motion due to Plaintiff's intention to withdraw and then unavailability, Plaintiff sat for deposition on December 15, 2025.

## ARGUMENT

### I. PLAINTIFF MUST SHOW, BY A PREPONDERANCE OF THE EVIDENCE, THAT CLASS CERTIFICATION IS APPROPRIATE.

Plaintiff seeks to certify a class under Rule 23(b)(3) of the Federal Rules of Civil Procedure. Mot. at 1. "For a district court to certify a class action, the named plaintiffs must have standing, and the putative class must meet each of the requirements specified in Federal Rule of Civil Procedure 23(a), as well as at least one of the requirements set forth in Rule 23(b)." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1265 (11th Cir. 2009). Rule 23(a) requires: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Rule 23(b)(3) further requires "(1) that common questions of law or fact predominate over questions affecting only individual class members ("predominance"); and (2) that a class action is superior to other available methods for adjudicating the controversy ("superiority")." *Id.* Courts must conduct a "rigorous analysis" of each element before certifying a class. *Id.* at 1216.

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quotation omitted). "The [movant] has a burden of proof," *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016), and the movant must

establish by a preponderance of evidence that *each* of Rule 23's requirements are met. *Vision Constr. Ent. Inc. v. Argos Ready Mix LLC*, 2019 WL 11075886, at *6 (N.D. Fla. Nov. 7, 2019). "All else being equal, the presumption is against class certification…." *Brown*, 817 F.3d at 1233. Plaintiff has not met her burden.

## II. PLAINTIFF DOES NOT HAVE STANDING.

A class cannot be certified if the named plaintiff lacks Article III standing. *Prado-Steiman*, 221 F.3d at 1279-80. The Article III standing analysis is a claim-by-claim analysis; "each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim." *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987).

Plaintiff asserts, incorrectly, that "the inquiry is straightforward because Plaintiff and all individuals who completed Appointment Request Forms on the Website had their PHI disclosed without consent, and therefore suffered injury." Mot. at 18. The claimed injury, therefore, is the claimed violation of a statute or common law right in and of itself.

### A. The Mere Alleged Violation of a Statute is Not Enough.

"In *TransUnion*, the [Supreme] Court reiterated that harm from a statutory violation had to be 'real' in order to be concrete, and that one way to tell if a harm is real is to compare it to a harm redressed in a traditional common-law tort." *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1239 (11th Cir. 2022). When Article III standing is based on a statutory violation analogous to a common-law harm, the Eleventh Circuit compares the elements of the common-law tort to see if the

statutory harm is similar. *Id.* at 1239-40. Where a necessary element of the comparator tort is missing, there is no concrete injury to support Article III standing. *Id.*

Plaintiff analogizes her FSCA and ECPA claims to a common law invasion of privacy claim. Mot at 18. Plaintiff's assertion, as noted above, is that the mere transmission of data to Google or Meta without consent is the claimed injury. The question then becomes whether the mere transmission of data to a third party, without more, is an injury that would have been recognized as a common law invasion of privacy. There are three common law claims that fall under the umbrella of "invasion of privacy": (1) intrusion upon seclusion; (2) publication of private facts; and (3) appropriation of name or likeness. *Rothenberg v. Knight Swift Transp.*, 2023 WL 3511271, at *2 (M.D. Fla. Feb. 7, 2023). The allegations in this action do not support a comparison to the tort of appropriation of name or likeness and publication of private facts requires disclosure to the public at large, which is not at issue here. *See e.g., Leach v. Dist. Bd. Of Trs. Of Palm Beach*, 244 F. Supp. 3d 1334, 1339-40 (S.D. Fla. 2017). This means that Plaintiff must be travelling under intrusion upon seclusion.

Plaintiff cannot show injury-in-fact through the comparison to intrusion upon seclusion. In fact, Plaintiff attempted to plead a claim for intrusion upon seclusion, which this Court dismissed for missing the necessary element of an intrusion *into private quarters*. ECF No. 38 at 21-25. Florida common law does not remedy intrusions upon *private activities,* just intrusion into *private quarters*. *Id.* ("Plaintiff's allegations demonstrate that her claim is based on an intrusion into private activities, rather than a private place, and therefore, her claim is not cognizable under Florida law.").

"Although an 'exact duplicate' of a traditionally recognized harm is not required, the new allegations cannot be missing an element 'essential to liability' under the comparator tort." *Hunstein*, 48 F.4th at 1242. For intrusion upon seclusion to convey standing, Plaintiff must show each element essential to liability under the claim. *Id.* at 1240 ("[I]f the elements do not match up, how could the harm that results from those elements?"). Plaintiff has failed to show an intrusion upon private *quarters*. With this element missing, Plaintiff's comparison to an injury under intrusion upon seclusion fails and she lacks standing for her ECPA and FSCA claims. *Id.*; *Cicale v. Prof'l Parking Mgmt. Corp.*, 2025 WL 3541417, at *4 (S.D. Fla. Sept. 11, 2025) (no standing based on invasion of privacy for lack of intrusion into a private *place*).

**B. Plaintiff Failed to Show Standing as to her Common Law Claims.**

To support standing as to her common law claims, Plaintiff alleges she and putative class members were injured by loss of privacy and confidence, lost benefit of the bargain, and the "value of the PHI that defendant was enriched by." Mot. at 18-19. What bargain, loss of privacy and confidence? Plaintiff does not explain. In any event, Plaintiff has not shown any of the foregoing injuries. Plaintiff has not established that she lost any money or was deprived of any opportunity to make money as a result of the transmission of browsing data or that she suffered any other impact. Again, the transmission of data in and of itself is what Plaintiff claims to be the injury.

Plaintiff has not presented any evidence as to what Device Information *relating to her* submission of an Appointment Request Form was intercepted by Pixel or GA and disclosed to Meta or Google, causing her harm. The absence of this evidence is

notable because Plaintiff testified that the transmission of the URL for the webpage related to her form submission does not constitute sharing her medical information WW Tr., Ex. A at Ex. 5 pg. 274:11-25 (admitting that sending "www.OrlandoHealth.com/physician-finder/neelu-dhingra-md#/overview is not sending her medical information). How can Plaintiff claim injury from disclosure of a URL she doesn't view as medical information? She cannot. Vint further notes that Plaintiff's Off Meta Activity Report[6] reflects only one instance of Plaintiff visiting the Website, which was almost a year after her submission of the Appointment Request Form. Vint R., Ex. A at Ex. 1 ¶94. "This could be because she used any of the browsing conditions…which prevented any Website activity from being linked to her Facebook account." Vint R., Ex. A at Ex. 1 ¶94.

Plaintiff assumes the alleged sharing of her information because she "observed on her Facebook account" advertisements for medical devices. ECF No. 1 at 110; Mot. at Ex. B, ¶7. This allegation fails to support Article III standing. Afterall, Plaintiff testified she extensively shared her medical condition and Orlando Health hospital visits on Facebook, even posting the medical whiteboard in her hospital room.[7] *Supra* Background, Pt. III.A. Because Plaintiff shared her health information with Facebook, any targeted advertisements likely stem from that disclosure and she cannot show otherwise. *See* Terms of Service, Facebook.com, available at

[6] The Off Meta Activity Report lists websites which run the Pixel and which of those websites a user visited while logged into Facebook on the same device-browser. Vint R., Ex. A at Ex. 1 ¶ 94.
[7] Plaintiff's Facebook privacy setting is irrelevant to what information *Facebook* receives from her.

https://www.facebook.com/terms/. Indeed, Plaintiff testified she brought this case after responding to a Facebook ad soliciting plaintiffs—an ad she likely received because of her own Facebook posts about Orlando Health. WW Tr., Ex. A at Ex. 5 pg. 254:23-255:12.

Lastly, nothing about the Device Information identified by Shafiq or the transmission of the URL related to Plaintiff's submission of an Appointment Request Form establishes Plaintiff's "patient status." *See* Vint R., Ex. A at Ex. 1 ¶¶20, 109-115. Rather, at best, it shows that a unique device visited a doctor's webpage and there was a generic "thank you" page URL. *See* Vint R., Ex. A at Ex. 1 ¶¶112, 180; Walker Decl., ¶11.

Plaintiff carries the burden of proof that there is Article III standing. Plaintiff has failed to carry that burden and, therefore, no class can be certified.

## III. Individualized Issues Predominate Over Any Common Question, Precluding Certification of Any Putative Class.

Rule 23(b)(3) requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members through evidentiary proof." *Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 888 (11th Cir. 2023). For common questions to predominate over individual issues, they must have a "direct impact on every class member's effort to establish liability that is more substantial than the impact of individualized issues in resolving the claim or claims of each class member." *Vega*, 564 F.3d at 1270. Here, (1) Article III standing for absent class members cannot be shown on a class-wide basis; and (2) the class claims will also

involve individualized issues that will predominate and preclude class certification.

"Rule 23(b)(3)'s predominance analysis implicates Article III standing." *Green-Cooper*, 73 F.4th at 891. Where individualized inquiries as to absent class members' Article III standing would predominate over common issues, Rule 23(b)(3)'s predominance requirement is not met and a class should not be certified. *Id.*; *Theus v. Brinker Int'l, Inc.*, 2025 WL 1786346, at *3-4 (M.D. Fla. June 27, 2025) (individualized inquiries as to standing predominated, precluding certification).

In addition to standing, analyzing predominance also involves a claim-by-claim analysis of how the claims and defenses would be proven at trial. "To determine whether the requirement of predominance is satisfied, a district court must first identify the parties' claims and defenses and their elements." *Brown*, 817 F.3d at 1234. The court must identify and classify issues "by predicting how the parties will prove them at trial." *Id.* Common questions can be resolved with evidence applicable to all members, while individual questions require varying evidence for each member. *Id.*

None of the cases cited by Plaintiff as having found predominance in a "healthcare tracking case[] under similar circumstances" support the conclusion that Plaintiff has satisfied her burden of proving predominance in this case. *Doe v. Mosaic Health Sys.*, 2025 WL 2531618, at *1 (Buchanan Cty., Mo. Cir. Ct. Aug. 29, 2025) (involving a different legal standard requiring the court to accept movant's allegations and evidence "as true"); *In re Novant*, 2024 WL 3028443, at *5 (M.D.N.C. June 17, 2024) (preliminary approval of class action settlement); *Doe v. Virginia Mason Med. Ctr.*,

2021 WL 12295937, at *3 (King Cty., Wash. Super. Ct. Sept. 21, 2021) (involving a more lenient legal standard); *Frasco v. Flo Health,* 349 F.R.D. 557, 568 (N.D. Cal. 2025) (centering on privacy representations which are not at issue here and observing that defendants "often did not support their arguments with useful analysis").

Plaintiff ignores two other Pixel healthcare cases where class certification was denied. *Doe v. Adventist Health Care Network, Inc.*, 2025 WL 1797226 (Los Angeles Sup. Ct., Cal. Feb. 14, 2025); *Doe v. Medstar Health, Inc.*, 2023 WL 4931348 (Cir. Ct. Baltimore City, Md. Mar. 10, 2023).

### A. Individualized Issues Regarding Injury-in-Fact under Article III Predominate.

#### *1. No Class-Wide Proof Exists to Show Injury-in-Fact for the Statutory Claims.*

Just as Plaintiff has failed to establish the existence of a concrete injury for herself, she has also failed to point to class-wide proof that would support the existence of a concrete injury for every member of the proposed class. Even assuming, without conceding, that there might be some putative class members who suffered an Article III injury, proof of that injury would necessarily be based on individualized proof.

For example, the question of whether a comparable "intrusion" occurred, and whether that particular intrusion would be "highly offensive to a reasonable person" cannot be answered on a class-wide basis. ECF No. 38 at 21-22 (stating elements of intrusion upon seclusion). Facts relevant to this inquiry include (1) the extent to which the alleged transmission of Device Information relating to an Appointment Request Form occurred and (2) whether any transmitted Device Information could be

attributed to an identifiable person. Both of these facts are individualized and depend on the circumstances of each person who used the Website to complete an Appointment Request Form.

First, there is no common proof to establish that every person who submitted an Appointment Request Form actually had information about that form sent to Meta or Google. It has been estimated that approximately 40% of website users in the United States use ad blocking technology. Vint R., Ex. A at Ex. 1 ¶160. There are free versions of ad blockers that do not require expertise to use. *Id.* at ¶78; Shafiq Tr., Ex. A at Ex. 3 pg. 237:21-239:1 (explaining ad blocker extensions can be installed with just a few clicks and comparing it to installing an app on a phone). When a user's browser has one or more of these commonplace ad blockers installed, no transmissions to Meta or Google may occur at all. Vint R., Ex. A at Ex. 1 ¶¶78-79, 168; Shafiq Tr., Ex. A at Ex. 3 pg. 84:23-85:4 (acknowledging there are adblockers available to consumers that block the Pixel and GA). Because these ad blockers do not all work the same way, a further inquiry into which adblocker was used is necessary—and it can only be done through individual evidence. *See* Vint R., Ex. A at Ex. 1 ¶¶78-79. For each putative class member, the Court will need to determine if each used ad blockers or other privacy tools (e.g., *id.* at ¶¶125-26), what kind of adblocker or privacy tool, and whether the tool prevented or impacted the ability for Pixel and GA to function. *In re: Facebook Privacy Litig.*, 2016 WL 4585817, at *9 (N.D. Cal. Sept. 2, 2016) ("In order to avoid class certification, Facebook is not required to prove that transmission did not occur—Facebook must show only that the question is not subject to common proof.").

Second, even when a transmission occurred, whether that Device Information was accompanied by information sufficient to identify the user is individualized. Determining what Device Information was transmitted for each putative class member and whether that Device Information identified them *and* disclosed their "patient status" necessitates individualized inquiries into each user's browsing environment, device settings, and the specific Device Information that was transmitted. *See* Vint R., Ex. A at Ex. 1 ¶¶116-18. There is no common evidence that can show this. *See id.* Further, as described above, *supra* Argument Pt. II.B., URLs for form submissions relating to specific doctors (like the form Plaintiff submitted) do not contain any language referencing an appointment or even a request for an appointment. Walker Decl., ¶11. These URLs disclose *nothing* about patient status. Indeed, it could be thanking someone for a donation, for volunteering, or for participating in a fundraising event. The actual URL transmitted upon submission of each Appointment Request Form requires an individualized inquiry as to whether "sensitive personal information" was disclosed to establish concrete harm. *See In re BPS Direct, LLC*, 705 F. Supp. 3d 333, 355 (E.D. Pa. 2023) ("We find Website Users who did not disclose highly sensitive personal information such as medical diagnosis information or financial data from banks or credit cards cannot establish concrete harm.").

The question of putative class members' standing will involve a litany of individualized issues that cannot be resolved on a class-wide basis. These individualized issues will result in thousands of mini-trials on the threshold issue of standing. This precludes certification of any class on the FSCA and ECPA claims.

2. *Individualized Inquiries Regarding Standing as to the Common Law Claims Predominate.*

Proving predominance as to standing on the common law claims also faces an insurmountable hurdle. As to the common law claims, Plaintiff's entire theory as to why individualized inquiries on standing do not predominate is also dependent upon the uniform transmission of "personally identifiable" Device Information for every putative class member which reveals "patient status."[8] Mot. at 5, 18. The evidence does not support this chain of inferences and assumptions.

Plaintiff's claimed injuries hinge on Device Information being transmitted to Meta or Google. However, as shown above, common proof cannot establish whether all or even any Device Information was transmitted for every member of the putative class or, if so, could be used to identify a specific individual. The fact that significant variations exist in the Device Information that may have been transmitted for each putative class member is an unavoidable consequence of the nature of the claims.

As discussed above, Plaintiff assumes the alleged sharing of her information because she "observed on her Facebook account" advertisements for medical devices related to her medical conditions. ECF No. 1 at 110; Mot. at Ex. 2, ¶7. Plaintiff's anecdotal allegation of observing medical-related advertisements on Facebook does

[8] Likewise, Shafiq's report is replete with references to what "patients" did on the Website and what information about "patients" was disclosed, based on the assumption that everyone in the putative class is a patient. *E.g.*, Mot., Ex. 1 at Ex. I, ¶¶2, 53. The entire premise of Shafiq's analysis *assumes* patient status. Shafiq Tr., Ex. A at Ex. 3 pg. 127:10-14 ("The goal of my testing is to essentially simulate or recreate the experience of a patient…."). Plaintiff's damages expert, Eric Krause, also assumes all Device Information for every putative class member and patient status was transmitted for his damages methodology, relying on Shafiq and Plaintiff's counsel having told him so. Krause Tr., Ex. A at Ex. 4 pg. 18:24-19:11.

not even begin to establish the necessary injury-in-fact for her, let alone the class.

Plaintiff relies on Shafiq's opinions to attempt to overcome these issues. Shafiq does not save the failure to show predominance on Article III standing. Shafiq opines that "Google and Meta *can* link or associate the shared information with specific individuals, as that is what their technologies are designed to do." Mot., Ex. 1 at Ex I, ¶14(c) (emphasis added). This is mere *ipse dixit*. In his deposition, Shafiq could not answer whether Google and Meta *actually* link or associate the information transmitted by Pixel and GA with a specific individual. *See* Shafiq Tr., Ex. A at Ex. 3 pg. 178:7-189:22, 208:13-216:8. Nor could Shafiq point to evidence of this association actually occurring, let alone across the entire proposed class. *Id.* Instead, Shafiq focuses on what is theoretically possible—<u>not what actually happens in every instance</u>. *See id.*

Shafiq's reliance on the use of Meta's Advanced Matching during a portion of the class period is also unavailing. Meta's Advanced Matching feature is meaningless if a person does not have a Facebook account. Vint R., Ex. A at Ex. 1 ¶73. Further, Meta's Advanced Matching does not transmit the plain text of first name, last name, email address, phone number, and zip code to Meta. *Id.* at ¶¶70-72. Instead, these form values are hashed (i.e., a string of characters) and it is these hashed values that are transmitted to be *compared* (<u>without unhashing</u>) with Meta's own database of hash values. *Id.* In other words, Meta is looking for matching random characters. Even then, the accuracy of any such matching is questionable, as differences in the hashes (for example, using a different email with Facebook as Plaintiff does, WW Tr., Ex. A at Ex. 5 pg. 267:14-269:6) may result in a failed match. *Id.* at ¶¶170-72. Moreover,

numerous profiles with the same name, like in the case of Plaintiff (Ex. A at Ex. 8), means they will have the same hash values further limiting the ability to connect activity to a specific account. Vint R., Ex. A at Ex. 1 ¶171. Shafiq did not engage in an analysis to determine the likelihood that Meta identified Plaintiff through Advanced Matching to be able to make this determination for Plaintiff herself – let alone each putative class member. *See* Shafiq Tr., Ex. A at Ex. 3 pg. 227:23-229:16.

The individualized inquiries that dominate the Article III questions in this case create an insurmountable barrier to class certification. The Motion should be denied.

### B. Individualized Issues Regarding the Merits of Plaintiff's Claims Will Also Predominate.

#### *1. Individualized Inquiries as to Consent Predominate.*

The Privacy Policy and Terms of Use published on the Website on November 17, 2021 establish a consent defense as it discloses the use of website analytics tools on the Website. *See supra* Background Pt. II.D. Indeed, after reading relevant portions of the Privacy Policy and Terms of Use during her deposition, Plaintiff testified she would not have used the Website because "I know then that you would be invading my privacy." WW Tr., Ex. A at Ex. 5 pg. 200:12-201:6.

Consent is an affirmative defense to Plaintiff's claims and entails individualized inquiries. *See, e.g.*, § 934.03(2)(d), Fla. Stat.; 18 U.S.C. § 2511(2)(c); *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 932 (11th Cir. 2020) (breach of confidence involves *unconsented* disclosures). "Individual affirmative defenses can defeat predominance in some circumstances." *Brown*, 817 F.3d at 1241. Consent can be either express or

implied. *See, e.g.*, *Griggs-Ryan v. Smith*, 904 F.2d 112, 116 (1st Cir. 1990).

The evidence required to prove consent is highly individualized. *See In re Google RTB Consumer Priv. Litig.*, 2024 WL 2242690, at *12-14 (N.D. Cal. Apr. 4, 2024) (implied consent defense raised individualized inquiries that would predominate); *New Concept Dental v. Dental Res. Sys., Inc.*, 2020 WL 3303064, at *8 (S.D. Fla. Mar. 3, 2020) (class certification denied for failure to show consent could be established with class-wide proof). Whether a putative class member provided consent is an individualized inquiry on a core defense that predominates over any common issues. *In re Google RTB Consumer Priv. Litig.*, 2024 WL 2242690 at *12-14; *Adams v. Lashify, Inc.,* 689 F. Supp. 3d 1146, 1154 (M.D. Fla. 2023) (browsewrap terms of use are enforceable when a person has actual knowledge of the same).

2. *The ECPA and FSCA Claims Raise Individualized Questions that Will Predominate and Defeat Class Certification.*

The elements and defenses in an ECPA and FSCA claim require individualized proof. For both the ECPA and FSCA, Plaintiff must prove that there was an (1) interception (2) of the contents of a wire, oral or electronic communication (3) through the use of an electronic, mechanical, or other device. §§ 934.02(3), Fla. Stat.;[9] 18 U.S.C. § 2511. In this case, even under Plaintiff's erroneous interpretation of what constitutes an "interception,"[10] individualized inquiries into each class member's

[9] For an ECPA claim, Plaintiff must also establish that the crime-tort exception to the one-party consent rule applies; otherwise, the claim fails as a matter of law. 18 U.S.C. § 2511(2)(d).
[10] Orlando Health maintains that no interception occurred under any circumstances. Vint R., Ex. A at Ex. 1 ¶105.

individual device and browser privacy settings would be necessary to prove an interception. *See supra* Argument Pt. III.A. This defeats predominance.

*3. The Breach of Implied Contract Claim Raises Individualized Inquiries that Predominate.*

In Florida, "an implied contract requires proof of the same elements as an express contract, including mutual assent and meeting of the minds." *In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*, 603 F. Supp. 3d 1183, 1220 (S.D. Fla. 2022) "[T]he existence and terms of an implied contract are manifested by conduct." *Id.* at 1221. And, "[i]n considering whether an implied contract exists, a court should give 'the effect which the parties, as fair and reasonable men, presumably would have agreed upon if, having in mind the possibility of the situation which has arisen, they had contracted expressly in reference thereto." *Id.*

Here, the formation of an implied contract (or lack thereof) and its terms will require individualized inquiries. Plaintiff alleges that "[a]s a condition of utilizing Defendant's digital platforms and receiving services from Defendant, Plaintiff and the Class provided their Private Information and compensation for their medical care" and they would "not have entrusted Defendant with their Private Information in the absence of an implied contract between them…." ECF No. 1 at ¶¶244 & 246. Without significant individualized inquiries, it cannot be known if every class member who submitted a form received medical care. Website visitors do not pay to use a public website, including to submit an Appointment Request Form—Plaintiff certainly did not. WW Tr., Ex. A at Ex. 5 pg. 242:3-6. Nor can it be determined without the

extensive individualized inquiries addressed above whether a class member's "Private Information" was disclosed or whether a class member would use the Website with knowledge of the use of the Pixel and GA. Simply put, inquiries into each putative class member's expectations and conduct will be required to determine if an implied contract was formed and its terms. Plaintiff has failed to show predominance as to the breach of implied contract claim.

*4. Plaintiff Fails to Show Predominance on the Unjust Enrichment Claim.*

An unjust enrichment claim requires a plaintiff to show: "(1) a benefit conferred upon a defendant by the plaintiff, (2) the defendant's appreciation of the benefit, and (3) the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof." *Vega*, 564 F.3d at 1274. Before relief can be awarded, "a court must examine the particular circumstances of an individual case and assure itself that, without a remedy, inequity would result or persist." *Id.* "Due to the necessity of this inquiry into the individualized equities attendant to each class member, courts, including [the Eleventh Circuit], have found unjust enrichment claims inappropriate for class action treatment." *Id.* "In short, common question will rarely, if ever, predominate an unjust enrichment claim, the resolution of which turns on individualized facts." *Id.* This case presents no exception.

Although Plaintiff claims Orlando Health engaged in uniform conduct, whether it would be unjust for Orlando Health to retain any benefit from each class member's form submission depends on individualized issues that will vary across the class. Is it unfair to retain a benefit conferred by someone: (1) who read the Privacy Policy and

Terms of Use disclosing the use of these technologies and still proceeded to use the Website?; (2) who knew that Orlando Health was using the technologies and still used the Website?; (3) who does not place value on the information allegedly disclosed by Orlando Health?; (4) who does not care to protect the privacy of their information and voluntarily shares it with Google and Facebook?; (5) who found a benefit in the technologies, which provide a better experience to website visitors?; *or* (6) who has no issue with the use of the technologies?

Plaintiff's testimony demonstrates the nature of this individualized inquiry. Plaintiff testified to frequently posting about her medical information on Facebook, disclosing to Facebook far more personal information than just being a patient of Orlando Health. *Supra* Background Pt. III.A. Plaintiff testified to taking no action to make her internet activity more private because of "laziness," despite being aware that there are tools to do so. WW Tr., Ex. A at Ex. 5 pg. 111:2-6. And, despite the claims brought in this action, Plaintiff continued to use the Website. *Id.* at 205:3-8. Plaintiff's circumstances underscore the individualized issues that bear on whether Orlando Health received and retained a benefit that was unfair so as to preclude class treatment of the unjust enrichment claim.

*5. The Breach of Confidence Claim Requires Individualized Inquiries.*

A common law claim for breach of confidence "involves the unconsented, unprivileged disclosure to a third party of nonpublic information that the defendant has learned within a confidential relationship." *Muransky*, 979 F.3d at 932. Whether any disclosure was "unconsented" requires individualized inquiries into whether each

person (1) knew of the technologies from the Privacy Policy and Terms of Use (*see supra* Argument Pt. III.B.1.), or (2) otherwise knew of the use of the technologies and proceeded anyway, thereby giving consent. Determining whether the information was nonpublic requires individualized inquiries into: (1) what was the information disclosed (*see supra* Argument Pt. III.A.) and (2) whether the person kept that information private. For non-patients, it also requires assessing whether any confidential relationship existed. These issues cannot be resolved on a class-wide basis.

*6. Plaintiff's Lack of a Plausible Actual Damages Methodology Defeats Predominance.*

Plaintiff has not offered a reliable methodology for calculating actual damages on a class-wide basis, thereby defeating predominance. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (without a damages model that shows damages are capable of measurement on a class-wide basis, a plaintiff cannot establish predominance); *Lingard v. Holiday Inn Club Vacations, Inc.*, 2025 WL 495019, at *17 (M.D. Fla. Feb. 14, 2025) (lack of a plausible damages methodology precludes finding of predominance). "[I]ndividual damages defeat predominance when they are accompanied by significant individualized questions going to liability." *Brown*, 817 F.3d at 1240.

Plaintiff offers the Krause opinion in a failed attempt to supply a feasible damages methodology. Krause opines that "patient status" and the "baseline" data Shafiq opines was transmitted to Meta and Google (the Device Information) has an *estimated* "value" of $200. Mot., Ex. 1 at Ex. J ("**Krause R.**"), at ¶70. Krause repeatedly caveats that this "value" represents a "preliminary" fair market value "estimate" of the

damages suffered by putative class members, which he refers to as simply a "preliminary placeholder valuation" and "preliminary exemplification." Krause Tr., Ex. A at Ex. 4 pg. 47:20-48:6; 77:21-25; 131:13-132:14. Krause does not contend the damages are a *loss* in value; in fact, he does just the opposite. ECF No. 63-2 (Declaration of Eric R. Krause) ("**Krause Decl.**") at ¶8; Krause Tr., Ex. A at Ex. 4 pg. 75:15-25; 47:10-20. He refers to the data as "non-rivalrous" and contends the damages are the difference between the "value" of the data and the amount each class member was "paid" for their data—which he assumes is zero. Krause Decl. at ¶8. He would not, because he cannot, opine that class members' data *lost* value from the alleged disclosures. Krause Tr., Ex. A at Ex. 4 pg. 76:21-77:14.

Critically, Krause's valuation is completely dependent upon all the "baseline" data identified by Shafiq *and* "patient status" having been transmitted to third parties *uniformly across the class*. *Id.* at 191:17-193:19. That is, if every type of the "baseline" data identified by Shafiq is not transmitted for every class member, then Krause unequivocally concedes that his damages methodology fails. *Id.* And even if all the "baseline" Device Information is transmitted, if patient status is not transmitted (as it is not with a URL that simply provides "thankyou"), Krause admits his valuation is negatively impacted to a degree he was unable to quantify. *Id.* at 194:9-23.

Fatal then is the fact, as explained above, that there is no uniformity of data transmissions across the proposed classes. When Krause's tower of assumptions falls, so too does his damages "methodology," nothing more than a "preliminary" "placeholder" at an unsupported number that he has offered in at least four other cases

where the information at issue may have varied. *Id.* at 17:14-18:8, 77:3-25 ("[It] is critical that we remember…that the $200 is simply a preliminary exemplification…."), 131:13-133:9, 168:2-170:20.

Krause offers a "fair market value" valuation that is the same for each putative class member - $200. He does this based on a "hypothetical competitive market" and "assume[s] that there are willing buyers and willing sellers" for this data, conceding there is [n]o public transparent market" for this data. Krause R., ¶28; Krause Tr., Ex. A at Ex. 4 pg. 101:11-103:15, 104:20-25. Orlando Health's rebuttal expert, Jonathan Orszag ("**Orszag**"), notes that "[a] market for individuals selling the data at issue in this litigation does not exist." Expert Report of Jonathan Orszag dated January 16, 2026 ("**Orszag R.**"), at ¶¶44, 36, attached as **Exhibit 6** to Brady Decl. That doesn't persuade Krause, who testified he need not know if a market exists because he can just assume that one does. Krause Tr., Ex. A at Ex. 4 pg. 105:24-106:13, 107:14-16. Thus, his preliminary fair market value estimate of "$200" is based on a make-believe market.

Krause relies on this "fair market valuation" approach to entirely ignore different demographics within the proposed class and apply $200 across the board. But Orszag explains that consumer valuations of private data are heterogeneous and "vary from person to person with respect to their tastes and preferences." Orszag R., Ex. A at Ex. 6 ¶19. Environmental and contextual differences, and demographics like age and gender often result in very different privacy preferences. (*Id.* at ¶20). Orlando Health's patients are drawn from an area which exhibits significant variation in factors

like age, income, education, race, ethnicity, sex, and marital status. (*Id.* at ¶21, Appendix A).

Although Krause maintains these differences do not affect his fair market value analysis, he relies heavily on a study (the "***Li* Study**") which identifies five "stylized facts" showing substantial variations across demographics and viewpoints that lead to significantly different bid prices for the same data sets. Krause R., ¶¶49-53; Krause Tr., Ex. A at Ex. 4 pg. 153:10-154:9; Orszag R., Ex. A at Ex. 6 ¶¶20, 35. Krause ignores demographic differences within Orlando Health's service area, asserting that the Li Study's 218 survey respondents are sufficient to extrapolate to the putative class. Krause Tr., Ex. A at Ex. 4 pg. 154:10-158:4; Orszag R., Ex. A at Ex. 6 ¶22.

In the end, Krause considers four different "perspectives" for valuing data, (Krause R. at ¶42),[11] and provides a wide range of "per-user values" (ranging from $99 to $754—although he was unable to identify the source of this $754 outlier at his deposition), magically arriving at a *preliminary* valuation of $200 per class member. Krause Tr., Ex. A at Ex. 4 pg. 187:7-188:15, Krause R. at ¶63, He offers no work papers or calculations as to how he derived $200 from this range. And his methodology based on assumptions bears no connection to the facts at issue.[12] Orszag R., Ex. A at Ex. 6 ¶¶43, 49-51.

---

[11] Orszag explains in detail why none of these "four perspectives" fit the data at issue here and how Krause's application of them fails in any event. Ex. A, Ex. 6 at ¶¶23, 30, 31-32, 37-41, 45-46.

[12] Krause acknowledges that the *Li* Study did not address the types of data at issue in this case and specifically did not include medical information in the study. Krause Tr., Ex. A at Ex. 4 pg. 144:3-19, 145:12-146:2.

Krause's unjust enrichment valuation is also flawed, relying solely on one global "large scale-randomized experiment" in 2025 (the "***Wernerfelt* Experiment**") of over 70,000 advertisers—78% of which are outside the United States and the majority of which are engaged in non-healthcare industries—to quantify the benefit to advertisers in using third-party cookies and offsite tracking data in ad delivery. Orszag R., Ex. A at Ex. 6 ¶¶57, 59, 61. First, o*ffsite* tracking is not at issue in this case. Rather, this case solely concerns use of the Pixel and GA on the Website. Second, healthcare advertisers comprised only a relatively small portion of this study. But, healthcare entities like Orlando Health are likely less affected by the loss of data analytics tools than e-commerce, retail, and other industries, inflating this calculation. Orszag R., Ex. A at Ex. 6 ¶¶64.

The *Wernerfelt* Experiment yielded an evaluation that there would be a 31% increase in the costs per incremental customers if advertisers cannot optimize ad delivery for offsite purchases. Orszag R., Ex. A at Ex. 6 ¶60. Krause's "straight forward approach" is to simply take this 31% inapplicable estimation and "gross up" Orlando Health's ***total*** <u>media spend</u> for the years in the class period to determine the "but for" media spend absent the technologies, opining that that the yearly difference between the actual and "but-for" spend is the unjust enrichment to Orlando Health. Krause R., ¶¶73-76.

Orlando Health's total media spend includes many media types that are non-digital, such as television, sports partnerships and sponsorships, radio, print, billboards, direct mail, and event sponsorships – just to name a few. Ruyter Decl., ¶12.

Krause refuses to consider other spends that have nothing to do with use of the technologies or operation of the Website. Krause Tr., Ex. A at Ex. 4 pg. 225:18-227:14; Orszag R., Ex. A at Ex. 6 ¶65. Undeterred, Krause uses his "gross up" to derive an unjust enrichment calculation of more than $18 million (for less than the entirety of the proposed class period). His methodology is the to simply divide this staggering amount evenly amongst only persons who submitted an Appointment Request Form on Orlando Health's Website. The result significantly overstates the benefit Orlando Health received from the use of Pixel and GA. This is not a reasonable methodology for valuing unjust enrichment, results in a windfall to persons who submitted an Appointment Request Form, and is untethered to *anything* related to this case—including the unjust enrichment to each class member based on *their* submission of an Appointment Request Form, defeating predominance. *See Lingard*, 2025 WL 495019, at *17.

### C. Individualized Issues Pertaining to Arbitrability of All Claims Predominate.

The Privacy Policy and Terms of Use published on the Website since November 17, 2021 provides: **"NOTE THAT THESE TERMS AND CONDITIONS OF USE INCLUDE AN AGREEMENT TO SUBMIT ALL DISPUTES TO INDIVIDUAL (NON-CLASS) ARBITRATION. READ CAREFULLY."** Ex. C at 2 (Emphasis in original). The Privacy Policy and Terms of Use applies to the Website and states that "use of the [Website]…is your acceptance of this Privacy Policy and the Terms and Conditions of Use." *Id.* at 1.

"Under Florida law, a browsewrap agreement is enforceable 'when the

purchaser has actual knowledge of the terms and conditions, or when the hyperlink to the terms and conditions is conspicuous enough to put a reasonably prudent person on inquiry notice.'" *Adams*, 689 F. Supp. 3d at 1154. Consequently, a person with actual knowledge of the arbitration provision in Orlando Health's Privacy Policy and Terms and of Use would be subject to it and Orlando Health would be entitled to enforce such arbitration provision for the type of claims alleged in this action.

For each putative class member who submitted a Request an Appointment Form after November 17, 2021, Orlando Health is entitled to develop and present evidence as to whether there was actual knowledge of the Privacy Policy and Terms of Use. This individualized inquiry on a threshold issue defeats predominance. *See Sliwa v. Bright House Networks, LLC*, 333 F.R.D. 255, 280-81 (M.D. Fla. 2019) (arbitration provision raised individualized inquiries defeating predominance).

## IV. PLAINTIFF CANNOT SHOW TYPICALITY.

"[T]ypicality refers to the individual characteristics of the named plaintiff in relation to the class." *Vega*, 564 F.3d at 1275. "[W]hile typicality does not require a complete identity of claims, typicality may be defeated if factual differences dominate." *Hively v. Northlake Foods, Inc.*, 191 F.R.D. 661, 668 (M.D. Fla. 2000). "Typicality is not present if the class representatives are subject to unique defenses that could be central to the litigation." *Id.*

Plaintiff asserts that this "case presents fundamental questions about patient privacy in the digital age…." Mot. at 1. The main premise of Plaintiff's Motion is that "patient status" was shared with Meta and Google. At the same time, Plaintiff testified

she extensively posted on Facebook about her medical conditions and experiences with Orlando Health. *Supra* Background Pt. III.A. Plaintiff cannot stand in the shoes of absent class members complaining about the sharing of internet metadata to Facebook while freely sharing with Facebook and Google (*supra* note 4) vastly more revealing medical information. Plaintiff's distinct factual circumstances and lack of standing (or, at a minimum, the significant issues with her standing, *supra* Argument Pt. II) render Plaintiff an atypical representative and will undermine her ability to represent the class, as it threatens to become the focus of a trial to the detriment of absent class members. *See generally Luczak v. Nat'l Beverage Corp.*, 548 F. Supp. 3d 1256, 1265-66 (S.D. Fla. 2021).

The wide variation in browsers, devices, privacy tools, and settings across the putative class—each affecting what information, if any, was transmitted—defeats typicality. *See Griffith v. TikTok, Inc.*, 2024 WL 4308813, at *8 (C.D. Cal. Sept. 9, 2024) (holding that merely showing a plaintiff fits the class is insufficient without evidence of how class members' internet activity and collected data vary and compare).

## V. PLAINTIFF FAILS TO SHOW SUPERIORITY OR MANAGEABILITY.

"The superiority requirement includes consideration of the likely difficulties in managing a class action.'" *Tershakovec v. Ford Motor Co., Inc.*, 79 F.4th 1299, 1316 (11th Cir. 2023). The Court must consider "the fourth Rule 23(b)(3) factor—the likely difficulties in managing a class action…." *Vega*, 564 F.3d at 1278. And where any trial would require the "presentation of a substantial amount of evidence specific to each of an unknown number of class members," courts may find the superiority

requirement is not met. *See, e.g.*, *id*.

Both Krause and Shafiq make clear that their opinions and valuations are dependent on all the Device Information and patient status being transmitted for each class member. If this Court were to certify any class now, the attempt to determine later who had their Device Information (and what Device Information) and patient status intercepted and transmitted so as to allow for any award of damages would make the case unmanageable. There would need to be mini-trials as to each putative class member. *See supra* Argument Pt. III. Self-reporting is not a solution. For instance, Plaintiff did not remember submitting her Appointment Request Form at issue or if she ever used adblockers. WW Tr., Ex. A at Ex. 5 pg. 117:6-12, 194:7-9. *See also In re Hulu Privacy Litig.*, 2014 WL 2758598, at *16 (N.D. Cal. June 17, 2014) (self-reporting not reliable method to answer individualized questions in data privacy class action). Plaintiff bears the burden to show the manageability of individualized issues and failed to "propose a trial plan that would feasibl[y] address them." *Vega*, 564 F.3d at 1278.

## VI. PLAINTIFF'S NATIONWIDE CLASS CANNOT BE CERTIFIED AS TO THE FSCA CLAIM AND THE COMMON LAW CLAIMS.

When proposing a nationwide class, "it falls to the plaintiff to demonstrate the homogeneity of different states' laws, or at least to show that any variation they contain is manageable." *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.,* 601 F.3d 1159, 1180 (11th Cir. 2010). The Court must consider which law applies to putative class members, not just the named plaintiff. *See id.* Differences in state law may defeat predominance and superiority requirements of Rule 23. *Gelfound v. Metlife*

*Ins. Co. of Connecticut*, 313 F.R.D. 674, 676 (S.D. Fla. 2016). "The Eleventh Circuit has explained that…it is the court's duty to determine whether the plaintiffs have borne their burden where a class will involve multiple jurisdictions and variations in state law." *Birmingham v. RoFx.net*, 2023 WL 3378177, at *4 (S.D. Fla. May 11, 2023).

For the nationwide class, claims of non-Florida residents may be governed by another state's laws. *See In re Photochromic Lens Antitrust Litig.*, 2011 WL 13141933, at *3 (M.D. Fla. Oct. 26, 2011) (for tort claims, typically the place where injury occurred governs); *Trumpet Vine Invs., N.V. v. Union Capital Partners I, Inc.*, 92 F.3d 1110, 1119 (11th Cir. 1996) ("[T]he law of the place where the contract is made" governs).

Plaintiff has not addressed which state laws would govern the common law claims of non-Florida residents. Consequently, Plaintiff has failed to meet her burden to show homogeneity across the various state laws at issue or that any variations do not defeat predominance and manageability. *Birmingham*, 2023 WL 3378177 at *4 (denying class certification for failure to address state law differences on common law claims like unjust enrichment). Nor can Plaintiff show her claims are typical of the claims of non-Florida residents, defeating typicality as to the nationwide class. *See In re Panacryl Sutures Prods. Liab. Cases*, 263 F.R.D. 312, 322 (E.D.N.C. 2009) (no typicality where "Plaintiffs have not shown that the prospective class representatives' claims will take into account the substantive laws governing every class member").

Further, Plaintiff's proposed nationwide class cannot be certified as to the FSCA claim. If an interception did not occur in Florida, a plaintiff must be a Florida resident to bring an FSCA claim. *Cohen Bros., LLC v. ME Corp., S.A.*, 872 So. 2d 321,

324 (Fla. 3d DCA 2004). An interception is deemed to occur "where the words or the communication is uttered, not where it is recorded or heard." *Id.* Whether a non-resident of Florida can bring an FSCA claim requires determining where they were located when accessing the Website. This is, likely, not Florida (Shafiq Tr., Ex. A at Ex. 3 pg. 157:2-17 (asserting any interception occurred in a person's browser)). The proposed nationwide class cannot be certified as to the common law claims and the FSCA claim.

## VII. Plaintiff is Not Adequate to Serve as Class Representative.

"Among the prerequisites to the maintenance of a class action is the requirement of Rule 23(a)(4) that the class representatives will fairly and adequately protect the interests of the class." *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1253 (11th Cir. 2003).

Whether due to illness, disinterest, or other priorities, Plaintiff has demonstrated an unwillingness or inability (or both) to participate fully in this action by fluctuating on whether to continue serving as a class representative: advising her counsel just days after filing the Motion and signing a Declaration that she did not want to proceed as the class representative, initially refusing to sit for a deposition after filing the Motion, and instructing her counsel to "never contact her again." Brady Decl. ¶7. Plaintiff ultimately agreed to sit for deposition and stay in this case – at least for now.

Plaintiff's actions call into question if she will adequately prosecute the action. The events of the last several months and counsel's attempts to find another plaintiff

indicate she may withdraw from this case following class certification.[13] Plaintiff's decision to abandon the litigation at a critical juncture raises serious concerns about her ability to fulfill the fiduciary obligations of a class representative. If Plaintiff cannot be relied upon to see this case through, the Court will face the need to decertify any class for lack of an adequate representative. Should Plaintiff's counsel attempt to substitute a new representative after any certification, that process will introduce delays and collateral disputes regarding the propriety of substitution—delays that prejudice both Orlando Health and absent class members. Plaintiff's actions create a substantial risk that the interests of absent class members will be compromised by unnecessary delays and litigation on non-merits issues.

## VIII. THE PROPOSED CLASS DEFINITIONS ARE OVERBROAD.

Plaintiff's proposed classes improperly include individuals whose claims would be time-barred under the statute of limitations for both the statutory and common-law claims. The statute of limitations for ECPA and FSCA claims is two years. 18 U.S.C. § 2520(e); Fla. Stat. § 934.10(3). Plaintiff's common law claims have a four-year statute of limitations period. Fla. Stat. § 95.11(3)(j) (breach of implied contract and unjust enrichment); Fla. Stat. § 95.11(3)(o) (catch-all for breach of confidence).

Plaintiff filed this action on June 10, 2024. ECF No. 1. The statutory claims can only extend back to June 10, 2022, short of application of the discovery rule codified

[13] Plaintiff's counsel had stated that they were searching for additional plaintiffs and would seek leave to amend their complaint to add additional plaintiffs. Brady Decl., ¶¶7, 10, 12. This seriously calls into question Plaintiff's adequacy. This Court should not condone any attempt to certify a class with Plaintiff as the only class representative and then allow a substitution if and after a class is certified.

in the FSCA and ECPA, which must be analyzed on an individual basis.[14] The statute of limitations on the common law claims bars any claims that accrued prior to June 10, 2020. But Plaintiff's proposed classes extend back to April 26, 2018, without any explanation to support this class period.[15] This class period cannot be maintained because it includes individuals whose claims would be time-barred or against whom Orlando Health has a statute of limitations defense. *See generally Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273, 309 (S.D. Ala. 2006) (individualized assessment of the statute of limitations may cause individual considerations to predominate).

While Orlando Health contends that no class can be certified in this action, this Court should, at a minimum, modify the class definition to address the statute of limitations period for the claims alleged. *See Lyttle v. Trulieve, Inc.*, 2021 WL 3602996, at *12 (M.D. Fla. Aug. 13, 2021) (modifying class period to avoid individualized inquiries on statute of limitations defenses).

## **CONCLUSION**

For the reasons set forth above, this action is not suitable for class treatment under Federal Rule of Civil Procedure 23. The Court should deny the Motion.

---

[14] Plaintiff's claim accrued more than two years before she filed this action. Barring application of the discovery rule and a determination that she did not have knowledge of the use of the technologies prior to June 10, 2022, her ECPA and FSCA claims are time-barred. In any event, application of the discovery rule defeats predominance because determining the "date upon which the claimant first has a reasonable opportunity to discovery the violation" involves individual inquiries as to a person's knowledge and circumstances. § 934.10, Fla. Stat.; 18 U.S.C. § 2520 (same).

[15] Presumably, the modified class period correlates to the time the Pixel was on the Website, but Plaintiff has failed to offer any reason or make any argument why the statute of limitations period extends to six years before this action was filed. It is too late for Plaintiff to do so now. *See, e.g.*, *Martinez v. D2C, LLC*, 2024 WL 4367406 at *9 (S.D. Fla. Oct. 1, 2024).

Dated: January 16, 2026.

*/s/ Julie Singer Brady*

Julie Singer Brady
Florida Bar No. 389315
jsingerbrady@bakerlaw.com
Yameel L. Mercado Robles
Florida Bar No. 1003897
ymercadorobles@bakerlaw.com
BAKER & HOSTETLER LLP
200 South Orange Avenue, Suite 2300
Orlando, FL 32801
Telephone: 407.649.4000
Facsimile: 407.841.0168

*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 16, 2026, I electronically filed the foregoing document with the Clerk of the Court by using the Florida E-Filing Portal, which will send a Notice of Electronic Filing to all counsel of record.

*/s/ Julie Singer Brady*
Julie Singer Brady